[No. S035368. July 30, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
ENRIQUE ZAMBRANO, Defendant and Appellant.

**C**OUNSEL

Robert R. Bryan, under appointment by the Supreme Court; Law Offices of Robert R. Bryan, Pamala Sayasane and Jill Culbert for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Ronald S. Matthias and Martin S. Kaye, Deputy Attorneys General, for Plaintiff and Respondent.

**O**PINION

**BAXTER, J.**—An information charged defendant with three 1988 crimes, the attempted murders of Robert and Barbara Mishell (Pen. Code, §§ 21a, 187),[1] and the first degree murder of Luis Reyna (§§ 187, 189). As to the attempted murders, it was alleged that defendant inflicted great bodily injury (§§ 1203.075, 12022.7) and used a dangerous and deadly weapon (§ 12022, subd. (b)). As to the murder, the information alleged a special circumstance of witness killing (§ 190.2, subd. (a)(10)) and included further allegations that defendant inflicted great bodily injury (§ 1203.075) and committed the offense while free on bail (§ 12022.1).

The prosecution's evidence indicated that defendant, a member of the Berkeley Waterfront Commission, bludgeoned the Mishells, a University of California professor and his wife, because he believed they had made anonymous telephone calls exposing his extramarital affair. The evidence further indicated that defendant then fatally shot Reyna, a fellow waterfront commissioner, to prevent Reyna from testifying against him in the Mishell matter.

Defendant admitted attacking the Mishells, but claimed provocation. He asserted that Reyna's death was an accident. Defendant admitted that, to

---

[1] All further unlabeled statutory references are to the Penal Code.

cover up the homicide, he decapitated, dismembered, and scattered Reyna's body, then fled to Mexico with his girlfriend.

The jury convicted defendant of all charges and found true all the additional allegations in the information. After hearing aggravating and mitigating evidence at the penalty phase, the jury returned a death verdict, which the trial court declined to modify. This appeal is automatic. We will affirm the judgment in full.

## I. FACTS

### A. *Guilt evidence*

#### 1. *The Mishell assaults and their aftermath*

On January 31, 1988, Robert Mishell (Robert), an immunology professor at the University of California in Berkeley and his wife Barbara, a high-ranking technician who managed Robert's laboratory, were brutally bludgeoned in their Berkeley home. Robert sustained two depressed skull fractures and 12 head lacerations. His injuries were life-threatening, but he largely recovered, though he suffered memory problems, could not continue teaching, and took a disability retirement. He suffered from posttraumatic amnesia and did not remember everything that occurred before the assault.

Barbara received six distinct blows to the head, resulting in compound skull fractures and brain damage. Her injuries rendered her severely and permanently disabled. At the time of trial, as a result of the damage to her brain, she remained behaviorally erratic, and she still could not speak.

The trial evidence, including defendant's own testimony, conclusively established defendant as the perpetrator of the assaults. The prosecution's evidence was as follows:

Defendant, a contractor, had done remodeling work on the Mishells' home. Robert and defendant shared an interest in computers, but the Mishells had no other social relationship with defendant. They knew nothing of his personal life.

In July 1987, defendant, a married man, began an affair with Celebration Oberman. In September 1987, defendant, members of his family, and Oberman began receiving anonymous telephone calls that exposed the affair. Defendant was upset by the calls and suspected someone was trying to break up his marriage. Nonetheless, he continued to see Oberman.

Defendant told Luis Reyna, a fellow member of the Berkeley Waterfront Commission, about the calls. Among others, defendant said, he suspected a Berkeley professor's wife who, he claimed, was in love with him. Ultimately,

defendant indicated that a private investigator had traced the calls to this couple. Reyna advised defendant to take his information to the authorities. More than once, however, defendant said he would handle the matter "his way."

On Sunday morning, January 31, 1988, around 11:00 a.m., defendant appeared unexpectedly at the Mishell residence. He and Robert chatted on the pool deck, where Barbara joined them. All three then went inside, drank coffee, and talked politics. At some point, Robert took defendant into the dining room to demonstrate his new computer. At trial, Robert recalled that defendant was standing behind him, next to a toolbox he had brought with him.

The next thing Robert remembered was waking up in bed several hours later. His head was bleeding. He looked for his wife. He found her on the kitchen floor, bleeding, unconscious, and unresponsive. He called the police.

Berkeley Police Officer Emberton arrived within minutes after Robert's call. Robert was dazed and bleeding, but able to speak. Barbara was unconscious on the kitchen floor, with coagulated blood all around. Robert recounted to Emberton his recollection of the events leading to his injuries, but did not mention that defendant had a utility belt or toolbox with him.

The house showed no signs of forced entry. Defendant's fingerprints were found on a half-full coffee mug in the kitchen, and on a book in the kitchen or dining room. Robert had purchased the book the day before.

Officers went to defendant's home on the night of January 31. When they told him they were investigating an assault against the Mishells, he left the room to make a telephone call. Upon his return, he said his lawyer had advised him not to speak. He spoke nonetheless, claiming he had not been at the Mishell home in two weeks. Asked to name a possible suspect, defendant mentioned another contractor to whom, defendant said, the Mishells owed a lot of money.

Asked to recount his movements for the day, defendant said that, after dropping off his daughter at 11:00 a.m., he went to the Berkeley Marina around 11:30 and spoke to Dave Shelley, who was working there. Then, defendant said, he went to Reyna's home to watch the Super Bowl. Defendant described the clothes he was wearing, and specifically mentioned athletic shoes.

Defendant did arrive at the Berkeley Marina sometime between 11:30 a.m. and 12:30 p.m. on January 31. According to Shelley, defendant stayed about

45 minutes. He made a telephone call and wrote a note to Chuck Roberts, the Berkeley Waterfront Commission's secretary, about an agenda item. The note included a notation of the ostensible time it was written—noon. Defendant later called and asked Shelley to make a copy of the note and send it to him. Shelley did so.

Roberts found the note when he came to work the next day. According to Roberts, defendant had written him notes before, but had never included the time. Given the note's subject matter, there was no reason to do so in this case.

Defendant arrived at Reyna's home about 1:00 p.m. on January 31, freshly groomed and wearing boots. Defendant volunteered that he had dropped off his daughter, then gone to his boat at the marina, and to the marina office. Reyna thought it odd that defendant wore boots on his boat. Defendant did not stay to watch the Super Bowl, but left after about 20 minutes.

On February 2, Reyna saw a newspaper article about the Mishell assault. Realizing that defendant had worked on the Mishells' home, Reyna contacted defendant and told him about the article. Defendant said he did not want to talk, but that his problem was solved.

On February 3, defendant asked Reyna to come to his house. Despite his reservations, Reyna went. Defendant took Reyna onto the deck, saying the police had just been there to search, and he did not want to speak inside. Defendant told Reyna the following: He had gone to the Mishells' home on January 31 to confront them about the harassing telephone calls. They laughed at his accusations and said he could do nothing about it. He then picked up something and beat the Mishells over the head. He took the unidentified weapon with him and discarded it where it would never be found.

When Reyna said that the Mishells could identify him, defendant responded that they never saw or knew who attacked them. Defendant asked Reyna to falsely tell the police defendant had telephoned him at 9:00 a.m. on January 31. That evening, at a commission meeting, defendant again made this request, explaining that the police believed the assaults had occurred before 11:30 a.m.

To Reyna, defendant never expressed remorse or regret about the Mishell assaults. Defendant said he was only sorry he was caught with another woman, and was just protecting his family.

Reyna did not immediately advise the authorities that defendant had confessed to him. Moreover, he initially did comply with defendant's request

that he lie to the police about when defendant called him on January 31. Members of Reyna's family testified that he was fearful, distraught, confused, and in turmoil about whether he should tell what he knew.

Ultimately, on April 5, 1988, Reyna gave a taped statement to the police. Defendant was arrested two days later. Thereafter, defendant wrote Reyna letters from jail, urging Reyna to lie for defendant about the Mishell assaults, and to recant his police statement.

Defendant enlisted Oberman in efforts to persuade his own defense team of his innocence. At defendant's request, Oberman falsely told a defense investigator she met defendant at the Berkeley Marina at 11:00 a.m. on January 31. She gave the investigator additional false information, supplied by defendant, that Reyna was angry with defendant over a debt, and thus had a motive to fabricate defendant's confession. Oberman also told the investigator, again falsely, that she was hiding under defendant's deck on February 3, when defendant supposedly told Reyna he had assaulted the Mishells.

The surgeons who operated, respectively, on Robert and Barbara after the assaults both testified that the victims' head injuries were inflicted by a blunt instrument like the head of a hammer.

### 2. *The murder of Luis Reyna and its aftermath*

On July 15, 1988, defendant made bail in the Mishell assault case, and he was released from custody. On the morning of July 18, Reyna left his home for a meeting with defendant and was never again seen alive. On July 26, Reyna's decapitated and dismembered body was found in an isolated location near the Lafayette Reservoir.

Overwhelming evidence linked defendant to Reyna's death. Reyna's sister Yolanda testified that, on the evening before his disappearance, Reyna received a call from defendant. During the call, she overheard Reyna say he was not afraid of defendant and intended to tell the truth.

The next morning, after calling work to say he would be late, Reyna told his mother he was going to meet defendant around the corner. Reyna, who did not own a gun, then departed, leaving behind his wallet, car keys, and automobile. He never returned. His family contacted the police.

Around 4:00 p.m. on July 19, defendant's truck was found at a Bay Area Rapid Transit station, its interior bloodstained and its bench seat missing. Water residue in the truck's interior indicated it had been hosed or washed out. Oberman had seen the bench seat in the truck the previous afternoon.

On July 20, while they were riding together, defendant handed Oberman a gun and told her to throw it in a sewer. She did so. On July 21, after making financial arrangements for an extended absence, the couple flew to San Diego and entered Mexico.

Meanwhile, on July 19, a hiker in the Lafayette hills came upon a human hand. On July 26, an unclothed human torso, missing head and hands, was found at a separate Lafayette hills location. The torso was positively identified as Reyna's, and the severed hand perfectly matched the torso's handless left arm. On July 28, items of clothing, an ax, and a saw were found near where the body had lain. A witness who had done construction work with defendant identified the ax, a somewhat rare type, as defendant's.

An autopsy indicated that Reyna had been dead for several days before his body was found. Except for the decapitation and dismemberment, the body showed no external or internal signs of human-inflicted trauma. A cause of death could not be determined. Forensic experts opined that the head and hands had been severed by sharp, incisive blows, and that damage to certain of the severed bones was consistent with the use of a saw.

In March 1989, a skull, positively identified as Reyna's, was found near where the body had been discovered. Four years later, Dr. Herrmann, a pathologist, examined the skull. He opined that the severed neck vertebrae had been cut either by a sharp object, or more likely, based on small ridges in the bone, by a saw. Though missing its lower jaw, the skull showed no other sign of trauma, such as a gunshot wound.

After July 1988, defendant and Oberman stayed in various locations in Mexico. They obtained false identification papers. In September 1988, they bought a residence in Mexico. Thereafter, Oberman returned to California. She worked in La Jolla and Palm Springs to earn money for their mutual support.

In February 1989, while on a surprise visit to Mexico, Oberman argued with defendant over his affair with another woman. During the argument, defendant confessed he had killed Reyna, and was not sorry. Defendant recounted the following: He picked Reyna up in his truck on the morning of July 18, 1988, and drove Reyna to a park in the hills. Reyna again told defendant he would not recant his police statement in the Mishell case. Reyna also called Oberman a whore. Defendant retrieved a gun from the toolbox in the rear of the vehicle and shot Reyna, who was sitting in the passenger seat, in the temple.

In March 1989, Oberman returned to Palm Springs. At her insistence, defendant followed. On September 11, 1989, FBI agents arrested him there

while he was driving with Oberman. Upon his arrest, defendant said to Oberman, "don't tell them anything."

In a letter to Oberman from jail, postmarked July 6, 1992, defendant said he would tell her, under separate cover, what he "expect[ed] [her] to remember" if she was called as a trial witness. A second letter, postmarked the same date, set forth a version of Reyna's death in which Reyna pulled a gun, which went off during a struggle, inflicting a fatal head wound on Reyna. The letter recited that defendant had dumped Reyna's body because both he and Oberman assumed the police would never believe him, and he needed time to consult with his lawyer. According to the letter, defendant fled the country to forestall civil suits and because of death threats from the Reyna family. Defendant wrote further that he hoped to avoid a harsh sentence in the Mishell case by claiming provocation.

At trial, Oberman insisted the letter's recitations about Reyna's death were false. She testified she had never discussed this version of events with defendant, or heard of it, until she received the letter.

### 3. *Defense case*

Defendant testified in his own behalf. He admitted bludgeoning the Mishells, inflicting multiple blows on each. Defendant stated that he lost control when the Mishells admitted, but laughed at, his accusations that they were behind the anonymous telephone calls exposing his affair. He said he picked up a meat tenderizer in the Mishells' kitchen, used it as his weapon, then threw it, weighted, into San Francisco Bay. Defendant acknowledged he lied to the police about the incident, sought to construct an alibi, confessed to Reyna, then pressured Reyna to recant the statement Reyna had given to the police.

Defendant further conceded that he called Reyna on the evening of July 17, 1988, that he met with Reyna on the morning of July 18, that Reyna died in his presence that day, and that he then dismembered Reyna's body. But defendant denied murdering Reyna. Defendant claimed the following: The men drove in defendant's truck to a waterfront park in Richmond. During a tense conversation, defendant walked around to the passenger door and opened it. Reyna, who seemed somewhat intoxicated, was pointing a gun at him. They struggled, and the weapon discharged.

According to defendant, he checked Reyna for signs of life and found none, though he saw no blood, wound, or visible sign of the bullet's trajectory. After driving around for several hours, trying to decide what to do, he disposed of Reyna's gun in Walnut Creek, then drove to the Lafayette

hills, where he dismembered Reyna's body, using a hacksaw not in evidence, and scattered the remains. He rinsed the truck, inside and out, at a carwash, then discarded other items of evidence, including the truck's bench seat. He did these things, he said, because he thought nobody would believe him, and he needed time to consult his attorneys.

After meeting with his lawyers on July 20, defendant said, he decided to flee because of death threats from Reyna's family, potential civil lawsuits, and the fear he would be denied bail on homicide charges. Defendant denied telling Oberman the details of his encounter with Reyna, and he insisted he never told her he murdered Reyna.

Defendant also insisted he had no reason to fear, and thus to kill, Reyna as a potential witness against him in the Mishell assault case. According to defendant, his attorney had advised him that, in an interview with a defense investigator, Reyna had recanted his earlier statement to the police, and his credibility could thus be destroyed on the stand. (See discussion, *post.*) Also, defendant suggested, Reyna was vulnerable because he had confided to defendant that he was homosexual, a fact he did not wish even his family to know.

The defense presented witnesses to challenge Robert Mishell's memory, particularly with respect to Robert's trial recollection that defendant arrived at the Mishell residence carrying a toolbox (and was thus perhaps already armed with the weapon used in the assault). The defense attacked the credibility of Reyna family witnesses, including Reyna's sister Yolanda, by presenting evidence of their extreme hostility to defendant and their dissatisfaction with police handling of the case. The defense attacked Oberman's credibility through the testimony of Sue Ann Van Epps, Oberman's former friend and business partner. Van Epps asserted that Oberman was motivated by money and attention, had engineered the flight to Mexico because of death threats from the Reyna family, and had suggested she and Van Epps collaborate on a book about Oberman's experiences in Mexico.

Finally, the defense sought to undermine Reyna's credibility and importance as a witness in the Mishell case, in order to suggest defendant had no motive to kill Reyna. Detective Gustafson testified that, although Reyna was a confidential informant in two earlier search warrants for defendant's property, Reyna's April 5, 1988, revelation that defendant had confessed to him added only details to what the police already knew about the Mishell assaults. Gustafson also said Reyna was reluctant to come forward because he doubted the veracity of defendant's claim and was wrestling with his loyalty to defendant.

Chuck Roberts testified that Reyna had also revealed defendant's confession to him, but was reluctant to go to the police because of his friendship for defendant and because defendant had told him things in the past that were not true.

Defense investigator George Cramer testified that, in an April 13, 1988, interview, which occurred subsequent to Reyna's taped police statement, Reyna recanted, saying that the police had taken his statement out of context, and that he did not believe defendant's confession was serious. According to Cramer, Reyna wanted to help defendant by telling the police everything he knew. Cramer said that he, defense counsel, and Reyna tried to speak with the prosecutor after April 13, but she refused to see them.

### B. *Penalty evidence*

#### 1. *Prosecution evidence*

The prosecution presented three penalty phase witnesses. Yolanda Reyna, the murder victim's sister, and Helen Reyna, his mother, testified about the effect of his death on them. Alexandra M., defendant's niece by marriage, recounted defendant's sexual assault on her.

Alexandra testified as follows:

She spent the summer of 1982, when she was 15 years old, with defendant's family. He contrived to drive her to the airport alone for her flight home. On the way, he asked her personal questions of a sexual nature. He parked in a deserted airport lot and enticed her into the rear of his van, where he kissed her and forced her head down onto his penis. When she bit him, he slapped her and stuffed a bandanna into her mouth. Restraining her arms, he then raped and sodomized her, ejaculating in her anus. He threatened to kill her and her family if she told anyone. He also told her she had enjoyed the experience. Though hysterical, she accepted the comment, because she knew no better.

On the flight home, she wrote a letter, never mailed, to her friend Margaret Yen, in which she said she enjoyed the encounter and mentioned no force or threats, but expressed shame that the incident had occurred. She did not tell her mother until, three months later, she discovered she was pregnant. She did not report the incident to police because she was afraid of the effect on her grandparents. By 1988, she had still told only Yen, her therapist, and other close friends and family members. In 1988, she told FBI agents who came to her home in connection with defendant's status as a wanted fugitive.

### 2. *Defense evidence*

Margaret Yen testified that when Alexandra M. returned home from California in 1982, she told Yen she had consensual sex with her uncle in a car at the airport. On the other hand, Yen stated that several months later, when Alexandra was upset over her parents' breakup, she told Yen she felt unloved and worthless, and had even been forced by her uncle to have oral sex.

A number of witnesses testified to defendant's positive qualities and contributions, including his involvement in community affairs, charm, sense of humor, diligence, intelligence, computer knowledge, helpfulness, concern for family, trustworthiness, and concern for human equality. His efforts to tutor fellow inmates while he was in jail awaiting trial were noted. But some witnesses admitted he had a temper, could be hard on others, and was capable of anything. And some conceded there was much about defendant they did not know, and that the trial had altered their opinions of his honesty. There was evidence that defendant held a contractor's license with no record of disciplinary action.

No member of defendant's family testified in his behalf. The defense presented evidence that his parents were deceased, and that he had asked that his children not be involved in the trial so as to spare them further pain.

Based solely on his review of defendant's jail records, Jiro Enomoto, a former Director of the Department of Corrections, testified that, if incarcerated, defendant would be assigned to high-security housing, and could be a constructive person. Enomoto conceded the security level of defendant's housing could change in the future. He insisted that defendant's numerous county jail incident reports were minor and not a cause for serious concern, though he admitted they were troubling.

## II. DISCUSSION

### A. *Jury selection issues*

#### 1. Wheeler/Batson *claim*

Sixty-eight members of the venire, including nine members who identified themselves as African-Americans, survived challenges for cause. Thirty-nine of these qualified prospective jurors were called into the jury box to face peremptory challenges.

Selection of both regular and alternate jurors was completed on Thursday, March 11, 1993. The remaining venire was excused, but the empaneled jurors

were not formally sworn. They were instructed to return for trial the following Monday morning, March 15, 1993. On that morning, defendant filed a written "Motion to Reinstate Improperly Challenged Jurors, Or, Alternatively, to Dismiss Empaneled Jurors and Quash Remaining Venire." The motion alleged violations of *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] (*Wheeler*) and *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712] (*Batson*), in that the prosecutor had employed peremptory challenges for the purpose of excluding African-Americans from the petit jury.

Specifically, the motion asserted, the prosecutor had used five of the 15 peremptory challenges he exercised to excuse Prospective Jurors Altie T., Gregory S., James B., Debria W., and June W.—every one of the identified African-Americans called into the jury box—such that the regular jury as empaneled had no African-American members. The motion conceded that the four alternate jurors included an African-American.

Opening statements were deferred, the jurors were sent home, and the motion was argued on March 15 and 16, 1993. Defense counsel insisted, as in the written motion, that the prosecutor's use of five of 15 peremptory challenges to excuse all African-Americans from the final jury established a prima facie case of discriminatory intent. Observing that the prosecutor's voir dire had centered around death qualification, counsel argued that the disputed prospective jurors had expressed no extreme views on that issue, either orally or in their questionnaires.

The prosecutor responded that the defense's statistical argument was misleading because of the small sample size, and that his questioning of the disputed prospective jurors demonstrated no intent to exclude them on the basis of their race. He indicated that this was all he had to say on "the prima facie issue," but if the court wished, he would discuss his individual reasons for excusing each disputed juror. Without ruling on whether a prima facie case had been made, the court said, "I think you might as well."

The prosecutor first conceded that all the excused jurors were theoretically death-qualified, but pointed out that he had to make a "more subtle judgment" whether these individuals could actually impose the death penalty. As to Altie T., the prosecutor observed that he "does not believe in the death penalty. Yes, he said he could work with it, but in my judgment someone that does not believe in the death penalty will not give it the same consideration and is not as likely to vote for the death penalty as someone who is in favor of it or is at least neutral."

The prosecutor said he excused Gregory S., not because of his death penalty views, but because he indicated in voir dire that he "had been the

victim of circumstantial evidence in a case when it seemed that he was guilty but, in fact he was not." Because the instant case was largely based on circumstantial evidence, the prosecutor explained, Gregory S. did not seem a suitable prosecution juror.

James B., the prosecutor noted, would probably be a suitable juror in a noncapital case. However, the prosecutor observed, "my notes indicate [James B.] said that he would have a difficult time voting for the death penalty because of religious convictions," and "that his wife was extremely opposed to the death penalty."

Debria W. had been excused, the prosecutor explained, because she said that "maybe" she could impose the death penalty, but it should not be used "except as a last resort and unless she was absolutely sure." This persuaded the prosecutor she would not evaluate death "even-handed[ly]" against life without parole, and thus was not a suitable juror.

June W., said the prosecutor, had "repeated many, many times that she could be fair," but he could not get a sense, from her answers, about her death penalty attitudes. Moreover, he indicated, "there was also a question or two that was asked that she did not understand, and she answered incorrectly based on her understanding, and it was my feeling [that] while she was a very nice woman, an older lady, that I did not believe that she would in the end be able to vote for the death penalty."

Ruling on the motion, the trial court first stated it "[did] not feel the manner in which the peremptory challenges were used created an inference that the prosecutor had a discriminatory motive. Therefore, I do not think there has been made a prima facie case."

The court further indicated that "I remember these particular people. I reviewed my notes; and, frankly, I feel that [the prosecutor] has given a satisfactory reason with reference to these particular people. They were— They were at best neutral to the death penalty. And if I were a prosecutor, I'd want people more in favor of it. [¶] Many of them did say only in the last resort could they do it or if they're absolutely sure, which is not the burden of proof. [¶] One juror, [Altie T.], said he did not believe in it. [¶] [Gregory S.] again is worried about circumstantial evidence. [¶] [Debria W.] is concerned about the absolute certainty, which kind of bothered me. [¶] [James B.] indicated it would be difficult to apply. [¶] Now, forgetting their color for a moment, any prosecutor would knock those people off. [¶] [June W.] was rather equivocal. I'm not so sure whether that's her personality or that is in response to the questions. [¶] But in my opinion, there's a valid basis for . . . the exercise of a peremptory, and I don't feel it was based on any type of discriminatory motive. [¶] So, . . . I will deny your motion."

 On appeal, defendant renews his *Wheeler/Batson* challenge. The applicable law is well settled. "[Under *Wheeler*,] [a] prosecutor's use of peremptory challenges to strike prospective jurors on the basis of group bias—that is, bias against 'members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds'—violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the state Constitution. [Citations.] [Under *Batson*,] [s]uch a practice also violates the defendant's right to equal protection under the Fourteenth Amendment. [Citations.]

"The United States Supreme Court has recently reaffirmed that *Batson* states the procedure and standard trial courts should use when handling motions challenging peremptory strikes. 'First, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." [Citations.] Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes. [Citations.] Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination." [Citation.]' " (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1008–1009 [47 Cal.Rptr.3d 467, 140 P.3d 775] (*Lewis and Oliver*), quoting *Johnson v. California* (2005) 545 U.S. 162, 168 [162 L.Ed.2d 129, 125 S.Ct. 2410].)

"We review the trial court's ruling on purposeful racial discrimination for substantial evidence. [Citation.] It is presumed that the prosecutor uses peremptory challenges in a constitutional manner. We defer to the court's ability to distinguish 'bona fide reasons from sham excuses.' [Citation.] As long as the court makes 'a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal.' " (*Lewis and Oliver, supra*, 39 Cal.4th 970, 1009.)[2]

As noted above, the trial court, after expressly reserving its decision whether a prima facie case had been established, accepted the prosecutor's offer to state his reasons for excusing individual prospective jurors. Having heard the prosecutor's justifications, the court ruled that his actions gave rise to no "inference" of discriminatory motive, and that a prima facie case had

---

[2] The trial court expressed concern that the *Wheeler/Batson* motion was untimely because no challenge to the prosecutor's use of peremptory challenges was made until after a final jury had been accepted even though, in accordance with the court's usual practice, the jurors had not yet been sworn. The People make no such argument on appeal, and we do not address the point. (See *People v. Roldan* (2005) 35 Cal.4th 646, 701 [27 Cal.Rptr.3d 360, 110 P.3d 289] (*Roldan*); compare *People v. Thompson* (1990) 50 Cal.3d 134, 179 [266 Cal.Rptr. 309, 785 P.2d 857] with *People v. McDermott* (2002) 28 Cal.4th 946, 949 [123 Cal.Rptr.2d 654, 51 P.3d 874] (*McDermott*).)

thus not been established. After comparing its own recollections with the prosecutor's stated grounds for the challenged excusals, the court further concluded that the prosecutor had given "satisfactory reason[s]" for their dismissal. Under these circumstances, the decision to hear the prosecutor's reasons did not imply that the court had found a prima facie case, nor did it moot the court's later contrary determination. (See *People v. Welch* (1999) 20 Cal.4th 701, 746 [85 Cal.Rptr.2d 203, 976 P.2d 754] (*Welch*).)[3]

However, our review of the court's finding that defendant failed to establish a prima facie case is complicated by intervening legal developments. In *Johnson v. California, supra,* 545 U.S. 162, the United States Supreme Court reversed *People v. Johnson* (2003) 30 Cal.4th 1302 [1 Cal.Rptr.3d 1, 71 P.3d 270], wherein we confirmed that the established California standard by which the opponent of juror strikes must demonstrate, prima facie, a *Wheeler/Batson* violation—even if sometimes previously expressed as a " 'reasonable inference' "—was to show that purposeful discrimination was "more likely than not." (*People v. Johnson, supra,* at pp. 1312–1318.) The high court made clear that this standard is too demanding for federal constitutional purposes. Under *Batson,* the court said, the prima facie burden is simply to "produc[e] evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." (*Johnson v. California, supra,* 545 U.S. 162, 170.)

Despite the instant trial court's use of "inference" in its prima facie ruling, that word had sometimes been employed in California as shorthand for the "more likely than not" standard. (See discussion, *ante.*) Hence, we cannot be sure the court understood the term in the sense later established by *Johnson v. California.* Accordingly, we cannot simply defer to the trial court's prima facie ruling. To uphold it, we would have to be satisfied, from our independent review of the record, that defendant produced insufficient evidence at the outset to permit an inference of discrimination. (E.g., *Bell, supra,* 40 Cal.4th 582, 597; *People v. Avila* (2006) 38 Cal.4th 491, 554 [43 Cal.Rptr.3d 1, 133 P.3d 1076].)

---

[3] Even where the trial court has not found a prima facie case of discrimination, which would require the prosecutor to state reasons for the challenged excusals, it is helpful, for purposes of appellate review, to have the prosecutor's explanation. We therefore encourage court and counsel in all *Wheeler/Batson* proceedings to make a full record on the issue. We stress, however, that the prosecutor is not *obliged* to state his reasons before the court has found a prima facie case. Until that time, the defendant carries the sole burden to establish an inference of discrimination. At this early stage, the prosecutor is not compelled to provide information which the defendant might then employ to argue the existence of a prima facie case. (Cf. *People v. Bell* (2007) 40 Cal.4th 582, 597 [54 Cal.Rptr.3d 453, 151 P.3d 292] (*Bell*).) Moreover, the prosecutor's voluntary decision to state reasons in advance of a prima facie ruling does not constitute an admission or concession that a prima facie case exists.

In the alternative, we may assume, without deciding, that defendant did satisfy the first, or prima facie, step of *Batson* and *Wheeler* by pointing to the prosecutor's use of five of 15 peremptory challenges to excuse from the regular jury the only African-Americans called to the box. (See, e.g., *Wheeler, supra,* 22 Cal.3d 258, 280.) Because the prosecutor voluntarily explained his dismissals, we may then proceed directly to the second and third steps of the *Wheeler/Batson* analysis. (*Lewis and Oliver, supra,* 39 Cal.4th 970, 1010; *People v. Ward* (2005) 36 Cal.4th 186, 200–201 [30 Cal.Rptr.3d 464, 114 P.3d 717].) We do so here. We find the prosecutor's stated nondiscriminatory reasons for excusing Prospective Jurors Altie T., Gregory S., James B., Debria W., and June W. to be amply supported.

As the prosecutor indicated, when asked in the juror questionnaire to describe his general feeling about the death penalty, Altie T. responded, "I don't believe in it but I can work with it." He also indicated that he was "[m]oderately against" the death penalty and was "[n]ot sure" how he would vote if the death penalty were on the ballot.

On voir dire, Altie T. indicated quite a strong conflict between his feelings against the death penalty and his duties as a juror. While he insisted he could vote for death "if [he] had to" in an appropriate case, including one with only one murder victim who was killed as a potential witness, he made clear that he "basically [didn't] believe in the death penalty" because "I don't think a man should take another man's life. He should be punished for it, but his life shouldn't be taken." Altie T. responded affirmatively when asked whether "therefore you think it's wrong for the state to take another man's life," i.e., "that it's morally wrong to do that." As the trial court found, the prosecutor had ample reason to be skeptical of Altie T.'s willingness and ability to impose death, and to excuse him on that basis.[4]

During the voir dire of Prospective Juror Gregory S., the prosecutor explained the difference between direct evidence and indirect, or circumstantial, evidence. The prosecutor asked if Gregory S. could impose the death penalty in a case based primarily on circumstantial evidence.

Later, defense counsel inquired about Gregory S.'s disclosure on his questionnaire that he himself had been the victim of an attempted robbery in which he suffered a head injury when struck with a pipe. Counsel asked if this experience caused Gregory S. to come into court with a "vendetta or some kind of ax to grind." Gregory S. responded: "No, no, I don't mainly because I've been in a situation myself years ago where—where there's a lot

---

[4] Both in his questionnaire and on voir dire, Altie T. also disclosed he had a significant hearing problem, which sometimes might have made it difficult to hear witnesses.

of circumstantial evidence laid against me and was viewed as being guilty when I knew I wasn't and couldn't prove it, so I knew that there [are] situations where a person could seem to be guilty but [is] not. But I didn't have a situation where I could go into a court system and prove it and the whole bit. So I keep an open mind whether a person's—is thought to be guilty until—until I'm convinced." On this basis, the prosecutor could reasonably decide that Gregory S.'s personal experience, dissimilar to any disclosed by other prospective jurors, might make him reluctant to impose death, or even to convict, in a case where the murder evidence was largely circumstantial.

In his juror questionnaire, Prospective Juror James B. expressed neutrality about the death penalty. On voir dire, he continued, at first, to insist he had no feelings that would interfere with his ability to consider the death penalty fairly. But when defense counsel asked if James B. had any religious or philosophical beliefs that might affect his decisionmaking ability in a death penalty situation, he responded, "It would be very difficult for me because of my religious convictions to really give a death sentence to another human being."

Later, the prosecutor examined James B. about his prior disclosure that recent murders reported in the newspapers had led to discussions with his wife and friends about whether they could actually impose the death penalty. The prosecutor asked what opinion James B.'s wife held on that subject. James B. responded, "My wife would not be able to do it at all. She was really a very religious woman, and she could not give out a death sentence to another human being at all."

Though James B. insisted his wife's views would not influence him, the prosecutor could reasonably conclude that James B.'s own religion-based death penalty scruples, reinforced by his wife's even stronger pro-life views, would make him an unsuitable prosecution juror in a death penalty case.

In her juror questionnaire, Prospective Juror Debria W. described her philosophical opinion about the death penalty as "[n]eutral." She explained that "if the evidence [strongly] show[ed] guilt," then "maybe" the death penalty would be appropriate.

On voir dire, Debria W. displayed, and admitted, considerable nervousness, and defense counsel remarked that she seemed shy. She stated at various points that she would be open and fair, that she would consider death in a single-victim witness-killing case, and that she could impose death where the evidence of guilt was circumstantial. However, when defense counsel asked if Debria W. thought the death penalty served a purpose in society, she

responded, "Not all the time I don't feel—I don't feel like it's justified." Asked to explain, Debria W. stated, "Only when it's—when it's—that's the last resort I mean, you know, *that's it*." She volunteered that she would have to be "absolutely sure"—"gut sure"—before imposing death; "I wouldn't just say yeah, guilt and then death." On the other hand, she agreed, she would "definitely" consider life without parole as an option.

The prosecutor followed up, asking again what Debria W. meant by saying the death penalty was a "last resort." She explained that if "*all* the evidence weighed out and *everything* pointed that way on the death penalty, then that's the way I would feel." (Italics added.)

On this basis, the prosecutor could reasonably conclude that Debria W. would be inclined to impose the death penalty, if at all, only in the most extreme cases, where she believed *no evidence at all* favored life without parole. Thus, as he indicated, he could surmise that she would not weigh the penalty evidence fairly to determine whether the balance of aggravating and mitigating factors made death the appropriate penalty.

In justifying his excusal of Prospective Juror June W., the prosecutor acknowledged this prospective juror had insisted on many occasions that she could weigh the penalty options fairly based on the evidence presented in the particular case. However, the prosecutor pointed to certain "incorrect[]" and ambiguous answers that prevented him from ascertaining June W.'s death penalty attitudes, but left him with the sense that "in the end" she would not be able to vote for death.

Beyond any impressions the prosecutor may have gleaned from June W.'s personality and demeanor—factors we cannot assess on the cold record—there is support for his evaluation. In her jury questionnaire, when asked how she would vote if the death penalty were placed *on the ballot*, June W. answered that she "had not thought about it, [but that] [o]*n a jury* I could be fair in [judgment]." (Italics added.) On voir dire, defense counsel followed up on this point, asking June W. if she had thought, since filling out the questionnaire, about how she might vote "if California placed it *on the ballot* [whether] there ought to be a death penalty." She responded, "I feel that I wouldn't have a problem voting for the death penalty *if that in my opinion was the case*." (Italics added.) She then answered "[c]orrect" when defense counsel asked whether this meant she agreed the death penalty "has a legitimate place in criminal justice" and is "an option the jury should have in deciding a case."

These answers could suggest that June W. was being evasive about her *political* position on the death penalty, and thus sought, by her answers, to

redirect all such questions on that subject toward her ability to be a fair *capital juror*. However rational such a stance might be in the abstract, it could reasonably raise concerns in the prosecutor's mind whether June W. was using it, consciously or unconsciously, to mask a deeper antipathy to capital punishment. On that basis, he could decide she was a less than suitable prosecution juror.

For the first time on appeal, defendant asks us to compare the responses provided by the 12 seated regular jurors, none of whom were African-American, with those given by the excused African-American prospective jurors, and cited by the prosecutor when justifying the disputed challenges. Such a comparison, defendant insists, exposes the prosecutor's stated reasons as sham, because the seated jurors disclosed death penalty views substantially similar to those expressed by Altie T., Gregory S., James B., Debria W., and June W.

We had previously declined to engage in comparative juror analysis for the first time on appeal, deeming such analysis unreliable in evaluating the prosecutor's reasons for excusing minority prospective jurors. (E.g., *People v. Box* (2000) 23 Cal.4th 1153, 1190 [99 Cal.Rptr.2d 69, 5 P.3d 130] (*Box*); *People v. Johnson* (1989) 47 Cal.3d 1194, 1220–1221 [255 Cal.Rptr. 569, 767 P.2d 1047].) However, in *Miller-El v. Dretke* (2005) 545 U.S. 231 [162 L.Ed.2d 196, 125 S.Ct. 2317] (*Miller-El*), a federal habeas corpus case, the United States Supreme Court conducted a comparative juror analysis to examine the veracity of the prosecutor's stated race-neutral reasons for the challenged excusals, though no such analysis had been sought or performed in lower courts. The court observed that "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." (*Id.* at p. 241.)

Assuming, without deciding, that we must undertake comparative juror analysis here (*Lewis and Oliver, supra*, 39 Cal.4th 970, 1017), we conclude that such a comparison fails to indicate the prosecutor engaged in purposeful discrimination. Though they obviously did not hold extreme views, the seated jurors expressed attitudes significantly more favorable to the prosecution than the African-American prospective jurors he excused.

Thus, in his questionnaire, Juror Stewart B. indicated he believed the death penalty "is an appropriate punishment for special circumstance crimes and if the jury decides it fits the crime." He also reported he was "[m]oderately in favor" of the death penalty, had no religious scruples against it, and would vote "[f]or" the death penalty on the ballot because "I believe it is appropriate for some crimes and may serve as a deterrent for some criminals."

On voir dire, Stewart B. indicated that he was familiar with the term "special circumstance," thought it was reserved for particularly violent murders and peace-officer murders, did not realize witness killing was a special circumstance, but assumed, if the statute included this category, that "it [was] appropriate." Asked by defense counsel if he understood he must vote for life if the good and bad in defendant's life were equal, Stewart B. expressed some reservations, indicating that "[a]t that point, [having found both guilt and one or more special circumstances], it kind of tilts the other way I would think," despite the need to be "careful," "once you're kind of balancing the scales of justice." Indeed, he said, "I would have to tell you right now I'm probably preinclined toward the death penalty" and "I support the death penalty."

Stewart B. professed he was comfortable that the death penalty meant exactly that, because "you need appropriate measures for the appropriate crime." He also indicated he would have no difficulty imposing the death penalty after having found guilt and special circumstances on the basis of circumstantial evidence, pointing out that the issues at the two phases of trial were different.

In her questionnaire, Juror Tina B. said that she had not thought a lot about capital punishment and was not sure how she would vote on a ballot measure addressing that issue, but believed the death penalty "is here for a reason." It was hard, she professed, to say how she felt about the death penalty, "[n]ot knowing the evidence." She indicated she had no religious reservations about capital punishment.

On voir dire, Tina B. said she was still not sure how she would vote on a death penalty ballot measure, because she did not have enough information. However, when asked what she meant by saying the death penalty is here for a reason, Tina B. explained that the "reason" was all the "bad" people who "cannot live on this earth without doing anything . . . but wrong such as murder over and over—. . . or child molestation, anything of that sort," and that "we should use [the death penalty] when it comes to that." When defense counsel inquired whether she had thought more about her attitudes since completing her juror questionnaire, Tina B. said, "Actually, yes, I have. . . . My additional thoughts are that it is here, and . . . we're supposed to use it, and if I had to make a choice, depending on the evidence, I would."

Asked if she would impose death in a witness-killing case, Tina B. said, "No, I'd have to hear the whole case," thus suggesting that she would not *automatically* do so. Asked about the death penalty in a circumstantial-evidence case, she replied that "[o]bviously he'd have to be pretty guilty of everything," but if circumstantial evidence convinced her, to the requisite degree of proof, that defendant deserved the death penalty, "I believed I would" be able to vote for it.

In her questionnaire, Juror Sharon B. indicated that she believed the death penalty was necessary for certain crimes "based on the evidence," was "[m]oderately in favor" of the death penalty, had no religious scruples against it, but was "[n]ot sure" how she would vote on a ballot measure. Responding to the question whether her death penalty views had changed substantially in recent years, she stated, "If I keep my emotions out of the way [and] think logically my feelings are the same."

In voir dire, defense counsel followed up on this latter comment, asking if it meant her thoughts changed from day to day depending on how she felt about a particular issue or case. She agreed, explaining that she had extreme emotional reactions to the "horrible" crimes she saw on television, but "then if you sit and think about it, then it depends on, you know, . . . what type of evidence is given to me." She insisted she could follow the penalty instructions and weigh both available punishments based on the aggravating and mitigating evidence.

Sharon B. indicated she was still not sure how she would vote on a ballot measure, "[b]ecause I think each individual case needs to be taken into consideration. . . . I just can't say somebody *automatically* deserves the death penalty." (Italics added.) Pressed to distinguish between the voting booth and a juror's duties, she maintained, on the political question, that "I [still] don't know how I feel" and had no "definite feelings." Asked about her views on life without parole, she said she was "[p]robably moderately favorable," which, she agreed, "was about the same as [she felt on] the death penalty." Finally, she agreed unequivocally that she could impose death even if the evidence of guilt was primarily circumstantial.

Thus, the overall portrait was of a juror who had strong initial reactions against aggravated murders, was inclined to favor the availability of both death and life without parole for selected crimes, and believed, in the end, that each individual case required careful consideration, based on logic and evidence. Under these circumstances, the prosecutor could readily conclude Sharon B. was a fair capital juror who would impose the death penalty if she believed it was warranted.

Juror Roberta C. left blank that portion of her questionnaire dealing with death penalty attitudes. On voir dire, she explained that she felt "rush[ed]," the form was "lengthy," and she was "caught off guard" by questions she had not previously pondered.

However, asked by the court about her feelings on this issue, she replied that her Catholic religion did not "teach to be in favor of the death penalty or capital punishment; *but for myself deep down in my heart I do believe in it.*"

(Italics added.) She admitted the conflict with her Catholic faith had given her a "difficult weekend," but "I think I'm going to have to dismiss the Catholic principles and just go from what I feel." Questioned further on the subject by the prosecutor, Roberta C. insisted she could go against her church's teaching if she thought death was the appropriate penalty, "[a]nd I don't think I'm the only one that would fall in that situation."

Roberta C. indicated she could consider the death penalty in a witness-killing case "[i]f that were the law." When the court advised that this *was* the law, she said she "probably" could. When the prosecutor asked what she meant by "probably," she answered, "Maybe I should rephrase that. If that is the law, then I will have to follow the law." Finally, she indicated unequivocally that she could impose the death penalty on the basis of circumstantial evidence.

These responses indicated quite clearly that, after some understandable soul searching, Roberta C. had resolved any religious conflict in favor of her personal belief in the death penalty. The prosecutor could readily conclude that her Catholic faith would not interfere with her duties as a capital juror, that she would follow the law, and that she would deliberate fairly on the issue of penalty.[5]

In her questionnaire, Juror Suzanne H. indicated that she was "not opposed" in general to the death penalty, had no religious scruples against it, and would vote "[f]or" it on the ballot because she "[felt] it should be an option." Asked to rate her "philosophical opinion" about the death penalty on a five-step scale, she first marked "[m]oderately in favor," crossed that out, and marked "[n]eutral."

On voir dire, Suzanne H. expressed the views of an ideal capital juror. She explained she was "neither for nor against" the death penalty in the abstract; instead, she said, "In some cases I'm very much in favor of [the death penalty] [while] [i]n some cases I would not be in favor." She thought both death and life without parole were valid options, depending on the case and the evidence, and she would "accept the facts as they are." She did not think death was appropriate only in cases of multiple murder victims, and she could impose the death penalty in a witness-killing case "[i]f I was so directed by

---

[5] Roberta C. was also examined about her failure to answer queries on the juror questionnaire about whether she, any family or household member, or any acquaintance had been investigated for, or charged with, a crime. Roberta C. had handwritten "PRIVATE" beside these questions. On voir dire, she explained that, when she was nine or 10 years old, her stepbrother had been involved in a shoot-out with police officers at Santa Rita jail and had gone to San Quentin. She insisted that this episode, which had occurred when she was a child, and in which she had no personal participation, would not affect her ability to sit as a juror.

the court." She also indicated she could impose death on the basis of a circumstantial guilt case. These responses left no doubt that Suzanne H. could deliberate fairly on the issue of penalty.

In his questionnaire, Juror David H. responded colorfully when asked his general feelings on the death penalty, explaining that "I used to be against it but now I feel [it is] a valid method of cleaning the pond scum off of the gene pool." He indicated he had no religious scruples against the death penalty and would vote "[f]or" it on the ballot, but nonetheless rated his "philosophical opinion" on the subject as "[n]eutral."

Asked on voir dire to explain his "pond scum" remark, David H. indicated he meant that "someone who's out and out bad, would go out and murder again, and have no problem with that, I don't see a point in that person existing." Nonetheless, under intense questioning by defense counsel, he indicated he understood, and could abide by, his obligations as a penalty juror, and would consider life without parole if the "good" about the defendant, when compared against the "bad," was sufficient to warrant that option. David H. provided an obvious basis for the prosecutor to surmise that he would be a suitable, even favorable, prosecution juror in a capital case.

Juror Judith H. stated in her questionnaire that she was "[m]oderately in favor" of the death penalty, and had no religious or philosophical reservations about it. She indicated she would vote "[f]or" the death penalty on the ballot because she "believe[d] the option should be available." Asked to explain her general feelings on the subject, she wrote she felt there were "probably some cases where it should be imposed." Her religious beliefs, she explained, were "that man should be punished for his sins unless he repents and restores losses he had caused," and it was impossible to restore life. She expressed the view that "[u]nder some circumstances, a guilty person should forfeit his own life as a means of expiation," but in others, "the death penalty would not be appropriate."

On voir dire, Judith H. confirmed these positions. Asked by the court if she could impose death in an appropriate case, she replied, "I believe in it" and "I'd have to say yes." When defense counsel inquired about her questionnaire statement that she was moderately for the death penalty, she said, "Well, I believe that it should exist." She admitted she "[didn't] believe anyone would really want to condemn another human being to death," but suggested that the group nature of the decision reduced the risk of error. On the other hand, she said she understood that, as a juror, she must make an individual determination. She denied that her religious beliefs required the forfeiture of life as expiation for every murder, and insisted she could not prejudge a case, but said she believed she could impose death in an appropriate case. She

professed to prefer neither death nor life without parole, but had "a strong preference to presume innocent until proven otherwise." She deferred to the law when asked whether death was ever appropriate in a witness-killing case. In response to the prosecutor's questions, she said she "probably" could impose death in a case of circumstantial evidence, though she "would have to feel that it's warranted."

In sum, Judith H.'s questionnaire and voir dire answers portrayed a person who strongly believed on religious grounds that the death penalty was a valid punishment for some murders, was willing and able to assess it where appropriate, and accepted that the categories of death eligibility were a matter for the law. On the other hand, they indicated that she would not prejudge individual cases, understood the gravity of condemning someone to death, and would therefore weigh the evidence and penalty choices carefully. On this basis, the prosecutor could readily conclude that Judith H. would be an evenhanded, and therefore acceptable, capital juror.

In her questionnaire, Juror Sherry K. rated herself as "[n]eutral" on the death penalty. However, she indicated she had no religious scruples on the issue and would vote "[f]or" the death penalty on the ballot because "people should have choices." Asked to describe her general feelings on the death penalty, she wrote, "The cases that I know about from the news indicate that it was warranted."

On voir dire, Sherry K. indicated she was thinking of high-profile cases— "Jeffrey Dahmer, Charles Manson"—when she wrote of cases in the news where the death penalty seemed appropriate. She also said she did not think death was warranted for a single murder to prevent a witness from testifying. However, she made clear that she was distinguishing her political and philosophical views from her duties as a juror. She explained that she would not "make such a *law*," but "since it is the law, I can still agree and abide by it." (Italics added.) Asked by the prosecutor if she meant that, even if she disagreed with the law, she could vote for death in such a case if persuaded the aggravating circumstances outweighed those in mitigation, she replied, "Yes, sir, that's what I'm telling you." When the court interrupted to ask if she would use the standard of proof required by the instructions, and not impose one of her own, she replied, "Absolutely." Finally, she agreed she could impose death in a circumstantial-evidence case if instructed that such evidence was equal to direct evidence.

From these answers, the prosecutor could infer that Sherry K. favored the death penalty in certain cases, and could put aside her personal views in others to deliberate fairly, under the law and instructions, on the issue of penalty. On that basis, she would appear to be an acceptable juror for the prosecution.

In her questionnaire, Juror Cecilia M. rated herself "[m]oderately in favor" of the death penalty, and stated she had no religious objections to it. She indicated she would vote "[f]or" the death penalty because "I feel it [is] necessary sometimes." Asked to describe her general feelings about the death penalty, she wrote, "I feel [it] is necessary in some cases."

On voir dire, Cecilia M. explained she thought the death penalty was sometimes necessary because "some crimes are [so] horrible that a person deserves to die." She stated that she could "make a choice" between death and life without parole in a case where a witness was killed to prevent his testimony. Under questioning by defense counsel, she admitted that, though she generally favored the death penalty, she had thought about whether it would be difficult actually to impose it, i.e., "how I would feel about determining if someone should die or not," and "if I could just morally do it." But when the prosecutor followed up on the same theme, Cecilia M. said, "Well, as I said, I've thought about it a lot since the questionnaire; and I honestly think I could." She agreed she could do so in a case involving circumstantial evidence.

These answers indicate that Cecilia M. generally believed in the death penalty, had pondered the moral significance of personal involvement in its imposition, but had ultimately decided her moral qualms, if any, were not so strong as to hinder her ability to deliberate fairly as a penalty juror. On this basis, the prosecutor could well find her acceptable as a juror.

In his questionnaire, Juror Manuel R. rated himself "[s]trongly in favor" of the death penalty and indicated he would vote "[f]or" the death penalty on the ballot. Asked to explain his general feelings about the death penalty, he wrote, "I have always been in favor of the death penalty [as] a strong deterrent to murder and violent crime. But I never, ever thought that the situation would occur where I may have to assist in the decision to implement it as a sentence." Asked if he had religious or philosophical scruples against the death penalty, he responded, "To be honest, I don't know. I think I'd actually have to be in the situation before I'd know for sure."

On voir dire, after hearing the court's explanation of the guilt and penalty process, Manuel R. told the court that "the outline you just gave, that clarified a lot," and he could now say he had no feelings that would prevent him from choosing between death and life without parole. He repeated this theme during questioning by both counsel. When defense counsel asked whether, at the final stage, Manuel R. would be willing to make a penalty judgment without being affected by any religious or philosophical principle, Manuel R. replied, "I think I could. It's something I've—since our original instructions I've thought about a lot between then and now, and I think that I could make that decision without being prejudiced or—or tilted one way or the other."

Manuel R. further explained that, despite his ambivalence on the questionnaire, he did not actually think he had any "built-in religious or philosophical difference or bias" concerning his ability to consider the death penalty. His uncertain questionnaire answer, he said, "was simply [from] coming for jury duty and being put in this situation" without having considered in advance how he might feel. However, he indicated, in thinking about it since, "I believe I could be objective and . . . consider the evidence and . . . make a decision that I thought was the correct decision without being biased."

When the prosecutor asked again if Manuel R. could actually impose the death penalty knowing that defendant would be taken to San Quentin and executed, Manuel R. responded, "Yes, I believe so." He also indicated he could "certainly" vote for death in a case involving primarily circumstantial evidence if, as the court would instruct, such evidence was equal in weight to direct evidence.

In sum, the prosecutor could surmise that Manuel R. strongly favored the death penalty in principle, faced momentary uncertainty about his ability to impose it personally, but, after thinking the matter over, concluded he was willing and able to consider that penalty fairly during penalty deliberations. Thus, the prosecutor could readily assume he was an acceptable capital juror.

Juror Brian S. stated in his questionnaire that he would vote "[f]or" the death penalty on the ballot "[b]ecause the person[']s life is all but over and making him die a slow life [in prison] would be cruel. That's why we still shoot horses when they have a broken leg." He indicated he had no religious or philosophical scruples against the death penalty, and that his philosophical opinion was "[n]eutral." Asked to describe his general feelings about the death penalty, he stated that if the evidence justified the death penalty, "then I think it must go on with it. I do believe in the death penalty only after all appeals have been exhausted."

On voir dire, Brian S. generally indicated his willingness to apply the death penalty law as the court would explain it to him. He confirmed, in response to questions from the court, that he supported the death penalty under "the terms permitted." He explained that, as a correctional officer in both the Montana and federal systems, he had seen prison conditions and had thought about capital punishment throughout his career. His basic view, he said, was "to go with it. The judge is supposed to make the determination and the jury, so I have to accept it." He amplified the "shoot horses" remark in his questionnaire by saying he saw "no reason why [the death penalty] shouldn't be carried out," where warranted, in preference to a lifetime of confinement under poor prison conditions with no hope of release, no goals, and no chance to contribute to society or the prison.

When asked by the prosecutor what he meant in his questionnaire by rating himself neutral on the death penalty, Brian S. said he believed that "[i]f it warrants the death penalty, if the crime warrants the death penalty, then I think I am for it. And if it didn't, then I'm against it." That was why, he added, he had written that it should be imposed only after all appeals were exhausted; he agreed with the prosecutor's suggestion that he wanted to "[m]ake sure everything was done right." He insisted his professional relationships with prisoners had not caused him to oppose the death penalty. He agreed he could impose death in a circumstantial-evidence case if such evidence was legally "equal" to direct evidence. And he indicated he would consider, but not prejudge, the propriety of the death penalty where one person was killed to prevent his testimony.

Nothing in these statements suggests Brian S. had reservations about imposing the penalty of death in an appropriate case, as determined by a jury under the terms of the death penalty law and affirmed on postconviction review. The prosecutor had ample grounds to find him acceptable as a capital juror.

Finally, Juror Christian W., in his questionnaire, rated himself "[n]eutral" on the death penalty and indicated his views had not changed substantially in recent years, explaining that "I'm not an advocate or proponent of the death penalty." On the other hand, he reported he had no religious or philosophical reservations, remarking that "[i]f the facts and verdict warrant the death penalty, then so be it." He also indicated he would vote "[f]or" the death penalty on the ballot, commenting that it was a "strong deterrent" to crime. Describing his general feelings on the subject, he said it "is a very difficult way to punish someone, but, if the facts of a case warrant that action, then it is a part of our judicial system that must be imposed."

On voir dire, when the court asked Christian W. if he would have difficulty choosing between the two punishments, he said, "On the face of it, no. Basically, my feeling[] is if the crime justifies [the] death penalty, then so be it, and if not—. . . ." In response to questions from defense counsel, he acknowledged that, now faced with possible personal responsibility for choosing between life and death, he realized he might not be as pro death penalty as he had thought. He said he had "relaxed a little bit" on the subject, and now understood his attitude to be "more or less, you know, that people have to have their say in front of the jury more so than . . . prejudging." Nonetheless, he indicated, he felt he could vote for either punishment.

Asked similarly by the prosecutor if he thought he could "make that vote," Christian W. answered, "As I sit here today, yes, I do if the facts warrant it."

He made clear that he could do so in a case supported primarily by circumstantial evidence, and where one person was killed to eliminate him as a witness.

Thus, all the seated jurors expressed death penalty views ranging from truly neutral to moderately favorable. Ultimately all indicated, without reservation, that they could apply the capital sentencing law, accept circumstantial evidence of defendant's guilt, deliberate fairly on the proper punishment, and choose the death penalty in an appropriate case. By contrast, three of the five excused African-American prospective jurors made, and did not retract, allusions to significant religious, moral, or other qualms that would make it very difficult for them to choose death. A fourth recounted a unique personal experience that might impair his ability to accept circumstantial evidence. The fifth evaded questions about her political stand on the death penalty in a manner that could give the prosecutor pause about her actual ability to deliberate fairly in a capital case.

■ Certainly no seated juror expressed views so starkly similar to those of the excused prospective jurors as to expose, on the face of a cold record, any pretext in the prosecutor's stated reasons for the excusals. Moreover, defendant points to no disparate or trick questioning by the prosecutor, designed to create pretexts for retaining nonminority panelists while excusing those belonging to a minority racial group. (See *Miller-El, supra,* 545 U.S. 231, 260–263, 265.) Under these circumstances, we see no basis to overturn the trial court's determination that the prosecutor's stated nondiscriminatory reasons for dismissing the five African-American prospective jurors were sincere, and that purposeful discrimination was not established. We therefore reject defendant's *Wheeler/Batson* claim.

### 2. *Restriction on voir dire*

The juror questionnaire included a question asking what jurors had heard about the case. During pretrial proceedings, defendant's counsel proposed to modify this question by preceding it with the following statement: "[Defendant,] a former Berkeley Waterfront Commissioner, is accused of attempted murder in connection with the January 31, 1988, beating of University of California Professor Robert Mishell and his wife while in their Berkeley home. [¶] He is also accused of murdering Luis Reyna, a Berkeley Waterfront Commissioner and an alleged witness in the Mishell case, on July 18, 1988. Mr. Reyna's body was found dismembered in the Lafayette hills a short time after his disappearance."

Another question asked jurors to rate their attitudes towards capital punishment on a scale ranging from strongly in favor to strongly against. The

defense proposed that, after answering this question, jurors be asked to review the facts set forth in the first modification, then state and explain "what change, if any, [those facts might produce] in your philosophical view of the death penalty."

Counsel argued that, in view of the publicity the case had received, the first modification was relevant to determining whether a motion for change of venue should be filed. Moreover, counsel urged, while the defense was "aware of the court's concern about any prejudgment of facts," the second modification was appropriate to ascertain whether the particularly gruesome facts might influence the jurors' penalty attitudes.

The trial court explained that, as was its usual practice, it would apprise prospective jurors of the general facts by reading aloud, then paraphrasing, the information. Also, the court said, it would allow counsel to voir dire the jurors "as to pretrial publicity in terms of the status of Mr. Mishell and his wife, him being a professor, that the assault occurred in their home, [and] that [defendant and the alleged murder victim Reyna] were Waterfront Commissioners." However, the court rejected the proposed questionnaire modifications. As to the "issue of dismemberment," the court explained, questioning prospective jurors about how they might be affected by the "method of killing" would, in effect, be asking them to prejudge the case.

Thus, the court ruled, counsel could examine jurors orally about their ability to choose between life and death if they found true the charges and allegations in the information—i.e., that defendant attempted to murder the Mishells, inflicted great bodily injury on them, and murdered Reyna to eliminate him as a witness in the Mishell case. Moreover, the court indicated, it would allow voir dire "[about] the location of the assault, [and] the status of the [defendant and the victims]; but I will not permit you to go into any of the factual issues, including but not limit[ed] to the dismemberment."

After the guilt trial, counsel again moved for further voir dire of the jurors concerning their ability to choose between life and death in light of the evidence, particularly the dismemberment evidence, the jury had actually heard. The court denied the motion, noting that, in its view, the defense had conducted a "complete and exhaustive" voir dire. The court indicated that it stood by its pretrial ruling against "arguing or voir diring the facts of the case."

Defendant now claims the court's refusal to allow questioning of jurors about whether they would automatically impose death in light of the dismemberment evidence violated his rights under the Sixth, Eighth, and Fourteenth Amendments and analogous provisions of the California Constitution. The contention lacks merit.

 "[T]he trial court has 'considerable discretion . . . to contain voir dire within reasonable limits' [citations]. This discretion extends to the process of death-qualification voir dire established by *Witherspoon v. Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770] and *Wainwright v. Witt* [(1985)] 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844]. [Citation.] Limitations on voir dire are subject to review for abuse of discretion. [Citation.]" (*People v. Jenkins* (2000) 22 Cal.4th 900, 990 [95 Cal.Rptr.2d 377, 997 P.2d 1044] (*Jenkins*).)

Moreover, as we have said on many occasions, "[d]efendant ha[s] no right to ask specific questions that invite[] prospective jurors to prejudge the penalty issue based on a summary of the aggravating and mitigating evidence (*People v. Cash* (2002) 28 Cal.4th 703, 721–722 [122 Cal.Rptr.2d 545, 50 P.3d 332]), to educate the jury as to the facts of the case (*People v. Sanders* (1995) 11 Cal.4th 475, 538–539 [46 Cal.Rptr.2d 751, 905 P.2d 420]), or to instruct the jury in matters of law (*People v. Ashmus* (1991) 54 Cal.3d 932, 959 [2 Cal.Rptr.2d 112, 820 P.2d 214])." (*People v. Burgener* (2003) 29 Cal.4th 833, 865 [129 Cal.Rptr.2d 747, 62 P.3d 1]; see also, e.g., *People v. Mason* (1991) 52 Cal.3d 909, 939–941 [277 Cal.Rptr. 166, 802 P.2d 950] (*Mason*).)

We have explained that "[t]he *Witherspoon-Witt* . . . voir dire seeks to determine only the views of the prospective jurors about capital punishment in the abstract . . . . The inquiry is directed to whether, without knowing the specifics of the case, the juror has an 'open mind' on the penalty determination." (*People v. Clark* (1990) 50 Cal.3d 583, 597 [268 Cal.Rptr. 399, 789 P.2d 127], citations omitted.) In *Mason*, alluding to the facts there presented, we said that "[m]any persons whose general neutrality toward capital punishment qualifies them to sit as jurors might, if presented with the gruesome details of a multiple-murder case, conclude that they would likely, if not automatically, vote for death." (*Mason, supra,* 52 Cal.3d 909, 940; see also *People v. Sanders, supra,* 11 Cal.4th 475, 539.)

On the other hand, we have indicated that because " '[a] prospective juror who would invariably vote either for or against the death penalty because of one or more circumstances likely to be present in the case being tried, without regard to the strength of aggravating and mitigating circumstances, is . . . subject to challenge for cause,' " the death qualification process "must probe 'prospective jurors' death penalty views as applied to the general facts of the case, whether or not those facts [have] been expressly charged.' " (*People v. Earp* (1999) 20 Cal.4th 826, 853 [85 Cal.Rptr.2d 857, 978 P.2d 15] (*Earp*).)

 Reconciling these competing principles dictates that "death-qualification voir dire must avoid two extremes. On the one hand, it must not

be so abstract that it fails to identify those jurors whose death penalty views would prevent or substantially impair the performance of their duties as jurors in the case being tried. On the other hand, it must not be so specific that it requires the prospective jurors to prejudge the penalty issue based on a summary of the mitigating and aggravating evidence likely to be presented. [Citation.] In deciding where to strike the balance in a particular case, trial courts have considerable discretion. [Citations.]" (*People v. Cash, supra,* 28 Cal.4th 703, 721–722 (*Cash*).)

In *Cash*—our only reversal of a death penalty judgment for failure to allow sufficient inquiry into jurors' death penalty attitudes about particular facts—we stressed that the court had refused to allow defense counsel to ask prospective jurors about "a general fact or circumstance . . . *that could cause some jurors invariably to vote for the death penalty, regardless of the strength of the mitigating circumstances.*" (*Cash, supra,* 28 Cal.4th 703, 721, italics added.) There, we concluded, the fact that the defendant had previously murdered his grandparents was "likely to be of great significance to prospective jurors." (*Ibid.*)

In *Roldan, supra,* 35 Cal.4th 646, the trial evidence showed that the defendant and an accomplice approached swap meet employees who were collecting and bundling the day's cash receipts. The defendant, brandishing a firearm, ordered the victims not to "fucking move." When one potential victim tried to flee, the defendant stated, "I said don't anybody fucking move." He then pointed his weapon at the fleeing victim and pulled the trigger, but the gun misfired. After taking bags of money, the robbers themselves fled, but another swap meet employee, one Teal, chased, caught, and held the accomplice. The defendant reappeared and told Teal he would shoot unless Teal released the accomplice. Teal obeyed the order, threw up his hands, and froze. The defendant thereupon fired several rapid shots into Teal's chest and arm, wounding him fatally.

The trial court itself undertook the death qualification of prospective jurors. It asked each panelist whether he or she would change any questionnaire answer, then posed four general questions about the panelist's ability to deliberate fairly in a death penalty case. Defense counsel requested that the court inquire further into the questionnaire and voir dire answers of two persons who ultimately sat on the jury. However, counsel never specified what additional questions and information he desired. The court denied the request.

On appeal, we rejected the defendant's claim that the court thereby erred. We first observed that the requests for supplementary voir dire were not sufficiently specific as to purpose or subject matter. We also dismissed the

defendant's reliance on *Cash*. There, we noted, the defense had been denied the opportunity to probe juror attitudes toward the defendant's prior murder of his grandparents—quoting, in added italics, *Cash*'s statement that this fact " *'could cause some jurors invariably to vote for the death penalty, regardless of the strength of the mitigating circumstances.'* " (*Roldan, supra,* 35 Cal.4th 646, 694.)

By contrast, we said in *Roldan,* "defendant identifies no fact about his case that is comparable in relevance to the prior murders in . . . *Cash* . . . , facts that could potentially have prejudiced *even a reasonable juror.* There were in this case no prior murders, no sensational sex crimes, no child victims,[6] no torture." (*Roldan, supra,* 35 Cal.4th 646, 694, italics added, citation omitted.) Under these circumstances, we concluded, the trial court did not abuse its discretion in disallowing further questioning.

Similarly here, the court did not abuse its broad discretion. We note at the outset that the defense was allowed to explore with prospective jurors several of the specific circumstances of the case. These included the Mishells' status as members of the University of California academic community, the prosecution's claims that defendant attempted to murder the Mishells and inflicted great bodily injury on them, the fact that defendant and murder victim Reyna were both members of the Berkeley Waterfront Commission, and the prosecution's allegation that defendant killed Reyna to eliminate him as a witness in the Mishell assault case. In addition, defendant's counsel were permitted to voir dire prospective jurors about what they had heard, seen, read, and remembered about the case. In several instances, such inquiry touched on the dismemberment issue.

The sole fact as to which the defense unsuccessfully sought additional inquiry—the condition of the adult murder victim's body when found—was not one that could cause a *reasonable* juror—i.e., one whose death penalty attitudes *otherwise* qualified him or her to sit on a capital jury—*invariably* to vote for death, regardless of the strength of the mitigating evidence. No child victim, prior murder, or sexual implications were involved. Nor, to the extent juror emotions might thereby be aroused, would there be evidence that Reyna was dismembered while alive.[7] The questions defendant wanted to ask did not indicate otherwise; indeed, they mentioned no particular cause for the condition in which Reyna's body was found.

---

[6] Cf., e.g., *Box, supra,* 23 Cal.4th 1153, 1178–1180 (three-year-old boy murdered along with mother; voir dire adequately covered the issue); *Earp, supra,* 20 Cal.4th 826, 851 (18-month-old girl killed in course of forcible sexual assault; voir dire adequately covered the issue).

[7] As noted above, there was no forensic indication of the cause of death. Prosecution witness Oberman testified defendant told her he killed Reyna with an intentional gunshot. Defendant insisted on the stand that he removed Reyna's head and hands hours after Reyna died from an accidental bullet wound.

A normal juror could not fail to be affected by the condition in which Reyna's body was found, as by any brutal circumstance of a criminal homicide. But the fact of dismemberment, in and of itself, does not appear so potentially inflammatory as to transform an otherwise death-qualified juror into one who *could not* deliberate fairly on the issue of penalty.

Moreover, insofar as the defense sought to restrict examination to the abstract issue of dismemberment, the question posed was not entirely fair in the context of this case. As jurors would later learn, the *circumstances* surrounding the dismemberment of Reyna's body were hotly disputed. The prosecution urged that defendant used dismemberment to commit, or cover up, a coldblooded murder. But defendant's version was that after pulling a gun on defendant, Reyna died accidentally during a struggle for the weapon, and that defendant, acting in a panic, dismembered Reyna's body only to delay its discovery and identification while he sought legal help. Jurors' attitudes toward the dismemberment thus might well be affected by which version they believed.

Accordingly, were the defense allowed to broach the dismemberment issue in voir dire, the prosecutor could strongly argue he should be permitted to explore in more detail how prospective jurors might react to *all* the anticipated evidence on that issue. This, in turn, could have led to a lengthy examination of prospective jurors about specific details of the case.

Given the trial court's duty to restrict death-qualification voir dire within reasonable bounds, and its broad latitude in carrying out that function, we must therefore conclude the court below did not abuse its discretion in refusing the inquiry defendant sought. No error occurred.

B. *Other pretrial or nontrial issues*

1. *Denial of change of venue*

Prior to jury selection, defendant moved for a change of venue. Attached to the motion were exhibits consisting of numerous articles from Bay Area newspapers reporting on the Mishell and Reyna cases and defendant's status as a suspect and accused in both. At a hearing on January 7, 1993, two videocassettes were also submitted. These recorded local television coverage of the cases, as well as a segment about them on the national television show *America's Most Wanted*, which aired on November 20, 1988, while defendant was a fugitive.

The court denied the motion. It reasoned as follows: The crimes, including a capital murder, were serious—a factor weighing in favor of a venue

change—but they were no more so than those increasingly common in a modern urban society. On the other hand, the population of Alameda County, from which the venire would be drawn, was "roughly 1,300,000," indicating that a fair trial could be had. Given the county's size and diversity, the community status of the victims and defendant was not particularly significant; the victims' prominence, if any, was localized, and defendant, himself a city official, was not of low status compared to them. The case had drawn considerable publicity, but most media coverage had ended with defendant's preliminary hearing, more than two and one-half years earlier. In the court's experience, a fair Alameda County jury could be empaneled in a case of this kind.

However, the court made clear that it would permit counsel to voir dire prospective jurors about their knowledge of the case, and their ability to be fair. "If I have any remote feeling at all that they could not base their decision solely, exclusively, peculiarly upon the information in the trial, I would excuse that juror. [¶] If we reach the point that I feel a venue issue will arise, *I will permit counsel the opportunity to renew their motion.*" (Italics added.) Defendant never did so.

Nonetheless, defendant urges on appeal that his venue motion was erroneously denied, and that the error resulted in an unfair trial, thus violating his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. As the People observe, the claim is forfeited, because defendant never renewed his motion after voir dire was complete, despite the court's explicit representation that it would entertain such a renewal. " '[W]hen a trial court initially denies a change of venue motion without prejudice, a defendant must renew the motion after voir dire of the jury to preserve the issue for appeal.' " (*People v. Hart* (1999) 20 Cal.4th 546, 598 [85 Cal.Rptr.2d 132, 976 P.2d 683] (*Hart*), quoting *People v. Williams* (1997) 16 Cal.4th 635, 654–655 [66 Cal.Rptr.2d 573, 941 P.2d 752].)

█ In any event, the contention fails on the merits. "The applicable law is settled. 'A change in venue must be granted when the defendant shows a reasonable likelihood that a fair trial cannot otherwise be had. The trial court typically considers the nature and gravity of the offense, the size of the community, the status of the defendant and the victim, and the nature and extent of the publicity. On appeal, the defendant must show that denial of the venue motion was error (i.e., that it was reasonably likely a fair trial could not be had at the time the motion was made) and that the error was prejudicial (i.e., that it [is] reasonably likely a fair trial was not in fact had). We will sustain the court's determination of the relevant facts where supported by substantial evidence. We independently review the court's ultimate determination of the reasonable likelihood of an unfair trial.' " (*Hart, supra,*

20 Cal.4th 546, 598, quoting *People v. Pride* (1992) 3 Cal.4th 195, 224 [10 Cal.Rptr.2d 636, 833 P.2d 643] (*Pride*).)

The trial court's ruling on the venue motion was not erroneous when made. "The charged offenses were serious and had attracted the attention of the media. 'However, every capital case involves a serious charge. While this factor adds weight to a motion to change venue, it does not in itself require a change.' [Citation.]" (*Hart, supra,* 20 Cal.4th 546, 598 [rape-sodomy murder of 15-year-old high school student; rape, sodomy, and oral copulation of murder victim's 15-year-old companion]; see *Welch, supra,* 20 Cal.4th 701, 744 [home invasion; murder of six occupants as they slept].) Defendant claims the unusually gruesome and sensational nature of the instant crimes warranted moving the case. However, the facts were not so extreme as to mandate such a step on that basis alone.

The parties agree with the court below that, at the time of defendant's trial, the population of Alameda County, a metropolitan area, well exceeded one million persons. (See *Welch, supra,* 20 Cal.4th 701, 744.) As the trial court suggested, the county's size and diversity weigh strongly against a change of venue. We routinely have upheld refusals to change venue from much smaller counties. (E.g., *People v. Vieira* (2005) 35 Cal.4th 264, 280 [25 Cal.Rptr.3d 337, 106 P.3d 990] (*Vieira*) [1990 population of Stanislaus County (approximately 370,000) did not weigh in favor of venue change]; *Hart, supra,* 20 Cal.4th 546, 598–599 [1987 population of Riverside County (approaching 900,000) did not weigh in favor of venue change]; *People v. Webb* (1993) 6 Cal.4th 494, 514 [24 Cal.Rptr.2d 779, 862 P.2d 779] (*Webb*) [San Luis Obispo County (population almost 200,000 at time of trial) was "moderately sized county," but not "relatively isolated and small" of kind where change-of-venue motions have been granted]; *Pride, supra,* 3 Cal.4th 195, 224 [size and metropolitan nature of Sacramento County (estimated population above 875,000) "weighed heavily against a change of venue"]; *People v. Howard* (1992) 1 Cal.4th 1132, 1167 [5 Cal.Rptr.2d 268, 824 P.2d 1315] [Tulare County, with 253,000 inhabitants at time of trial, was "not a small community"; "most recent successful venue motions have involved communities with substantially smaller populations"].)

Defendant focuses on the size of the City of Berkeley (1990 population 102,724). However, he overlooks that the jury venire was drawn at random from the entire county. As indicated above, the population factor weighed against the need for a change of venue.

Defendant claims the victims' prominent status, as well as his own, tipped the balance toward a change of venue. The Mishells, he notes, were respected members of the university academic community, and Reyna was a city

official. That defendant himself held a public position, he suggests, also worked against him, because jurors would find it unconscionable that one afforded such benefits and privileges by the community would commit these heinous crimes.

However, there is no evidence the Mishells had wide prominence in the relevant community. Any public prominence or notoriety Reyna and defendant had attained was confined to their own municipality—as noted above, a relatively small portion of the area from which the venire would be drawn. Moreover, defendant's community status was essentially equal to that of his victims. He was not a friendless newcomer or transient, or a despised outcast, accused of murdering a victim with "long and extensive ties to the community." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 46 [17 Cal.Rptr.3d 710, 96 P.3d 30] (*Coffman and Marlow*); see *Martinez v. Superior Court* (1981) 29 Cal.3d 574, 584–585 [174 Cal.Rptr. 701, 629 P.2d 502]; *Frazier v. Superior Court* (1971) 5 Cal.3d 287, 293–294 [95 Cal.Rptr. 798, 486 P.2d 694].) Thus, as the trial court indicated, this factor has little influence on whether a change of venue was appropriate.

Defendant stresses the degree of media publicity. There was considerable newspaper coverage, and some local television coverage, of the assaults on the Mishells, the injuries they suffered, the disappearance of Reyna, his family's reaction, the discovery and identification of his remains, defendant's status as a suspect in both cases, his own disappearance when his arrest was imminent, and the progress of the criminal charges once he was apprehended. While defendant was a fugitive, *America's Most Wanted* devoted a segment to the case, including staged reenactments of the Mishell and Reyna crimes.

But while the local coverage disclosed the brutal details of the crimes, and elicited their effects on the victims and their families, the reporting was essentially factual, not sensationalized. The vast bulk of the local coverage was clustered around the times of significant events in the case—early 1988 for the Mishell assaults and late summer 1988 for the murder of Reyna. The most recent substantial coverage had occurred during defendant's preliminary hearing, in April and May of 1990, over two and one-half years before the motion to change venue was made, heard, and denied.[8]

The essentially neutral nature of the local reporting, plus the fact that, for the most part, it occurred well before defendant's trial, weighs strongly against a change of venue. (*Hart, supra,* 20 Cal.4th 546, 600; see also, e.g.,

---

[8] *The most recent article cited by defense counsel was a report in the San Francisco Examiner, dated January 5, 1993, two days before the venue hearing. This article apparently noted that defendant's trial was about to begin and included statements by both the prosecutor and defense counsel.*

*People v. Hayes* (1999) 21 Cal.4th 1211, 1251 [91 Cal.Rptr.2d 211, 989 P.2d 645] [headless and handless bodies found; almost three-year lapse in publicity]; *People v. Dennis* (1998) 17 Cal.4th 468, 523–524 [71 Cal.Rptr.2d 680, 950 P.2d 1035] *(Dennis)* [bulk of publicity over three years old]; *Pride, supra,* 3 Cal.4th 195, 225 [main publicity occurred near time of crime; two-year hiatus before trial weighs heavily against change of venue]; *People v. Edwards* (1991) 54 Cal.3d 787, 808 [1 Cal.Rptr.2d 696, 819 P.2d 436] [16-month lapse between crime-engendered publicity and trial weighs heavily against change of venue]; *People v. Sully* (1991) 53 Cal.3d 1195, 1237 [283 Cal.Rptr. 144, 812 P.2d 163] *(Sully)* [dissipation of publicity in months before trial weighs against change of venue].)

The *America's Most Wanted* broadcast took a less neutral approach. The program portrayed defendant in an unflattering light, as a philanderer, social climber and manipulator, and it provided staged reenactments in which he was identified as the suspected perpetrator. But this broadcast aired on November 20, 1988, over four years before the trial. Moreover, it was seen nationally, so a change of venue could not be expected to dilute its prejudicial effect.

In sum, the circumstances apparent when the venue issue was considered did not warrant a ruling that a change of venue was necessary. The trial court's refusal to grant such relief was not erroneous when made.

Nor, in hindsight, did retention of the case in Alameda County produce an unfair trial. As the People indicate, answers to the juror questionnaires indicated that the vast majority of prospective jurors did not remember hearing anything about the case. Included in this group were six members of the final jury. Of the six sitting jurors who had heard of the case, two recalled no details. The remaining four expressed no difficulty in judging the case fairly.

■ Jurors need not be totally ignorant of the facts and issues involved. It is sufficient if the juror can lay aside his impressions or opinions and render a verdict based on the evidence adduced in court. *(Irvin v. Dowd* (1961) 366 U.S. 717, 722–723 [6 L.Ed.2d 751, 81 S.Ct. 1639]; *People v. Fauber* (1992) 2 Cal.4th 792, 819 [9 Cal.Rptr.2d 24, 831 P.2d 249]; *People v. Ainsworth* (1988) 45 Cal.3d 984, 1002 [248 Cal.Rptr. 568, 755 P.2d 1017]; *People v. Harris* (1981) 28 Cal.3d 935, 949–950 [171 Cal.Rptr. 679, 623 P.2d 240].)

Defendant did not challenge any of the sitting jurors for cause. Moreover, he failed to pose peremptory challenges against any of them, even though he ultimately exhausted only 16 of his 20 allotted challenges, 12 on the regular

panel and four on the alternates. This is a strong indication that the jurors were fair, and that the defense so concluded. (*Dennis, supra,* 17 Cal.4th 468, 524; *People v. Price* (1991) 1 Cal.4th 324, 393 [3 Cal.Rptr.2d 106, 821 P.2d 610] (*Price*); *People v. Daniels* (1991) 52 Cal.3d 815, 853–854 [277 Cal.Rptr. 122, 802 P.2d 906] [indicating that this factor can be decisive].)[9] On this record, we cannot say the denial of a venue change led to an unfair trial. No basis for reversal on this ground is shown.

### 2. *Denial of severance*

The trial court denied defendant's pretrial motion to sever the attempted murder counts involving the Mishells from the count charging the murder of Reyna. Defendant claims the trial court thereby erred. The error, he asserts, violated his due process, fair trial, jury trial, equal protection, and reliable adjudication rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments, and analogous provisions of the California Constitution. However, no error occurred.

■ As defendant concedes, the Mishell and Reyna matters were statutorily eligible for joinder as offenses of the same class. (§ 954; see, e.g., *People v. Miller* (1990) 50 Cal.3d 954, 987 [269 Cal.Rptr. 492, 790 P.2d 1289] [murder and attempted murder are both assaultive crimes against the person, and as such are " 'offenses of the same class' " expressly made joinable by § 954].) Trial courts nonetheless have statutory discretion, in the interests of justice, to sever otherwise joinable counts where joinder would unfairly prejudice the defendant. (§ 954.)

We review the denial of severance under a deferential abuse of discretion standard. (*People v. Mayfield* (1997) 14 Cal.4th 668, 720 [60 Cal.Rptr.2d 1, 928 P.2d 485] (*Mayfield*).) Where the statutory requirements for joinder are met, the defendant must make a clear showing of prejudice to demonstrate that the trial court abused its discretion. (*People v. Stitely* (2005) 35 Cal.4th 514, 531 [26 Cal.Rptr.3d 1, 108 P.3d 182] (*Stitely*); *Mayfield, supra,* at p. 720; see also *People v. Mendoza* (2000) 24 Cal.4th 130, 160 [99 Cal.Rptr.2d 485, 6 P.3d 150] (*Mendoza*).)

In assessing potential prejudice, we examine the record before the trial court at the time of its ruling. The relevant factors are whether (1) the evidence would be cross-admissible in separate trials, (2) some charges are

---

[9] In his reply brief, defendant notes that, during her voir dire, Suzanne H., who sat on the jury, indicated a quite detailed recall of the circumstances of the Mishell assaults and the murder of Reyna. But defendant did not challenge Suzanne H., either for cause or peremptorily, and he failed to exhaust his peremptory challenges. Hence, it appears the defense believed Suzanne H.'s assurances that she could judge the case fairly.

unusually likely to inflame the jury against the defendant, (3) a weak case has been joined with a strong case, or with another weak case, so that the total evidence may unfairly alter the outcome on some or all charges, and (4) one of the charges is a capital offense, or joinder of the charges converts the matter into a capital case. (E.g., *Mendoza, supra,* 24 Cal.4th 130, 161; see also *People v. Marshall* (1997) 15 Cal.4th 1, 27 [61 Cal.Rptr.2d 84, 931 P.2d 262]; *Price, supra,* 1 Cal.4th 324, 388.)

Cross-admissibility ordinarily dispels any inference of prejudice. *(Stitely, supra,* 35 Cal.4th 514, 531–532; *People v. Bradford* (1997) 15 Cal.4th 1229, 1315–1316 [65 Cal.Rptr.2d 145, 939 P.2d 259] *(Bradford); Mayfield, supra,* 14 Cal.4th 668, 721; *People v. Sandoval* (1992) 4 Cal.4th 155, 173 [14 Cal.Rptr.2d 342, 841 P.2d 862] *(Sandoval); People v. Balderas* (1985) 41 Cal.3d 144, 171–172 [222 Cal.Rptr. 184, 711 P.2d 480] *(Balderas).)* Here, as the trial court ruled, evidence of the Mishell assaults would have been cross-admissible in a separate trial of the murder charge, in order to prove defendant's motive for killing Reyna, and to help establish the special circumstance that Reyna was murdered to eliminate him as a witness in the Mishell case. Moreover, it is enough that the assaults were admissible in the murder case; "two-way" cross-admissibility is not required. (E.g., *People v. Cunningham* (2001) 25 Cal.4th 926, 986 [108 Cal.Rptr.2d 291, 25 P.3d 519]; *People v. Cummings* (1993) 4 Cal.4th 1233, 1284 [18 Cal.Rptr.2d 796, 850 P.2d 1] *(Cummings).)*[10]

■ Defendant urges that because motive is not a disputed element of murder, motive evidence was not cross-admissible on the murder charge at issue here. However, we have frequently held that evidence of other offenses is cross-admissible to prove motive *(Jenkins, supra,* 22 Cal.4th 900, 948; see also *People v. Arias* (1996) 13 Cal.4th 92, 127–128 [51 Cal.Rptr.2d 770, 913 P.2d 980] *(Arias); Cummings, supra,* 4 Cal.4th 1233, 1284; *Price, supra,* 1 Cal.4th 324, 388), and in particular a motive to kill to prevent a witness from testifying *(Jenkins, supra,* at p. 948). Moreover, defendant overlooks that his motive to eliminate Reyna as a witness *was* a disputed element of the *witness-killing special circumstance.* (§ 190.2, subd. (a)(10).)

Defendant argues that, where the issue is identity, other-crimes evidence is admissible (see Evid. Code, § 1101) only if it demonstrates highly similar and distinctive common marks suggesting a common perpetrator. But common marks are not crucial where the mere *fact* that the defendant committed a

---

[10] Though this trial postdates the adoption of Proposition 115, we are not concerned with section 954.1, added to the Penal Code by that initiative measure, and providing that, notwithstanding section 954, a trial court may not *grant* severance, where the statutory requirements for joinder are met, solely on the ground that evidence in the joined cases is *not* cross-admissible.

prior offense gives rise to an inference that he had a motive to commit a later one. (*People v. Pertsoni* (1985) 172 Cal.App.3d 369, 375 [218 Cal.Rptr. 350]; see *Lewis and Oliver, supra,* 39 Cal.4th 970, 1001; *Stitely, supra,* 35 Cal.4th 514, 532; *People v. Barnett* (1998) 17 Cal.4th 1044, 1120 [74 Cal.Rptr.2d 121, 954 P.2d 384].)

Defendant suggests that, even if the *fact* of defendant's responsibility for the Mishell assaults would be cross-admissible in the Reyna murder case, evidence of the *extent* of the Mishells' injuries was not necessary to prove the motive for killing Reyna, and should have been excluded as more prejudicial than probative. (See Evid. Code, § 352.) However, as the People observe, the gravity of the attack on the Mishells, and the consequent seriousness of the criminal liability defendant faced in that case, was relevant evidence of the strength of defendant's incentive to kill Reyna, the man to whom he had confessed. Hence, the trial court did not abuse its discretion by ruling that, in a separate murder trial, it would have admitted this evidence over an Evidence Code section 352 objection.

Given the clear cross-admissibility of the Mishell assault evidence in the Reyna murder case, no other factor indicates the cases should have been severed. The Reyna charges carried the death penalty, but because the Mishell evidence would have been admissible to support those charges regardless of joinder, joinder produced no additional prejudice in favor of capital punishment. Moreover, contrary to defendant's assertion, joinder did not serve to bolster a weak case or cases. Evidence of defendant's responsibility for the Mishell assaults was virtually conclusive, and the evidence that he murdered Reyna, though circumstantial, was extremely strong.[11] Accordingly, the denial of severance did not constitute an abuse of the trial court's discretion.

For all these reasons, we similarly conclude, on appeal, that the trial court's ruling, proper when made, did not produce, in hindsight, " 'a gross unfairness . . . such as to deprive the defendant of a fair trial or due process of law.' [Citation.]" (*Sandoval, supra,* 4 Cal.4th 155, 174, quoting *People v. Johnson* (1988) 47 Cal.3d 576, 590 [253 Cal.Rptr. 710, 764 P.2d 1087]; see *Stitely, supra,* 35 Cal.4th 514, 531.) Defendant's severance claim must be rejected.

---

[11] As indicated above, this evidence included the fact that Reyna told a number of people defendant had admitted the Mishell assaults to him, that Reyna gave a police statement to that effect, that Reyna resisted defendant's pressure to recant his statement and avoid testifying in the Mishell case, that Reyna left for a meeting with defendant and was never again seen alive, that a tool identified as defendant's was found at the isolated scene where Reyna's dismembered body was discovered, and that defendant fled the country immediately after Reyna's disappearance.

### 3. *Alleged discovery violation*

On Monday, April 12, 1993, after defendant's testimony had commenced and the jury had been dismissed for the day, defense counsel announced that, on the previous Friday, his office had obtained letters sent in 1989 by defendant's sister Terri Zambrano (Terri) to a deputy sheriff at the North County jail, where defendant was housed pending trial, and to the prosecutor himself.

The letters were written in an agitated style, with many words and phrases underlined and capitalized for emphasis. They expressed Terri's fear of defendant and asked that she be notified immediately if his release was imminent. According to the letters, Terri had obtained a restraining order against defendant after he tried to rape and kill her, and he had also tried to kill other members of the Zambrano family. The letter to the prosecutor further stated that defendant had been "born insane" (capitalization omitted), that the condition was hereditary, that he was "incurable and untreatable" (capitalization omitted), that prison would not punish him or improve his condition, and that he "[would] kill again" (capitalization, underscoring, & multiple exclamation points omitted) if given life without parole.

Defense counsel urged that the People's failure to disclose the letter to the prosecutor contravened *Brady v. Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215, 83 S.Ct. 1194] (*Brady*). Counsel insisted the revelation of defendant's mental problems was favorable and material within the meaning of *Brady*, because it might have spurred an investigation into possible mental defenses. That strategy was now foreclosed, counsel urged, because the defense had already put defendant on the stand, and Terri had died since the letter was written and sent. On this basis, counsel moved for a mistrial.

The prosecutor responded as follows: He had not seen, and did not know of, the letter sent to the jail. He had received the letter addressed to him, but placed little weight on it because of his serious doubts about the author's state of mind. In any event, Terri's letter was the kind of material he would normally include in discovery, and "[i]f that was not turned over, then it was an oversight. I turned everything that I have over to them [or] attempted to."

The prosecutor noted that "[t]here is still remaining alive another sister . . . that the defense hasn't spoken with I've been told and also [a] brother . . . ." Finally, the prosecutor indicated, "I think [defense] counsel will agree that on a couple of occasions I have asked them or invited them to go through all the files that I've got to make sure that everything was turned over."

The court observed that basing an insanity defense on the letter seemed somewhat of a stretch, while a diminished capacity defense was contradicted

by defendant's testimony that he did not intend to kill Luis Reyna. On this basis, the mistrial motion was denied. However, the court noted, the defense could submit the letter to a psychiatrist for any help it might be at the penalty phase. The court also admonished that the prosecutor could not use the letter to cross-examine defendant.

On appeal, defendant contends the prosecutor's failure to disclose the letters was prejudicial misconduct in violation of both the state reciprocal discovery statute (§ 1054 et seq.), and the federal constitutional obligation, under *Brady*, not to suppress evidence materially favorable to the defense. We reject the claim.[12]

■ The federal due process clause prohibits the prosecution from suppressing evidence materially favorable to the accused. The duty of disclosure exists regardless of good or bad faith, and regardless of whether the defense has requested the materials. (*United States v. Agurs* (1976) 427 U.S. 97, 107 [49 L.Ed.2d 342, 96 S.Ct. 2392]; *Brady, supra*, 373 U.S. 83, 87.) The obligation is not limited to evidence the prosecutor's office itself actually knows of or possesses, but includes "evidence known to the others acting on the government's behalf in the case, including the police." (*Kyles v. Whitley* (1995) 514 U.S. 419, 437 [131 L.Ed.2d 490, 115 S.Ct. 1555] (*Kyles*).)

For *Brady* purposes, evidence is favorable if it helps the defense or hurts the prosecution, as by impeaching a prosecution witness. (*United States v. Bagley* (1985) 473 U.S. 667, 676 [87 L.Ed.2d 481, 105 S.Ct. 3375]; see *In re Sassounian* (1995) 9 Cal.4th 535, 544 [37 Cal.Rptr.2d 446, 887 P.2d 527].) Evidence is material if there is a reasonable probability its disclosure would have altered the trial result. (E.g., *Banks v. Dretke* (2004) 540 U.S. 668, 699 [157 L.Ed.2d 1166, 124 S.Ct. 1256].) Materiality includes consideration of the effect of the nondisclosure on defense investigations and trial strategies. (*Bagley, supra*, at pp. 682–683; see *In re Brown* (1998) 17 Cal.4th 873, 887

---

[12] Defendant arguably has forfeited the state statutory claim. In the trial court, he mentioned only *Brady*, not the reciprocal discovery statute, though his 1992 motion long postdates the 1990 adoption of Proposition 115, the initiative measure that enacted the statute. Moreover, there is no indication defendant made a prior "informal request" to the prosecution for these materials (either specifically or as part of a general category of discovery) as the statute requires. (§ 1054.5, subd. (b).)

However, before trial, defendant made a formal nonstatutory *motion*, and obtained a *court order*, for comprehensive discovery, including disclosure of "[a]ll material in the possession of the prosecution or law enforcement personnel which . . . is material to the defendant's guilt or innocence, or is otherwise relevant to the determination of penalty." Moreover, it is difficult to conclude that the statutory "informal request" procedures apply to specific items of which the party entitled to disclosure neither knows nor has reason to know. Because the preliminary issues of forfeiture and statutory compliance are thus close and difficult, we assume defendant has preserved his statutory claim on appeal. (See *People v. Champion* (1995) 9 Cal.4th 879, 908, fn. 6 [39 Cal.Rptr.2d 547, 891 P.2d 93] (*Champion*).)

[72 Cal.Rptr.2d 698, 952 P.2d 715] (*Brown*).) Because a constitutional violation occurs only if the suppressed evidence was material by these standards, a finding that *Brady* was not satisfied is reversible without need for further harmless-error review. (*Kyles, supra,* 514 U.S. 419, 435.)

As indicated above, the reciprocal discovery statute independently requires the prosecution to disclose to the defense, in advance of trial or as soon as discovered, certain categories of evidence "in the possession of the prosecuting attorney or [known by] the prosecuting attorney . . . to be in the possession of the investigating agencies." (§ 1054.1.) Evidence subject to disclosure includes "[a]ll relevant real evidence seized or obtained as a part of the investigation of the offenses charged" (*id.,* subd. (c)) and "[a]ny exculpatory evidence" (*id.,* subd. (e)). Absent good cause, such evidence must be disclosed at least 30 days before trial, or immediately if discovered or obtained within 30 days of trial. (§ 1054.7.)

It is clear the prosecutor committed no lapse, constitutional or statutory, with respect to Terri's letter to the deputy sheriff. The prosecutor represented, without contradiction, that his office did not possess that letter and that he was unaware of its existence elsewhere. Hence, he had no statutory duty to disclose it. (§ 1054.1.)

Moreover, the record does not show the sheriff's office was an agency subject to the statutory or constitutional duty of disclosure. So far as appears, the sheriff was only defendant's jailer, and was not involved in the investigation or prosecution of the charges against him.

Under *Brady,* the prosecutor's duty extends to evidence "known to the others acting on the government's behalf" (*Kyles, supra,* 514 U.S. 419, 437), "[b]ut the prosecution cannot reasonably be held responsible for evidence in the possession of *all* government agencies, including those not involved in the investigation or prosecution of the case. . . . '[I]nformation possessed by an agency that has no connection to the investigation or prosecution of the criminal charge against the defendant is not possessed by the prosecution team, and the prosecutor does not have the duty to search for or to disclose such material.' [Citation.]" (*In re Steele* (2004) 32 Cal.4th 682, 697 [10 Cal.Rptr.3d 536, 85 P.3d 444] (*Steele*); see also *Brown, supra,* 17 Cal.4th 873, 879 [*Brady* duty concerns evidence possessed by the " ' " 'prosecution team,' " ' " which includes " ' "both investigative and prosecutorial personnel" ' "].)

Similarly, the reciprocal discovery statute refers only to evidence possessed by the prosecutor's office and "the investigating agencies." (§ 1054.1.) There is no reason to assume the quoted statutory phrase assigns the prosecutor a

broader duty to discover and disclose evidence in the hands of other agencies than do *Brady* and its progeny. Accordingly, the letter to the sheriff's deputy was not within constitutional or statutory disclosure requirements.

Finally, nothing in the letter to the deputy was remotely favorable or material to the defense. Defendant does not seriously argue otherwise. The letter did not allude to defendant's mental condition; it simply represented that he is a violent person who attacked his own family members in the past and would do so again if free from incarceration. Hence, this letter was not subject to disclosure under either *Brady* or the exculpatory-evidence prong of the discovery statute.

Nor did the prosecutor violate disclosure duties, constitutional or statutory, with respect to the letter sent to him. In the first place, while he conceded he might have neglected to "turn[] over" this item, he nonetheless agreed the letter was in his possession, and he pointed out that he had invited defense counsel "on a couple of occasions . . . to go through all the files that I've got to make sure that everything was turned over."

Defense counsel neither denied these invitations were made nor asserted they came too late. He did not indicate that a timely examination of the prosecutor's files had failed to reveal the letter. Nor did he suggest the files had been made available under circumstances that rendered examination impracticable or unfairly oppressive.

 "Although the prosecution may not withhold favorable and material evidence from the defense, neither does it have the duty to conduct the defendant's investigation for him. [Citation.] If the material evidence is in a defendant's possession *or is available to a defendant through the exercise of due diligence*, then . . . the defendant has all that is necessary to ensure a fair trial . . . ." (*People v. Salazar* (2005) 35 Cal.4th 1031, 1048–1049 [29 Cal.Rptr.3d 16, 112 P.3d 14], italics added; see also *People v. Morrison* (2004) 34 Cal.4th 698, 715 [21 Cal.Rptr.3d 682, 101 P.3d 568].)

For this reason, as the People observe, the prosecutor's *Brady* obligation may, under proper circumstances, be satisfied by an "open file" policy, under which defense counsel are free to examine all materials regarding the case that are in the prosecutor's possession. (See *Strickler v. Greene* (1999) 527 U.S. 263, 283, fn. 23 [144 L.Ed.2d 286, 119 S.Ct. 1936]; see also, e.g., *U.S. v. Morales-Rodriguez* (1st Cir. 2006) 467 F.3d 1, 15; *U.S. v. Beers* (10th Cir. 1999) 189 F.3d 1297, 1304.) Of course, if the prosecutor relies on such a policy to comply with *Brady*, the defense may assume his files contain all the evidence he is obligated to share. (*Strickler, supra*, at p. 283, fn. 23.) Concerns might also arise if the prosecutor used the policy to impose impracticable or unduly oppressive self-discovery burdens on the defense.

But, for reasons detailed above, those concerns are not raised by this record. For all that appears, the letter was in the prosecutor's files, and would have been revealed by a timely, practicable examination of those files pursuant to the prosecutor's multiple invitations. Accordingly, defendant fails to demonstrate a *Brady* violation. Because we see no reason to assume the reciprocal discovery statute imposed greater burdens on the prosecutor, we reach a similar conclusion as to defendant's claim of a statutory violation.

Finally, we are not persuaded that Terri's letter to the prosecutor was material for purposes of *Brady*, or that any failure to disclose it was prejudicial for purposes of state law.[13] Defense counsel conceded the letter's only value would have been to spur an investigation of defendant's mental problems. Yet the claim that nondisclosure of the letter may have denied defendant a chance to investigate and present successful mental defenses is speculative and stretches credulity.

Given the convincing evidence that defendant had savagely assaulted the Mishells, and had dismembered Reyna's body after killing him, it is difficult to imagine that a mental-condition strategy did not otherwise occur to counsel. To the extent family information was relevant, counsel had ample opportunity, on their own initiative, to obtain it. Though the defense had already implemented its guilt phase strategy, and Terri apparently had died, by the time the "born insane" letter was revealed, there seems no reason why this information was not available earlier, from Terri or other family members, as the result of a reasonably diligent defense investigation.

Moreover, the letter's exaggerated, even hysterical, style rendered its credibility suspect. Indeed, any notion that the defense believed the letter provided credible new information about defendant's mental condition is belied by the fact that, although mental issues would have been independently relevant at the *penalty* phase (see § 190.3, factors (d), (h), (k)), and although the court specifically told counsel they could present the letter to a psychiatrist for use on the issue of penalty, counsel sought no penalty phase continuance to explore the issues raised by the letter. And the defense presented no mental-condition evidence at the penalty phase.

Most fundamentally, there is little chance that evidence of defendant's mental illness would have influenced either the guilt or penalty results. The

---

[13] No reason appears why any violation of the California reciprocal-discovery statute, considered as such, is not subject on appeal to the harmless-error standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243], and thus is a basis for reversal only where it is reasonably probable, by state-law standards, that the omission affected the trial result. We disapprove any contrary implication in *People v. Bohannon* (2000) 82 Cal.App.4th 798, 805–807 [98 Cal.Rptr.2d 488] (appearing to apply the *Brady* materiality standard to violations of the reciprocal-discovery statute).

evidence actually presented made clear that defendant, a successful contractor and public official, carried on an extramarital affair, then assaulted the Mishells because he suspected them of exposing it. Defendant took elaborate steps to establish an alibi for the Mishell beatings. Having admitted his guilt to Luis Reyna—an admission Reyna reported to the police—defendant pressured Reyna to recant his police statement, and to avoid testifying against defendant.

When Reyna resisted these efforts, defendant killed him to prevent his testimony. Using his contractor's tools, defendant beheaded, dismembered, and scattered Reyna's body in an isolated area under circumstances which—even aside from defendant's trial admissions—suggested a purpose to hamper the body's identification. With his girlfriend's help, defendant then obtained false identity documents, fled to Mexico, and lived at large there for many months before he was apprehended upon his return to the United States. From his jail cell, he continued his efforts to suppress the proof against him. At the penalty trial, his niece testified that when she was 15 years old, he had contrived to take her to an isolated location, where he sexually assaulted her.

Thus, the evidence portrayed defendant as rational, calculating, and manipulative in the pursuit of venal ends. Under these circumstances, there is no reasonable chance any mental-condition defense would have succeeded in exonerating him, reducing his culpability, or preventing a death judgment. The claim of material, prejudicial nondisclosure of evidence therefore fails.

C. *Guilt trial evidentiary issues*

1. *Neuropsychologist's evidence regarding Mishells' recovery and prognoses*

The prosecution presented testimony by physicians who treated the Mishells in the immediate aftermath of defendant's assaults. This testimony indicated, among other things, the following: Both victims suffered multiple depressed skull fractures, and both required surgery to relieve injury-related, and life-threatening, pressure on their brains. Barbara Mishell emerged from her trauma-induced coma with right-side paralysis, difficulty in swallowing, and an inability to read, write, or speak. By the time she left the hospital, she still could not walk, talk, or feed herself. It appeared she would need extensive rehabilitative therapy, and her prognosis was not good.

Subsequently, defense counsel advised the court it understood the prosecution intended to present Dr. Price, a neuropsychologist, who had supervised both victims' long-term rehabilitative therapy and continued to treat them at the time of trial. Counsel anticipated Dr. Price's testimony would concern the

couple's rehabilitative progress over the two or three years since their release from the hospital. Counsel objected that such evidence was irrelevant (Evid. Code, §§ 210, 350) and cumulative, in that medical witnesses had already established the serious and extensive nature of the Mishells' injuries. Counsel also asserted that this evidence should be excluded as more prejudicial than probative. (*Id.*, § 352.)

Alluding to the complaint's allegation that the Mishells had suffered great bodily injury (GBI), the prosecutor responded that "I don't think the law says . . . we have to stop as soon as the minimum burden for [GBI] is met, and I think the jury has a right to understand the full scope of [those] injuries." He insisted that Dr. Price's testimony would differ from that already presented, because it would describe the long-term impact of the blows defendant had inflicted.

The court advised the prosecutor that "I think [counsel is] trying to say, does that help you to prove intent to kill or premeditation. [¶] Why are you doing this?" The prosecutor again asserted that "I'm doing this to prove the extent of the [GBI] and to prove intent to kill and to show the full extent of the injuries [Barbara] suffered, and I think the law entitles me to do that." Suggesting that the evidence "might be able to show the issue of the necessary mental state in assault with a deadly weapon or attempted murder," the court overruled the objection but directed the prosecutor to keep his presentation brief.

In his testimony, Dr. Price reported that Robert Mishell had largely regained his cognitive function, but would have difficulty resuming his career as an immunology professor because he retained deficits in the areas of memory and visual spatial functioning. Dr. Price also discussed the characteristics of posttraumatic amnesia as they might apply to Robert's recall of the events surrounding the attacks. Dr. Price related that Barbara continued to exhibit emotional and behavioral instability related to brain damage, as well as profound aphasia—the inability to speak or understand speech. He said her prognosis for regaining the functional use of language was poor.

On appeal, defendant claims Dr. Price's testimony was irrelevant to the elements of the attempted murder charges. He urges it was cumulative to the extensive evidence already produced about the nature and extent of the Mishells' injuries, served only to inflame the jury, and should have been excluded under Evidence Code section 352. The court's error, he asserts, additionally violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

The evidence was properly admitted. Information about the full extent of the Mishells' conditions resulting from the attacks was directly relevant and

probative as to the allegation, not formally conceded by defendant, that he inflicted GBI on the victims. Nor was the evidence cumulative insofar as it focused on the long-term effects of the Mishells' injuries—information not provided by other prosecution witnesses.

 As below, the People correctly observe that they were not required to withhold evidence of the full extent of the Mishells' injuries once a minimum threshold necessary to prove the GBI allegation had been passed. The prosecution need not sap the force of its case by presenting only the most antiseptic evidence, even in the face of a defense offer to stipulate. (E.g., *People v. Marks* (2003) 31 Cal.4th 197, 226 [2 Cal.Rptr.3d 252, 72 P.3d 1222] (*Marks*); *Box, supra,* 23 Cal.4th 1153, 1199; *Pride, supra,* 3 Cal.4th 195, 243.) A fortiori, where, as here, the prosecution must convince the fact finder, beyond reasonable doubt, of charges and allegations the defendant has not conceded, it need not sanitize its case by presenting only enough evidence to meet bare legal sufficiency.

Moreover, evidence that the victims, and in particular Barbara Mishell, suffered not only severe acute trauma, but also substantial long-term deficits and disabilities, as the result of defendant's vicious attack was not unduly prejudicial for purposes of Evidence Code section 352. For this purpose, "prejudicial" means uniquely inflammatory without regard to relevance. (E.g., *People v. Kipp* (2001) 26 Cal.4th 1100, 1121 [113 Cal.Rptr.2d 27, 33 P.3d 450].) Dr. Price's testimony was logically related to the issues, and was presented in a nonsensational way, through the testimony of an expert witness. The court acted well within its broad discretion under section 352 (e.g., *People v. Gurule* (2002) 28 Cal.4th 557, 654 [123 Cal.Rptr.2d 345, 51 P.3d 224]; *Champion, supra,* 9 Cal.4th 879, 913) when it ruled the evidence admissible.

Defendant invokes the premise that, when the trial court rules on an Evidence Code section 352 objection, the record must affirmatively show the court weighed prejudice against probative value. (See, e.g., *People v. Mickey* (1991) 54 Cal.3d 612, 656 [286 Cal.Rptr. 801, 818 P.2d 84] (*Mickey*).)[14] Defendant insists the instant trial court failed to satisfy this requirement, or to exercise its discretion correctly, when it used a mistaken legal theory—that the evidence was relevant to his culpable mental state—to assess the probative value of the evidence.

Whatever the technical merits of this argument, the evidence was manifestly admissible, over a section 352 objection, for other reasons presented by

---

[14] Of course, "the trial judge need not expressly weigh prejudice against probative value—or even expressly state that he has done so [citation]." (*Mickey, supra,* 54 Cal.3d 612, 656; accord, *People v. Crittenden* (1994) 9 Cal.4th 83, 135 [36 Cal.Rptr.2d 474, 885 P.2d 887] (*Crittenden*).)

the prosecutor to the trial court. Indeed, under a correct analysis, the probative value of Dr. Price's testimony so clearly exceeded its prejudicial effect that the court might well have abused its discretion by *excluding* the evidence.

In any event, admission of the evidence was harmless by any applicable standard. The jury heard conclusive evidence that defendant was the perpetrator of a vicious assault against the Mishells, in which they each suffered multiple life-threatening head injuries leading, in Barbara's case, to severe brain damage from which she was unlikely to recover. Under these circumstances, additional evidence confirming the couple's long-term deficits and disabilities could not, beyond a reasonable doubt, have influenced the guilt or penalty outcome. No basis for reversal is demonstrated.

### 2. *Admission of Robert Mishell's testimony*

Defendant claims Robert Mishell's memory of the events of January 31, 1988, impaired by both his head injuries and his preexisting bipolar disorder, was unreliable. Hence, defendant urges, Robert's testimony should have been excluded under Evidence Code sections 702 (evidence of witness lacking personal knowledge is inadmissible) and 352 (evidence may be excluded as more prejudicial than probative). Admission of the evidence, defendant insists, violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

As evidence of Robert's faulty recollection, defendant points to inconsistent details related by Robert at various times, including in his preliminary hearing testimony and in his interviews with police officers in the hours and days following the assaults. Perhaps most significantly, defendant notes, Robert's trial testimony that defendant arrived at the Mishell residence with a toolbox, thus suggesting he brought with him the weapon used in the attacks, was contradicted by what he told the police hours after the attacks.

The claim is forfeited because defendant did not object *at trial* to the introduction of Robert's testimony. (Evid. Code, § 353, subd. (a); *People v. Cudjo* (1993) 6 Cal.4th 585, 622 [25 Cal.Rptr.2d 390, 863 P.2d 635] [defendant must raise claim of testimonial incompetence at trial].) *At the preliminary hearing*, defendant was permitted to examine Robert on the issue of his "competency" to testify. Following that examination, the preliminary hearing court found Robert "qualified to testify from his personal knowledge." Absent a ruling or stipulation that an objection to such testimony would be deemed renewed at trial, defendant's failure to renew it means the issue was not preserved for appeal. (*People v. Clark, supra,* 50 Cal.3d at pp. 623–624 [objection made in prior trial, but not renewed]; cf. *People v.*

*Pompa-Ortiz* (1980) 27 Cal.3d 519 [165 Cal.Rptr. 851, 612 P.2d 941] (*Pompa-Ortiz*) [denial of substantial right at preliminary hearing no basis for appellate reversal of conviction following fair trial].)

██ In any event, the claim lacks merit. The principles governing exclusion of testimony on grounds of the witness's lack of capacity are well settled. "Under . . . current [law], every person is qualified to testify except as provided by statute. (Evid. Code, § 700.) A person is disqualified as a witness only if he or she is '[i]ncapable of expressing himself or herself [understandably] concerning the [testimonial] matter' (*id.,* § 701, subd. (a)(1) . . .), or is '[i]ncapable of understanding the duty of a witness to tell the truth' (*id.,* . . . subd. (a)(2) . . .)." (*People v. Anderson* (2001) 25 Cal.4th 543, 572–573 [106 Cal.Rptr.2d 575, 22 P.3d 347] (*Anderson*), italics omitted.) These issues are "preliminary fact[s] to be determined exclusively by the court . . . . (Evid. Code, § 405, subd. (a) . . . .)" (*Anderson, supra,* at p. 573.)

Even if a witness is not entirely disqualified for incapacity to communicate understandably or grasp the duty to tell the truth, his or her testimony on a *particular matter* is inadmissible if he or she lacks personal knowledge of the subject matter. (Evid. Code, § 702, subd. (a).) The capacity to perceive and recollect particular facts is subsumed within the issue of personal knowledge. (*Anderson, supra,* 25 Cal.4th 543, 573, and authorities cited.)

But, under Evidence Code section 403, subdivision (a)(2), personal knowledge, including the capacity to perceive and recollect particular events, is determined in a different manner from fundamental capacity to act as a witness. Evidence may be excluded for lack of personal knowledge " 'only if no jury could reasonably find that [the witness] has such knowledge.' " (*Anderson, supra,* 25 Cal.4th 543, 573, italics omitted.) Thus, " 'if there is evidence that the witness [can perceive and recollect the events at issue], the determination whether he [or she] in fact perceived and does recollect is left to the trier of fact.' " (*Id.* at pp. 573–574, italics omitted.)

Defendant has never claimed Robert was fundamentally disqualified as a witness. Here, as below, he asserts only that Robert's testimony about the events of January 31, 1988, was inadmissible because he lacked the capacity to perceive and recall those events.

But the record contains ample evidence from which a rational jury could conclude that Robert did perceive and independently recollect the attacks and their surrounding circumstances, and correctly identified defendant as the assailant. At trial, Robert gave a coherent and entirely plausible account of these events, which account was consistent with the physical evidence.

During an extensive cross-examination, he admitted that, before and since the attacks, he suffered from chronic bipolar disorder, controlled by medication, but denied that this condition affected his memory. He conceded he had suffered posttraumatic amnesia during the two weeks following the attacks, and other instances of forgetfulness were revealed. Yet the lengthy cross-examination, in which defense counsel took the witness through an exhaustive review of his preliminary hearing testimony and his several police statements, indicated only minor variations in these versions.

That Robert's various accounts were inconsistent in some respects, or that his testimony revealed lapses in memory, is no basis for a determination that he was fundamentally unable to perceive or recollect the testimonial events. (*People v. Lewis* (2001) 26 Cal.4th 334, 357 [110 Cal.Rptr.2d 272, 28 P.3d 34]; *Anderson, supra,* 25 Cal.4th 543, 574.) In sum, there was no substantial basis for the exclusion of his testimony. It was up to the jury to decide whether his recollections were accurate. (*Lewis, supra,* at p. 358; *Anderson, supra,* at p. 574.) No error occurred.

3. *Admission of "hacker" excerpt from defendant's letter to Oberman*

During her testimony for the People, Celebration Oberman read to the jury, without defense objection, passages from two letters, previously marked for identification as People's exhibits 72 and 73, that defendant had written her from jail. From exhibit 73, postmarked December 4, 1989, Oberman read: " 'If any of your friends attack me, tell them that you like your toy boys to be darkly handsome and charming and dangerous, hackers, murderers, pirates, and that I fit the bill.' " From exhibit 72, postmarked December 19, 1989, Oberman read: " 'Sorry I don't know more about kitchens. I do know about hacking, however; and I could easily hack you a cart to make pizzas.' "

At the conclusion of the People's case, defendant objected on relevance grounds, and under Evidence Code section 352, to admission of these letters, and in particular to admission of the pages containing the passages Oberman had read—pages now marked for identification as People's exhibits 72-A and 73-A, respectively. Counsel urged that the term "hacking" in exhibit 72-A— there used in connection with making a pizza cart—did not pertain to any trial issue, but was highly prejudicial given the facts of the case. As to exhibit 73-A, in which defendant said he "fit the bill" as a "hacker[], murderer[], [and] pirate[]," counsel asserted that even if "hacker[]" was not related to the "pizza cart" reference in exhibit 72-A, its use next to the word "murderer[]" produced a prejudicial effect far in excess of its probative value.

The court ruled that exhibit 72-A, the "pizza cart" passage, would be excluded "on 352," in that the "hacking" reference there, read in context,

appeared not connected to the case. However, the court admitted exhibit 73-A as "an admission of guilt," i.e., that defendant was "a murderer, a hacker, that kind of stuff," and "[t]hat's why it's going in."

In his trial testimony, defendant stated that "hacker" was a "computer term" which had come to have a pejorative connotation, but originally meant "a person who would elegantly solve a problem by hacking at it but persistently trying to find a solution." He said that while he and Oberman were in Palm Springs, he had read to Oberman, a "computer illiterate," from a book about "hackers" as "computer heroes," and as a result, she had come to call defendant "her little hacker."

Defendant now urges that, by admitting exhibit 73-A, the trial court abused its discretion under Evidence Code section 352. He asserts the trial court admitted this exhibit *even though it recognized that "hacker" was not used in a murderous context.* In particular, he insists, by placing before the jury defendant's self-reference as a "hacker"—an inflammatory term for purposes of this particular case—the court denied him his Eighth Amendment right to a reliable capital trial.

We find no abuse of discretion. At the outset, defendant is mistaken that the trial court saw no sinister implication to defendant's use of "hacker" in exhibit 73-A. On the contrary, as indicated above, while the court considered that the "hacking" reference in exhibit *72-A* was probably innocent, it ruled that the "hacker" reference in exhibit *73-A* could be considered an admission of guilt.

The court properly concluded that exhibit 73-A was probative on this issue. Though the meaning of the disputed passage was perhaps open to interpretation, a sinister construction was reasonable. Under these circumstances, it was for the jury to make the determination. (See, e.g., *People v. Kraft* (2000) 23 Cal.4th 978, 1032–1035 [99 Cal.Rptr.2d 1, 5 P.3d 68] (*Kraft*).)

Nor, as the trial court implicitly found, was the evidence so uniquely inflammatory that its potential for unfair prejudice clearly outweighed its probative value. Indeed, by admitting this letter excerpt, the prosecution simply asked the fact finder to interpret defendant's own bragging words. There is no basis to conclude the trial court erred by admitting exhibit 73-A.

Moreover, any error was harmless by any applicable standard. The jurors had already heard the disputed passages, read to them from the witness stand by Oberman. Under these circumstances, and beyond a reasonable doubt, later admission of exhibit 73-A into evidence cannot have affected the guilt or penalty outcome. No basis for reversal appears.

### 4. *Hearsay objection to Reyna tape recording*

On August 7, 1992, prior to jury selection, the prosecution notified the defense it intended to offer in evidence Luis Reyna's April 5, 1988, tape-recorded interview with the police. In this interview, Reyna stated that, during a conversation between the two men, defendant had admitted his responsibility for the Mishell assaults; Reyna also indicated that defendant had attempted to enlist Reyna's help in establishing an alibi for those offenses.

 The notice asserted that the statement was admissible, as an exception to the hearsay rule, under Evidence Code section 1350. This statute provides a hearsay exception, in a "serious felony" case, for properly memorialized, authenticated, trustworthy, and corroborated statements made to a law enforcement officer by a declarant who thereafter became unavailable as a court witness because, by clear and convincing evidence, he or she was kidnapped or killed, with the defendant's participation or at his behest, for the purpose of preventing the defendant's arrest or prosecution.[15]

Defendant moved in limine to exclude the tape, urging that it did not meet the requirements of Evidence Code section 1350—interpreted in light of the federal confrontation clause's ban on untrustworthy hearsay[16]—and was more prejudicial than probative (Evid. Code, § 352).

[15] Evidence Code section 1350, enacted in 1985 (Stats. 1985, ch. 783, § 1, p. 2523), provides in pertinent part:

"(a) In a criminal proceeding charging a serious felony, evidence of a statement made by a declarant is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness, and all of the following are true:

"(1) There is clear and convincing evidence that the declarant's unavailability was knowingly caused by, aided by, or solicited by the party against whom the statement is offered for the purpose of preventing the arrest or prosecution of the party and is the result of the death by homicide or the kidnapping of the declarant. [¶] . . . [¶]

"(3) The statement has been memorialized in a tape recording made by a law enforcement official, or in a written statement prepared by a law enforcement official and signed by the declarant and notarized in the presence of the law enforcement official, prior to the death or kidnapping of the declarant.

"(4) The statement was made under circumstances which indicate its trustworthiness and was not the result of promise, inducement, threat, or coercion.

"(5) The statement is relevant to the issues to be tried.

"(6) The statement is corroborated by other evidence which tends to connect the party against whom the statement is offered with the commission of the serious felony with which the party is charged. The corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."

[16] At the time of defendant's trial, the federal confrontation clause (U.S. Const., 6th Amend., cl. 3) was deemed to preclude the use against a criminal accused, for truth, of the out-of-court statement of a declarant unavailable for cross-examination only if the statement did not (1) fall within a firmly rooted hearsay exception or (2) otherwise exhibit "particularized guarantees of trustworthiness." (*Ohio v. Roberts* (1980) 448 U.S. 56, 66 [65 L.Ed.2d 597, 100 S.Ct. 2531].) Thereafter, in *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354]

The court denied the defense motion. Among other things, the court correctly noted that the "corroboration" requirement set forth in Evidence Code section 1350 applied only to the Mishell assaults—the only charges as to which Reyna's statement was offered *for its truth,* and was thus subject to the hearsay rule (see Evid. Code, § 1200).[17] After confirming it had reviewed a transcript of the taped statement, and had read the preliminary hearing transcript, the court ruled that "I am going to admit the recorded statement under [section] 1350 on the ground there is evidence, clear and convincing, [that] [Reyna's] unavailability was caused by the defendant and the statement which concerns the assault is corroborated by the evidence."

Defendant renewed his objection prior to the prosecution's opening statement, this time explicitly invoking the confrontation clause as well as Evidence Code section 1350, and again in midtrial, before the introduction of the taped statement. Subject to certain redactions for other evidentiary reasons, these objections were again overruled. The tape recording of Reyna's April 5, 1988, police statement, as redacted, was played for the jury.

On appeal, defendant again contends the prosecution failed to satisfy the prerequisites for the admission of Reyna's statement under Evidence Code section 1350. The claim lacks merit.

We review evidentiary rulings, including those involving hearsay issues, for abuse of discretion. (E.g., *People v. Waidla* (2000) 22 Cal.4th 690, 725 [94 Cal.Rptr.2d 396, 996 P.2d 46] (*Waidla*).) Under that standard, the record considered by the trial court amply supports its conclusion that the statement was admissible under this statute.

Defendant first insists that, at the time of the court's evidentiary ruling, there was not clear and convincing evidence defendant knowingly caused Reyna's death for the purpose of preventing defendant's arrest or prosecution.[18] But the taped statement itself was evidence of Reyna's status as a

---

(*Crawford*), the high court overruled *Roberts* and held that the confrontation clause forbids the criminal use, for truth, of all " 'testimonial' " statements made outside of court by a declarant who does not appear as a trial witness unless the defendant had a prior opportunity to cross-examine the declarant. (*Crawford, supra,* at p. 51.) A "recorded statement, knowingly given in response to structured police questioning," qualifies as testimonial under *Crawford.* (*Id.* at p. 53, fn. 4.)

[17] As we discuss below, Reyna's taped statement was admissible on the murder charge *not* for the truth of the assertions made by Reyna, but as evidence that he was a significant potential witness against defendant in the Mishell attempted murder case, and that defendant thus had a motive to kill Reyna to prevent his testimony.

[18] Defendant does not dispute that the statutory phrase "for the purpose of preventing the *arrest or prosecution* of [the defendant]" (Evid. Code, § 1350, subd. (a)(1), italics added) extends to killings for the purpose of preventing a potential witness's trial testimony against

potential, and significant, prosecution witness in the Mishell assault case.[19] Moreover, the preliminary hearing disclosed evidence that defendant knew of the threat posed by Reyna. There Reyna's sister Yolanda testified, as at trial, that the night before he disappeared, Reyna told defendant on the telephone he was not afraid of defendant and intended to testify against him.[20]

There was also strong evidence that, within a day after receiving this news from Reyna, defendant killed him. At the preliminary hearing, Reyna's mother Helen testified, as at trial, that on the morning after his telephone conversation with defendant, Reyna left the family home, with some trepidation, to meet defendant face to face, and that Reyna never returned. Other preliminary hearing witnesses recounted the discovery, days after Reyna's disappearance, of his decapitated and dismembered body in an isolated location, as well as physical and forensic evidence linking defendant to the homicide. This included testimony that bloodstains on the exterior and interior of defendant's abandoned truck included samples consistent with the victim's blood.

Under these circumstances, a strong inference arose that defendant had murdered Reyna, and had done so to prevent the testimony Reyna threatened he would give. The trial court was amply justified in finding, by clear and convincing evidence, that defendant knowingly caused Reyna's death for this purpose.

Defendant also asserts there were insufficient indicia of trustworthiness surrounding Reyna's police statement to satisfy either Evidence Code section

the defendant. Indeed, as the People point out, comments on the 1985 bill which became Evidence Code section 1350 indicated that "the legislation was 'motivated by the "murdered witness problem" . . . serious charges are dismissed, lost or reduced every year because of the unavailability of prosecution witnesses who have been murdered or kidnapped by the persons against whom they would testify.' " (*Dalton v. Superior Court* (1993) 19 Cal.App.4th 1506, 1511 [24 Cal.Rptr.2d 248], quoting Assem. Off. of Research, 3d reading analysis of Assem. Bill No. 2059 (1985–1986 Reg. Sess.).)

Defendant also concedes, as he must, that the attempted murder charges in the Mishell case were "serious felon[ies]" for purposes of Evidence Code section 1350. (*Id.*, subd. (d); Pen. Code, § 1192.7, subd. (c)(9).)

[19] Evidence Code section 1350 requires that the *facts* asserted in the recorded statement be corroborated by some other evidence linking the defendant to the crime. Otherwise, however, nothing in this statute, or any other principle of which we are aware, precludes consideration of Reyna's police statement itself for the foundational purpose of determining its admissibility over a hearsay objection.

[20] Defendant makes much of the notion that, based on the evidence available when the court ruled Reyna's statement admissible, defendant had no reason to fear testimony from Reyna, his erstwhile friend and waterfront commission colleague, because Reyna subsequently attempted, in an April 13, 1988, interview with a defense investigator, to recant his police statement. The investigator testified at the preliminary hearing about this interview. But any such inference was belied by the later telephone conversation, the night before Reyna disappeared, in which Reyna advised defendant he was not afraid of him and intended to tell the truth.

1350 or the confrontation clause. We discuss below (fn. 21, *post*) any argument defendant may be understood to advance under the federal Constitution. For purposes of Evidence Code section 1350, evidence that the statement was trustworthy is very strong.

At the time of his statement, Reyna was not in custody, nor a suspect in any crime, but a citizen witness. At the outset of the police interview, he agreed that he was at the police station "of [his] own free will" and that the police had not "made [him] any promises or guarantees or set any conditions" on his statement. Reyna indicated that he and defendant were friends and colleagues on the Berkeley Waterfront Commission.

Reyna then gave a detailed account of his conversations and encounters with defendant over several months about the anonymous telephone calls defendant was receiving, his suspicions that a professor and his wife were responsible, his determination to handle the matter "his way," his ultimate account of his attack on the Mishells, and his efforts to enlist Reyna's help in constructing an alibi. At one point, the interviewer, Detective Gustafson, observed that Reyna was consulting notes he had made of his contacts with defendant over this period.

The record disclosed no motive for Reyna to lie about what his colleague and erstwhile friend had told him. Indeed, the preliminary hearing testimony of Reyna's mother and sister suggested that he later resisted defendant's efforts to dissuade him from testifying despite concern for his personal safety.

Defendant urges Reyna's statement should have been deemed untrustworthy because Gustafson testified at the preliminary hearing that Reyna provided no significant new information, and that, prior to his statement, at least some details, contained in a previously sealed search warrant affidavit, had become public when the media obtained a copy of the affidavit. Defendant also notes from the preliminary hearing transcript that Reyna told several persons, including defense investigator Cramer, that defendant often teased him and he did not necessarily believe defendant's claim of responsibility for the assaults.

But Reyna never varied from the *substance* of what defendant had told him. Moreover, his uncertainty, before going to the police, about what he should do with the information, and his subsequent effort to convince Cramer that newspaper reports had taken his statement out of context, actually support the statement's reliability. Reyna spoke to the police despite his deep conflict about his public responsibility, his friendship for defendant, his willingness to give defendant the benefit of the doubt, and his concern for his

own safety. Ample evidence thus supports the trial court's implicit finding that the statement was made under circumstances indicating its trustworthiness.

Finally, defendant disputes that, at the time of the evidentiary ruling, Reyna's statement was corroborated by other evidence linking defendant to the Mishell assaults. But such corroboration was present in the preliminary hearing testimony of Robert Mishell, who, as at trial, implicated defendant as his attacker. The trial court's finding on this issue was not an abuse of its discretion.[21]

Defendant argues, confusingly, that he suffered prejudice insofar as the jury may have considered Reyna's statement *both* for its truth in the Mishell attempted murder case *and* as evidence of defendant's motive to kill Reyna. But having surmounted the hurdle of Evidence Code section 1350, the statement *was* admissible for its truth, despite its hearsay character, as evidence of defendant's responsibility for the attacks on the Mishells. Without regard to the hearsay rule, it was also admissible in the murder case, not for its truth, but to demonstrate defendant's motive to kill Reyna as a potential witness against him.

Because the statement was thus admissible for *all* the purposes defendant cites, no possibility of juror confusion, or unfair prejudice, is shown. For similar reasons, there is no merit to defendant's argument that the undue risk of confusion and prejudice should have led to exclusion of the statement under Evidence Code section 352.[22]

### 5. Admission of photographs

At the conclusion of jury selection, the court turned to the admission of photographic evidence proffered by the prosecution. The court first noted that

---

[21] Insofar as defendant may be understood to have made, and preserved, a confrontation clause argument against admission of Reyna's statement, that claim is extinguished, despite the clear testimonial nature of the statement (*Crawford, supra,* 541 U.S. 36, 51; see fn. 16, *ante*), under the doctrine of forfeiture by wrongdoing. "[O]ne who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation." (*Davis v. Washington* (2006) 547 U.S. 813, 833 [165 L.Ed.2d 224, 126 S.Ct. 2266, 2280]; see *Crawford, supra,* at p. 62; *People v. Giles* (2007) 40 Cal.4th 833, 840–841 [55 Cal.Rptr.3d 133, 152 P.3d 433].) At a hearing to determine whether forfeiture by wrongdoing has occurred, the preponderance of evidence standard applies. (*Davis, supra,* at pp. 833–834 [126 S.Ct. at p. 2280]; see also *Giles, supra,* at pp. 852–853.) The instant trial court's finding, by clear and convincing evidence, that defendant murdered Reyna to prevent his testimony more than satisfied this requirement.

[22] For the first time on appeal, defendant urges that the erroneous admission of Reyna's statement forced him, in violation of his Fifth Amendment privilege of silence, to testify in rebuttal to the statement. This distinct constitutional issue, not raised in the trial court, is forfeited. (*People v. Partida* (2005) 37 Cal.4th 428, 435 [35 Cal.Rptr.3d 644, 122 P.3d 765].) In any event, it fails on the merits, because admission of the statement was not error.

the People had submitted 15 photographs of various parts of Reyna's dismembered body. The court indicated it had "culled [these 15 photos] down . . . to five." Citing Evidence Code section 352, the defense objected to only two of the remaining five—one, five by seven inches, depicting an arm minus a hand, and the other, also five by seven inches, depicting a severed hand held next to a handless arm to demonstrate a match.

The court ruled that the photograph of the arm-hand matchup could be admitted, but reserved judgment on the other disputed photo. The arm-hand matchup photo was later marked as People's exhibit 59 and admitted in evidence. The coroner, Dr. Daugherty, and a forensic anthropologist, Dr. Heglar, each testified that exhibit 59 showed how they had matched the hand to the wrist by comparing similar cuts in the appropriate locations. The prosecution did not introduce the remaining photo to which defendant had objected.

Defendant also sought, under Evidence Code section 352, to exclude seven photographs, five by seven inches each, taken at different angles of Robert and Barbara Mishell in their hospital beds, their heads shaved, with the gashes and stitches in their scalps visible. The three pictures of Barbara showed her apparently unconscious, with a breathing apparatus in her mouth. The trial court accepted the People's argument that the photos were relevant to demonstrate the extent of the Mishells' injuries, and were not cumulative or unduly inflammatory. It ruled the photos admissible. They were later admitted in evidence collectively as People's exhibit 5. The Mishells' physicians used exhibit 5 to illustrate their testimony about their treatment of the victims' wounds.

Finally, defendant moved, under Evidence Code section 352, to exclude eight five-by-seven-inch photos showing the Mishell kitchen as a crime scene, apparently after the Mishells had been transported to the hospital. Several of the photos showed blood spots and bloody footprints on the kitchen floor, and one showed a substantial quantity of pooled blood on the floor. One showed an overturned kitchen stool; one showed a black robe strewn on the floor; and one showed blood on the telephone Robert apparently used to call for assistance.

The prosecutor urged that each picture would be relevant to testimony about what happened on the morning of the assaults, that he had culled these from many more, and that he had kept them modestly sized to reduce their inflammatory nature. The motion was denied. The photos, displayed on a board, were subsequently admitted collectively as People's exhibit 15. They were used by various witnesses to illustrate how the kitchen and various evidentiary items in it appeared after the crimes.

On appeal, defendant contends again that Evidence Code section 352 required exclusion of People's exhibits 5, 15, and 59, because neither the nature and extent of the Mishells' injuries, nor the identity and dismemberment of Reyna's body, were disputed. Hence, he urges, the pictures were irrelevant, and served only to inflame the jury. The error, he asserts, violated his constitutional rights to due process, a fair trial, and a reliable adjudication at all stages of a capital trial. The claim fails, for no error occurred.

Relevant evidence includes all "evidence . . . having any tendency in reason to prove . . . any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) "Except as otherwise provided by statute, all relevant evidence is admissible." (*Id.*, § 351.) As the People suggest, the photos illustrated the nature and extent of the Mishells' injuries, the scene of the murderous assault on the Mishells, and the condition of Reyna's body when found, indicating that it had been dismembered and scattered by human hands to hamper its identification. These details bore on matters the prosecution was obliged to establish beyond a reasonable doubt—that Reyna died by homicide, that the Mishells suffered an attack with murderous intent, and that they sustained great bodily injury as a result. Hence, the evidence had a tendency in reason to prove material facts in the case.

Though defendant suggests these issues were not disputed, he never stipulated, or offered to stipulate, to any of them. Even if he had, the prosecution was not required to accept defense concessions as a sanitized alternative to the full presentation of its case. As we have repeatedly said, the prosecution need not prove the details of the charges solely from the testimony of live witnesses (*Pride, supra,* 3 Cal.4th 195, 243; *People v. Turner* (1990) 50 Cal.3d 668, 706 [268 Cal.Rptr. 706, 789 P.2d 887]) nor " 'accept antiseptic stipulations in lieu of photographic evidence.' " (*Box, supra,* 23 Cal.4th 1153, 1199, quoting *Pride, supra,* at p. 243; see also *Crittenden, supra,* 9 Cal.4th 83, 133.) The jury was entitled to see how the physical circumstances of the crimes supported the prosecution's theories. (*Pride, supra,* at p. 243; *Turner, supra,* at p. 706.)

Nor was the trial court's decision to admit the photographs an abuse of its discretion under Evidence Code section 352. " 'The admission of photographs . . . lies within the broad discretion of the trial court when a claim is made that they are unduly gruesome or inflammatory. [Citations.] The court's exercise of that discretion will not be disturbed on appeal unless the probative value of the photographs clearly is outweighed by their prejudicial effect. [Citations.]' " (*People v. Ramirez* (2006) 39 Cal.4th 398, 453–454 [46 Cal.Rptr.3d 677, 139 P.3d 64] (*Ramirez*), quoting *Crittenden, supra,* 9 Cal.4th 83, 133–134.)

As detailed above, the trial court carefully considered each proffered photograph. Sensitive to the condition in which Reyna's body was found, the court, on its own motion, excluded 10 of the 15 murder scene photos originally submitted by the prosecution in order to avoid undue cumulative effect. The prosecutor also culled through the many photos of the Mishell crime scene to present the minimum he deemed necessary to illustrate his case. The multiple-angle photos of the injured Mishells showed the many wounds they had sustained on various parts of their heads. All the proffered pictures were presented in a modest size, as normal snapshots, to minimize sensationalism. There can be no doubt that all parties were acutely aware of the duty to refrain from presenting unfairly inflammatory evidence.[23]

We have examined the photos. They are unpleasant, but " '[v]ictim photographs . . . in murder cases always are disturbing. [Citation.]' " (*Ramirez, supra,* 39 Cal.4th 398, 454, quoting *Crittenden, supra,* 9 Cal.4th 83, 134.) "The photographs at issue here are gruesome because the charged offenses were gruesome, but they did no more than accurately portray the shocking nature of the crimes." (*Ramirez, supra,* at p. 454.) The jury must be protected from sensationalized illustrations of a crime, "but the jury cannot be shielded from an accurate depiction of the charged crimes that does not unnecessarily play upon the emotions of the jurors." (*Ibid.*) People's exhibits 5, 15, and 59 did not cross the prohibited line. The photographs were properly admitted.

### 6. *Sufficiency of evidence of witness-killing special circumstance*

Before trial, defendant moved to strike the witness-murder special-circumstance allegation on grounds this special circumstance only applies to a victim who was an *eyewitness* to a prior offense, not simply one to whom the defendant had made incriminating admissions. The trial court denied the motion.

On appeal, defendant renews his argument as a claim of insufficient evidence to support the witness-murder special-circumstance finding. Noting that Reyna's only relationship to the Mishell case was as the recipient of defendant's incriminating admissions, defendant claims Reyna was thus not a "witness *to a crime*" (italics added) as the special circumstance requires. (§ 190.2, subd. (a)(10).)

As defendant concedes, we have rejected this precise contention. (*Jenkins, supra,* 22 Cal.4th 900, 1018; *People v. Jones* (1996) 13 Cal.4th 535,

---

[23] We do not, of course, suggest that pictures whose prejudicial content outweighs their probative value may be admitted if modestly sized, or that photos whose probative content outweighs their prejudicial value are nonetheless inadmissible if presented in large form. We note only that efforts to minimize the inflammatory effect of photographic evidence by restricting a photo's size are pertinent to weighing the prejudicial effect of the evidence.

550 [54 Cal.Rptr.2d 42, 917 P.2d 1165]; see *Alvarado v. Superior Court* (2000) 23 Cal.4th 1121, 1151 [99 Cal.Rptr.2d 149, 5 P.3d 203]; *People v. Allen* (1986) 42 Cal.3d 1222, 1236–1244, 1273–1274 [232 Cal.Rptr. 849, 729 P.2d 115]; *People v. Weidert* (1985) 39 Cal.3d 836, 853 [218 Cal.Rptr. 57, 705 P.2d 380].) In *Jones*, we indicated that "nothing in the language of the applicable special circumstance or in our decisions applying this special circumstance supports the suggestion that the special circumstance is confined to the killing of an 'eyewitness,' as opposed to any other witness who might testify in a criminal proceeding." (*Jones, supra,* at p. 550.)

Defendant asks that we reconsider this holding. He advances no compelling reason to do so. The evidence supports the true finding on the witness-murder special circumstance.

### D. *Guilt trial misconduct issue: prosecutor's argument that witness misspoke*

As indicated above, defendant conceded that Luis Reyna died in his presence, that he dumped Reyna's body in the Lafayette hills, and that he severed and scattered Reyna's head and hands to prevent or delay the body's identification. The only disputed issue was how Reyna died. As a prosecution witness, Celebration Oberman said defendant told her he shot Reyna in the temple when Reyna insisted he would testify against defendant in the Mishell assault case. Defendant claimed Reyna pulled a gun, which went off accidentally in the ensuing struggle. Defendant said he then checked Reyna's head and neck, but saw no bullet wound. Crime investigators found no obvious gunshot evidence in Reyna's skull or torso. The body's decomposition prevented forensic determination of the exact cause of Reyna's death.

At the request of the autopsy physician, Dr. Daugherty, Dr. Heglar, a forensic anthropologist, examined and photographed neck vertebrae from Reyna's remains for the purpose of determining the cause of certain "deconstruction" of these bones. Dr. Heglar then testified for the People about his opinions on this issue.

Dr. Heglar first stated that, in "two areas" of interest to Dr. Daugherty, the "*incising* event appeared to be consistent with *saw marks or saw invasion of a bone.*" (Italics added.) The prosecutor then asked Dr. Heglar to illustrate his conclusions with four photos the witness had taken during his examination of the fourth and fifth cervical vertebrae. On the first photo, taken of the "anterior" or front "superior right," Dr. Heglar noted "a deep squarish indentation into the bone." The following colloquy then took place: "[The witness]: Lower on the body of vertebra C-4, cervical four, is a much deeper but narrower, straight looking, looks like a black line, a shadow, but an

invasion of bone. [¶] Q: And is that what you refer to as . . . *incised*[?] [¶] A: *Incised with gunshot or blunt force.*" (Italics added.)

Dr. Heglar pointed out the same two marks in the three other photos, taken from different angles. He then explained that the two invasion marks indicated "the possibility of two *saw-like* instruments, maybe one different from the other." (Italics added.) Shown a saw marked as People's exhibit 40-D, Dr. Heglar indicated, based on comparative measurements taken in his laboratory, that its blade pattern was a close, if not identical, match for one of the two "*incised* area[s]" in the photos. (Italics added.) Moving on to his comparative examination of the left arm and severed left hand, Dr. Heglar indicated "that the surfaces there appear again to have been *incised* in some manner, were reciprocal by their raised and lowered area to each other." (Italics added.) The defense did not cross-examine Dr. Heglar to clarify what he meant by the word "incise," particularly in the phrase "incised with gunshot or blunt force."

In his closing argument, defense counsel stressed the absence of evidence of a gunshot wound to Reyna's skull. Counsel urged this was significant because it refuted the prosecution's version, as recounted by Oberman—i.e., that defendant said he retrieved a gun from the back of his truck, came around to the passenger door, and shot Reyna in the head. Indeed, counsel argued, "when you intend to shoot somebody, that's where you shoot." On the other hand, counsel suggested, "when you don't intend to kill someone, like wrestling over a gun and it accidentally goes off, [the bullet] doesn't get placed so well."

Thus, counsel asserted, evidence of a bullet wound to the neck would support defendant's claim that he saw no head wound, and that the shooting was an accident. There was such evidence, counsel proposed, pointing to Dr. Heglar's testimony about "the incised fourth vertebra that he attributed either to an incise wound *or to a gunshot wound.*" (Italics added.)

In rebuttal, the prosecutor said he wanted to talk about the portion of defense counsel's argument "where [counsel] ended with the one little piece of testimony from Dr. Heglar that was taken out of context." This defense argument, said the prosecutor, was "what I call something that has nothing to do with the facts. It's what I call a lawyer's game because it's an attempt to draw something out of the transcript that was a *mistake*, a *misstatement by the witness*, and using it to try to confuse a clear issue." (Italics added.)

The prosecutor continued: "What the quoted transcript said . . . regarding the damage to the fourth vertebra was [']incised by bullet or blunt force['] or [']incised with bullet or blunt force.['] What Dr. Heglar intended to say very clearly was [']incised *as opposed to* bullet or blunt force.[']" (Italics added.)

Asserting that "[s]imple misstatements happen all the time in the courtroom," the prosecutor offered several indicia that Dr. Heglar had misspoken. First, the prosecutor asserted, the witness's literal statement "made no sense"; as an expert, Dr. Heglar surely knew that " 'incised' means sharp or cutting," a "sharp," "straight," "narrow," and "deep" wound, as "caused by a knife or a saw," rather than a "smashing" or "crushing" effect caused by a bullet or other blunt force trauma. "When a knife or saw goes through a bone," the prosecutor said, "it makes a sharp, clean incision, and a bullet or other blunt object . . . smashes through it. A hammer is a blunt object."

At this point, defense counsel objected on grounds the prosecutor's argument was "not based on anything that I see in evidence." The court responded by admonishing the jury that "the statements of the attorneys [are] not evidence; and you base your decision upon the evidence, the—what the evidence was." The court then invited the prosecutor to proceed.

Continuing on the theme of blunt versus sharp, the prosecutor suggested that to take Dr. Heglar's statement literally would make as much sense as to say someone was "cut with a baseball bat" or "stabbed with a hammer." Moreover, the prosecutor pointed out, the overall context of Dr. Heglar's testimony was that the vertebral damage, and the detachment of the hand from the arm, were caused by the reciprocating motion of a saw or saws, which defendant himself later confirmed he used to sever the head and hand from Reyna's body. The prosecutor argued that a bullet hole through the neck would have left blood and soft-tissue damage not seen by the investigators, and that defendant himself said he checked Reyna's neck for a pulse, but saw no wound.

On appeal, defendant insists the prosecutor committed misconduct "by urging the jury to ignore crucial evidence testified to by a state expert witness which was favorable to the defense, and to instead substitute his own unsworn interpretation of that testimony." Assuming such a contention was preserved by defendant's trial objection that the prosecutor's argument was not supported by the evidence, it nonetheless fails on the merits.[24]

 Defendant cites no authority whatever against a prosecutor's *argument* that his own witness misspoke, or that the defense, in its own argument, has taken the witness's testimony out of context. On the contrary, prosecutors have wide latitude to draw reasonable inferences from the evidence presented

---

[24] As to this claim, as well as to the numerous claims of prosecutorial misconduct at the penalty phase, defendant urges that, insofar as he failed to object, or to object adequately, during the trial, the trial court had a sua sponte duty to control the alleged misconduct. It did not. (E.g., *People v. Jones* (1997) 15 Cal.4th 119, 181–182 [61 Cal.Rptr.2d 386, 931 P.2d 960]; *People v. Montiel* (1993) 5 Cal.4th 877, 914 [21 Cal.Rptr.2d 705, 855 P.2d 1277].)

at trial, and to refer to matters of common knowledge (such as the meaning of words). (E.g., *Mendoza, supra,* 24 Cal.4th 130, 172; *People v. Hill* (1998) 17 Cal.4th 800, 823 [72 Cal.Rptr.2d 656, 952 P.2d 673]; *People v. Williams* (1997) 16 Cal.4th 153, 221 [66 Cal.Rptr.2d 123, 940 P.2d 710].)

The prosecutor could not *misstate* or *mischaracterize* the evidence (e.g., *People v. Hill, supra,* 17 Cal.4th 800, 823; *People v. Avena* (1996) 13 Cal.4th 394, 420 [53 Cal.Rptr.2d 301, 916 P.2d 1000]), but he did not do so here. Nor did he "go beyond the evidence" or "put words in the witness's mouth" as defendant suggests. Candidly conceding the testimony the defense sought to exploit, he simply argued an inference, from the commonly understood meaning of the word "incise," from Dr. Heglar's overall remarks, and from the trial evidence in general, that the witness's literal phraseology at this particular point did not express his true meaning. Such an argument, where based on the record, is not improper.

For the reasons urged by the prosecutor, his argument that Dr. Heglar did not literally mean to equate "incised" with "blunt force or gunshot wound" was a reasonable interpretation of the evidence.[25] It was up to the jury to agree or disagree. The trial court made this clear by admonishing the jurors that the prosecutor's arguments were not evidence, and that they must decide the case on the evidence itself. No misconduct occurred.

Defendant also asserts the prosecutor committed misconduct by disparaging defense counsel's argument as a "lawyer's game" and an attempt to confuse the jury by taking the witness's statement out of context. Because defendant failed to raise such an objection at trial, where an admonition would have cured any harm, the claim is forfeited on appeal. (E.g., *People v. Stanley* (2006) 39 Cal.4th 913, 952 [47 Cal.Rptr.3d 420, 140 P.3d 736] (*Stanley*); *People v. Young* (2005) 34 Cal.4th 1149, 1188 [24 Cal.Rptr.3d 112, 105 P.3d 487] (*Young*); *McDermott, supra,* 28 Cal.4th 946, 1001.)

In any event, there was no misconduct. The prosecutor did not engage in such forbidden tactics as accusing defense counsel of fabricating a defense or factually deceiving the jury. (*Stitely, supra,* 35 Cal.4th 514, 560; *People v. Bemore* (2000) 22 Cal.4th 809, 846 [94 Cal.Rptr.2d 840, 996 P.2d 1152] (*Bemore*).) He simply used pungent language to describe defense counsel's tactical effort to exploit what the prosecutor considered a slip of the tongue by a People's witness.

---

[25] The People note a definition of "incised" as "made with or as if with a sharp knife or scalpel : clean and well defined." (Quoting Webster's Third New Internat. Dict. (1976) p. 1142; see also, e.g., American Heritage Dict. (1985 ed.) p. 650 ["[m]ade with or as if with a sharp instrument"].)

It was clear the prosecutor's comment was aimed solely at the persuasive force of defense counsel's closing argument, and not at counsel personally. We have found no impropriety in similar prosecutorial remarks. (E.g., *Stitely, supra,* 35 Cal.4th 514, 559–560 [argument that jurors should avoid " 'fall[ing] for' " defense counsel's " 'ridiculous' " and " 'outrageous' " attempt to allow defendant to " 'walk' free" by claiming he was guilty only of second degree murder]; *People v. Gionis* (1995) 9 Cal.4th 1196, 1215–1216 [40 Cal.Rptr.2d 456, 892 P.2d 1199] [argument that defense counsel was talking out of both sides of his mouth and that this was " 'great lawyering' "]; *People v. Breaux* (1991) 1 Cal.4th 281, 306–307 [3 Cal.Rptr.2d 81, 821 P.2d 585] [argument that law students are taught to create confusion when neither the law nor the facts are on their side, because confusion benefits the defense]; *People v. Bell* (1989) 49 Cal.3d 502, 538 [262 Cal.Rptr. 1, 778 P.2d 129] [argument that defense counsel's job is to " 'confuse[]' " and " 'throw sand in your eyes,' " and that counsel " 'does a good job of it' "].)

Here, as in the cases cited above, we see no improper attack on counsel's integrity, but only on the merits of his trial tactics and arguments. The prosecutor's argument was not improper.

E. *Guilt trial instructional issues*

1. *Reasonable doubt instruction*

A standard reasonable doubt instruction, as set forth in CALJIC No. 2.90 (5th ed. 1988), was given with certain modifications at defendant's guilt trial. Defendant claims the instruction violated his constitutional rights to a jury trial, a fundamentally fair trial, and a reliable determination of guilt and penalty. In particular, he urges that the phrases "moral evidence," "moral certainty," and "abiding conviction," as contained in this instruction, are contradictory, archaic, and incomprehensible to a modern jury.[26]

---

[26] The court modified the then standard instructional definition of reasonable doubt as follows (nonstandard insertions in brackets): "Reasonable doubt is defined as follows: It is not mere possible doubt, because everything relating to human affairs *and depending upon moral evidence* is open to some possible or imaginary doubt. [¶] [Now the word 'moral' here does not mean religiosity or truthfulness. The word 'moral' means mortal; in other words, *evidence from people.*] [¶] [So let me start again.] [¶] Reasonable doubt is defined as follows: It is not a mere possible doubt because everything relating to human affairs and depending upon moral evidence[,] [that is, *evidence that comes to you from the mouth of people,*] is open to some possible or imaginary doubt. It is that state of the case which after the entire comparison and consideration of all the evidence leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge. [¶] The law does not require demonstration of that degree of proof which, excluding all possibility of error, produces absolute certainty, for such degree of proof is rarely possible. Moral certainty only is required, which is that degree of proof which produces an abiding conviction in an unprejudiced mind." (Italics added.)

However, the United States Supreme Court upheld this instruction, despite concerns about its language (*Victor v. Nebraska* (1994) 511 U.S. 1 [127 L.Ed.2d 583, 114 S.Ct. 1239], affg. *Sandoval, supra,* 4 Cal.4th 155, 185–186),[27] and we have consistently rejected arguments similar to those defendant makes here. (E.g., *People v. Cook* (2006) 39 Cal.4th 566, 601 [47 Cal.Rptr.3d 22, 139 P.3d 492] (*Cook*); *People v. Robinson* (2005) 37 Cal.4th 592, 637 [36 Cal.Rptr.3d 760, 124 P.3d 363] (*Robinson*); *People v. Maury* (2003) 30 Cal.4th 342, 429 [133 Cal.Rptr.2d 561, 68 P.3d 1] (*Maury*); *People v. Seaton* (2001) 26 Cal.4th 598, 668 [110 Cal.Rptr.2d 441, 28 P.3d 175] (*Seaton*); *People v. Ray* (1996) 13 Cal.4th 313, 346–347 [52 Cal.Rptr.2d 296, 914 P.2d 846]; *People v. Davis* (1995) 10 Cal.4th 463, 520–521 [41 Cal.Rptr.2d 826, 896 P.2d 119]; *People v. Jennings* (1991) 53 Cal.3d 334, 385–386 [279 Cal.Rptr. 780, 807 P.2d 1009].) We do so again.[28]

### 2. *Witness-killing special-circumstance instruction*

Defendant urges the court erred by refusing a proffered defense instruction that a witness, for purposes of the witness-killing special-circumstance allegation, must be someone who actually witnessed a crime by the accused, and by later instructing that, for purposes of the special circumstance, "a witness to a crime does not necessarily require an eyewitness." The contention lacks merit. As we have previously explained, the witness-killing special circumstance is not limited to eyewitnesses.

### 3. *Instruction regarding defendant's preoffense statement of motive*

The trial court gave a standard general instruction (see CALJIC No. 2.51) on motive (motive is not an element and need not be shown, but the presence or absence of motive may tend to establish guilt or innocence; the jury is the exclusive judge of the weight of motive evidence). The court also instructed, in standard form (see CALJIC No. 2.71), on extrajudicial admissions by the defendant (an admission is a statement by defendant which, while not itself an acknowledgment of guilt, tends to prove guilt when considered with other evidence; the jury is the exclusive judge whether defendant made such an admission and, if so, whether it is true in whole or in part; an extrajudicial admission by defendant should be viewed with caution).

---

[27] CALJIC No. 2.90 (6th ed. 1996) has since been modified to eliminate references to "moral evidence" and "moral certainty."

[28] We note that the definition of "moral evidence" inserted by the trial court, as "evidence from people" or from the "mouth of people," generally conforms to the historical explanation of that phrase provided by the majority in *Victor v. Nebraska, supra,* 511 U.S. 1, 10–12, as evidence about the daily affairs of life, proven by human testimony, that cannot, by its nature, attain objective certainty. Defendant does not argue that this addition by the court *worsened* the instruction constitutionally; in his reply brief, he merely urges that the addition did not *cure* the defects in the standard instruction.

Over defense objection, the trial court also gave an adapted version of CALJIC No. 2.71.7, stating there was evidence from which the jury might find that "an oral statement of motive was made by the defendant before the offense with which he is charged was committed." In standard form, this instruction further advised that the jury was the exclusive judge whether such a statement was made, and that evidence of such an oral statement should be viewed with caution.

On appeal, as below, defendant urges that the issue presented by CALJIC No. 2.71.7 was adequately addressed by the general instructions on motive and extrajudicial admissions. As given in his case, defendant contends, CALJIC No. 2.71.7 was an improper "pinpoint" instruction, cumulative to those described above, "which gave undue emphasis to a vital part of the purported evidence. The jury was essentially told as a matter of fact that the accused had motive to commit the homicide in issue." As a result, he argues, he suffered violations of his constitutional rights to due process, a fair trial, and a reliable verdict.

However, we have held that both CALJIC Nos. 2.71 and 2.71.7 are standard cautionary instructions, intended for the defendant's benefit, which must be given sua sponte where applicable. (E.g., *People v. Garceau* (1993) 6 Cal.4th 140, 194 [24 Cal.Rptr.2d 664, 862 P.2d 664]; *People v. Lang* (1989) 49 Cal.3d 991, 1021 [264 Cal.Rptr. 386, 782 P.2d 627] (*Lang*).) As the People note, defendant does not argue that CALJIC No. 2.71.7, as given in this case, was unsupported by evidence.[29]

We have indicated that CALJIC No. 2.71 is broad enough to cover all out-of-court statements by the defendant offered to prove his guilt. Thus, the defendant suffers no prejudice when CALJIC No. 2.71.7 is not *also* given. (*Lang, supra*, 49 Cal.3d 991, 1021.) But this is not to say the defendant *does* suffer error or prejudice when both *are* given, as justified by the evidence.

Defendant's claim that the instruction was biased in form also lacks merit. Far from presenting motive as a predetermined "fact," the instruction merely stated that the jury "may" find defendant expressed such a motive and must view any such expression with caution. No error occurred.

In any event, inclusion of CALJIC No. 2.71.7 in the instructions was harmless by any applicable standard. As noted, the principal effect of the

[29] The most obvious evidence supporting the instruction had to do with defendant's motive for attempting to kill the Mishells. In his police statement, as recounted above, Reyna indicated that, before the assault against the Mishells, defendant said he suspected a professor and his wife were behind the anonymous telephone calls exposing defendant's extramarital affair, and that when Reyna suggested defendant take his information to the police, defendant said, on more than one occasion, that he would handle it "his way."

instruction was to reemphasize, on defendant's behalf, that his inculpatory extrajudicial statements, if any, should be viewed with caution. Insofar as the instruction focused on evidence that defendant had motives to commit the charged crimes, that evidence was overwhelming. CALJIC No. 2.71.7 cannot have altered the jury's views on the subject to defendant's prejudice. No basis for reversal appears.

### 4. CALJIC No. 2.71

After the jury was instructed, but before guilt deliberations commenced, defendant raised a concern about CALJIC No. 2.71, the general instruction regarding extrajudicial admissions by the defendant, as read to the jury. Defense counsel suggested that the instruction, as given, was "not pinpoint enough," because it failed to specify that the admonition to view such statements with caution did not apply to *exculpatory* portions of the defendant's statement. The trial court ruled that the instruction as read required no supplementation.

On appeal, defendant urges the trial court erred by giving CALJIC No. 2.71 "over defense objection," because the jury could interpret the instruction's definition of "admissions" to be viewed with caution as including exculpatory portions of a defendant's statement. The instruction unfairly compromised his defense, he asserts, because that defense was based primarily on his own testimony. He claims violations of his constitutional rights to a fair trial and a reliable verdict.

We rejected a similar challenge to CALJIC No. 2.71 in *People v. Bacigalupo* (1991) 1 Cal.4th 103 [2 Cal.Rptr.2d 335, 820 P.2d 559]. As we noted, the instruction, considered as a whole, "[does] not tell the jury to distrust those portions of defendant's statements . . . that [do] not either acknowledge or tend to show his guilt." (*Id.* at p. 129.)

Moreover, insofar as defendant claims the instruction hampered his defense by inviting the jury to view his *trial testimony* with caution, the assertion is patently without merit. Both in standard form and as modified in this case, the instruction addresses only the subject of *extrajudicial* admissions.[30] Nothing in CALJIC No. 2.71 admonishes the jury to be skeptical of statements made by the defendant on the stand. No error occurred.

---

[30] As given, the instruction provided in pertinent part: "An admission is a statement made by a defendant *other than at his trial* which does not by itself acknowledge his guilt of the crimes for which such defendant is on trial but which statement tends to prove his guilt when considered with the rest of the evidence." (Italics added.)

### 5. *CALJIC Nos. 2.01, 2.02, 2.06*

The court instructed, pursuant to CALJIC No. 2.06, that if the jury found defendant attempted to suppress evidence, the jury could consider this as a circumstance tending to show consciousness of guilt, but must judge for itself the weight and significance of such evidence. The court also gave CALJIC Nos. 2.01, regarding circumstantial evidence generally, and 2.02, regarding circumstantial evidence of a specific mental state. Among other things, these instructions explained that all circumstances leading to an inference of guilt must be proved beyond reasonable doubt; that circumstantial evidence cannot support a conviction unless it cannot be reconciled with any other rational conclusion; that, between two reasonable interpretations of the evidence, the one more consistent with innocence must be accepted; but that a reasonable interpretation must be accepted over an unreasonable one.

Defendant urges that all such instructions diluted the presumption of innocence, reduced the prosecution's burden of proof, and created a mandatory conclusive presumption of guilt, in derogation of his constitutional rights to due process and reliable factfinding. As defendant concedes, we have rejected similar arguments on many occasions. (E.g., *People v. Jurado* (2006) 38 Cal.4th 72, 127 [41 Cal.Rptr.3d 319, 131 P.3d 400] (*Jurado*) [CALJIC No. 2.01]; *People v. Guerra* (2006) 37 Cal.4th 1067, 1139–1140 [40 Cal.Rptr.3d 118, 129 P.3d 321] [same]; *Robinson, supra,* 37 Cal.4th 592, 637 [same]; *People v. Wilson* (2005) 36 Cal.4th 309, 330 [30 Cal.Rptr.3d 513, 114 P.3d 758] [CALJIC No. 2.06]; *Coffman and Marlow, supra,* 34 Cal.4th 1, 103 [same]; *Maury, supra,* 30 Cal.4th 342, 428 [CALJIC No. 2.01]; *People v. Hughes* (2002) 27 Cal.4th 287, 346–347 [116 Cal.Rptr.2d 401, 39 P.3d 432] [same]; *People v. Jackson* (1996) 13 Cal.4th 1164, 1223–1224 [56 Cal.Rptr.2d 49, 920 P.2d 1254] [CALJIC No. 2.06].) Defendant presents no compelling reason to reconsider these authorities. We find no error.

### 6. *Flight instruction*

The trial court instructed the jury, pursuant to section 1127c and CALJIC No. 2.52, that a person's flight immediately after a crime, or after he is accused of a crime, cannot alone establish guilt, but may be considered together with other proven facts in deciding the accused's guilt or innocence. Defendant urges the instruction was improper, because he freely admitted his identity with respect to all the charges, disputing only the nature and degree of the offenses as determined by his mental state. Because his flight following the crimes had no logical tendency to resolve that issue, defendant asserts, the instruction allowed the jury to infer, on an arbitrary basis, the most culpable mental state, and thus the maximum degree of guilt. This, he argues, violated his constitutional right to due process.

We disagree. At the outset, defendant's claim that he committed crimes against the Mishells and Reyna is, in significant part, wrong. As to Reyna's death, defendant testified that Reyna pulled a gun, which went off accidentally during the ensuing struggle. (See discussion, *ante*.) In closing argument, defense counsel reminded the jury that defendant's testimony was the only direct evidence of what happened to Reyna. Counsel alluded to the possibility that the killing was accidental, and therefore urged the jury to acquit defendant of any crime against Reyna. The jury was instructed that an accidental killing is not a crime, and that any reasonable doubt on the issue must be resolved in defendant's favor.

We have explained that the flight instruction, as the jury would understand it, does not address the defendant's specific mental state at the time of the offenses, or his guilt of a particular crime, but advises of circumstances suggesting his *consciousness that he has committed some wrongdoing*. (*People v. Bolin* (1998) 18 Cal.4th 297, 327 [75 Cal.Rptr.2d 412, 956 P.2d 374] (*Bolin*); *People v. Crandell* (1988) 46 Cal.3d 833, 871 [251 Cal.Rptr. 227, 760 P.2d 423] (*Crandell*).) Thus, the flight instruction—amply supported by evidence of defendant's sudden departure for Mexico within days of Reyna's disappearance—was manifestly relevant to the issue whether defendant held an honest belief that Reyna's death was an accident for which he bore no criminal responsibility.

 In any event, we have repeatedly rejected the argument that instructions on consciousness of guilt, including instructions regarding the defendant's flight following the crime, permit the jury to draw impermissible inferences about the defendant's mental state, or are otherwise inappropriate where mental state, not identity, is the principal disputed issue. (E.g., *Jurado*, *supra*, 38 Cal.4th 72, 125; *People v. Moon* (2005) 37 Cal.4th 1, 28 [32 Cal.Rptr.3d 894, 117 P.3d 591] (*Moon*); *People v. Smithey* (1999) 20 Cal.4th 936, 983 [86 Cal.Rptr.2d 243, 978 P.2d 1171]; *Bolin*, *supra*, 18 Cal.4th 297, 327; *Crandell*, *supra*, 46 Cal.3d 833, 871; *People v. Nicolaus* (1991) 54 Cal.3d 551, 579–580 [286 Cal.Rptr. 628, 817 P.2d 893].) As we have said, even where the defendant concedes some aspect of a criminal charge, the prosecution is entitled to bolster its case, which requires proof of the defendant's guilt beyond a reasonable doubt, by presenting evidence of the defendant's consciousness of guilt. (E.g., *Moon*, *supra*, at p. 28; *Nicolaus*, *supra*, at pp. 579–580.) No reason appears to reconsider the soundness of these decisions and conclusions. We find no error.

### F. *Penalty trial misconduct issues*

#### 1. *Notice and discovery of aggravating evidence*

On August 7, 1992, eight months before the penalty phase began, the People filed their statutory notice of intent to introduce evidence in aggravation (§ 190.3). The notice included defendant's alleged 1982 sexual assault on his 15-year-old niece, Alexandra M. It referred only to a "rape" of the victim, but warned that the proof would include "all acts committed by the defendant whether or not they resulted in a plea or finding of guilty."

Also in August 1992, according to defense counsel, the prosecution provided the defense with an offer of proof regarding evidence in aggravation (Offer of Proof). As to the Alexandra M. incident, this document still mentioned only a rape, but it did provide additional details about the circumstances of the assault. It also alleged that as a result of the rape, Alexandra M. became pregnant, had an abortion, and attempted suicide, and that she never reported the crime to the police because she feared the effect on her grandparents if they ever found out.[31]

On January 6, 1993, prior to the guilt trial, the trial court ordered a *Phillips* hearing[32] as to the Alexandra M. incident, to be held if the guilt verdicts made it necessary, in order to allow the defense to cross-examine the complaining witness prior to the penalty trial. The court also instructed the prosecutor to provide the defense with "any corroborating evidence" he "would have" in the meantime, including "[a]ny other witnesses who may have seen it, any police reports, the extent of any injuries she may have sustained," the hospital where she was treated, and any treatment she received.

In mid-April 1993, the prosecutor received, and turned over to the defense, a letter Alexandra M. wrote immediately after the assault, but did not send, to her friend Margaret Yen, in which she said she enjoyed the encounter and mentioned no force or fear.

At the *Phillips* hearing, held on April 29, 1993, Alexandra M. indicated the following: Defendant had gagged her with a bandanna. The assault included

---

[31] This document was marked as "Court Exhibit F," and, though not admitted in evidence, was used by defense counsel to cross-examine Alexandra M. before the jury. It bears a court file-stamp date of January 8, 1993, though defense counsel represented below, both in writing and orally, that the prosecution provided it in mid-August 1992.

[32] In *People v. Phillips* (1985) 41 Cal.3d 29 [222 Cal.Rptr. 127, 711 P.2d 423], we suggested that the trial court may, and sometimes should, conduct a preliminary inquiry prior to the penalty phase to determine whether there is substantial evidence to prove each element of "other criminal activity" the prosecution intends to introduce in aggravation. (*Id.* at pp. 72–73, fn. 25.)

sodomy and forcible oral copulation as well as rape. Defendant threatened to kill Alexandra and various members of her family if she revealed the incident. She aborted her pregnancy at Planned Parenthood in New York City. She ultimately revealed the assault to Yen, her parents, her therapist, her godfather, and several other close friends and family members. In 1988, while defendant was a fugitive, she disclosed it to FBI agents who came to her house. At some point, her mother spoke to a Berkeley police detective. In their prior conversations, the prosecutor did not ask for details, and she had provided them fully only that morning, though she had mentioned the gag two weeks earlier.

Based on the newly disclosed information, defendant moved in limine to exclude Alexandra M.'s testimony on grounds, among others, that the prosecution had failed to give fair notice and discovery of the aggravating evidence. Alternatively, he sought a continuance to investigate the new information.

The motion was heard the day after the *Phillips* hearing. Defense counsel indicated that "I don't think it's controverted . . . that up to yesterday, even [the prosecutor] was in possession of only one piece of evidence that had to do with this case"—i.e., the Margaret Yen letter delivered to the defense two weeks earlier. The prosecutor represented, without objection from defense counsel, that he had provided the defense with information about where the abortion took place as soon as the defense requested it, and that there were no police reports on the incident. The prosecutor confirmed he had not known, prior to the *Phillips* hearing, of any other witnesses or corroborating evidence. The court agreed to exclude evidence of Alexandra's attempted suicide, but otherwise denied the motion.

At the ensuing penalty trial, Alexandra M. testified in basic conformity with her statements at the *Phillips* hearing. The defense cross-examined her about the unmailed letter to Yen, and pointed out how her trial testimony differed from the facts recited in the Offer of Proof. Alexandra insisted at trial that, in July 1992, she had told the prosecutor of the threats to her family—a fact not mentioned in the Offer of Proof—but the parties ultimately stipulated before the jury that she did not disclose either the sodomy and oral copulation, or the threats against her and her family, until the day of the *Phillips* hearing.

On appeal, defendant renews his argument that the prosecutor violated his notice and discovery obligations by failing to provide, prior to the *Phillips* hearing, the new details Alexandra M. disclosed in the hearing—in particular, the sodomy and forcible oral copulation, and the identities of the persons Alexandra had told of the assault. Defendant cites the court's order of

January 6, 1993, that the prosecutor turn over all corroborating evidence the prosecutor had, as well as the prosecutor's duty, under *Brady, supra*, 373 U.S. 83, and the California criminal discovery statute (§ 1054.1 et seq.), to disclose exculpatory evidence.[33]

However, as recounted above, the prosecutor did not know of the additional sex crimes, or of the corroborating witnesses, until Alexandra M. disclosed them at the *Phillips* hearing. The court's January 1993 discovery order obliged the prosecution only to turn over corroborating evidence it "would have" between then and the *Phillips* hearing. Under the California criminal discovery statute, disclosure of covered information should be made within 30 days of trial, but is timely in any event if provided "immediately" after the prosecution becomes aware of it. (§ 1054.7.) *Brady* and its progeny do not require disclosure of information before the prosecution actually or constructively possesses it.

Defendant suggests the prosecutor had a statutory and constitutional duty to *know* this information sooner, because Alexandra M. was his intended witness. Not so. Under section 1054.1, evidence is subject to disclosure, if at all, only to the extent it is "in the possession of the prosecuting attorney or [known by him] to be in the [actual] possession of the investigating agencies." Under the federal Constitution, evidence is subject to disclosure, if at all, only to the extent actually possessed by the "prosecution team," i.e., those government agencies assisting in the criminal investigation, such as the police. (*Steele, supra*, 32 Cal.4th 682, 697; see *Kyles, supra*, 514 U.S. 419, 437.)

The prosecution " 'has no *general duty* to seek out, obtain, and disclose all evidence that might be beneficial to the defense.' [Citation.]" (*People v. Panah* (2005) 35 Cal.4th 395, 460 [25 Cal.Rptr.3d 672, 107 P.3d 790] (*Panah*).) Thus, it need not extract all possible information from a private citizen who is a potential prosecution witness in order to disclose it to the defense.[34]

---

[33] Insofar as defendant argues that the notice of aggravating evidence required specifically by the death penalty statute (§ 190.3) was insufficient, the claim lacks merit. The section 190.3 notice, filed on August 7, 1992, referenced the rape and warned that "all evidence" surrounding the incident would be presented. Notice that a particular crime will be presented in aggravation should alert defense counsel that all crimes committed as part of the same course of conduct will be offered, and thus substantially complies with section 190.3. (*People v. Farnam* (2002) 28 Cal.4th 107, 175 [121 Cal.Rptr.2d 106, 47 P.3d 988] (*Farnam*); *Hart, supra*, 20 Cal.4th 546, 639.) In particular, a notice of rape informs the defense that any unlawful sex act performed on the same occasion will be introduced. (*Pride, supra*, 3 Cal.4th 195, 259.)

[34] The parties stipulated at trial that the prosecutor followed his usual "practice" of not questioning sexual assault victims about the details of the crimes perpetrated on them. No evidence suggests that the prosecutor deliberately delayed asking Alexandra M. detailed questions for the purpose of avoiding discovery. (See *Panah, supra*, 35 Cal.4th 395, 460.)

Defendant also fails to demonstrate, for purposes of *Brady* and the criminal discovery statute (§ 1054.1, subd. (e)), that the prosecution failed to disclose *exculpatory* evidence. The prosecution did turn over, as soon as it received, the only arguably exculpatory evidence in the record, Alexandra's unmailed letter to Margaret Yen. Alexandra M.'s disclosure, at the *Phillips* hearing, of the additional forcible sex acts committed by defendant was certainly not exculpatory. And the record contains no evidence that persons whom Alexandra revealed she told about the assault—other than Yen, who did testify for the defense—would have provided information to impeach Alexandra or otherwise undermine the prosecution's case.

Insofar as the court's January 1993 discovery order required the prosecutor to turn over corroborating evidence, it is difficult to see how any omission was prejudicial. At trial, the People presented no corroborating witnesses or evidence. In sum, no misconduct or prejudice occurred.[35]

## 2. *Cross-examination of defense prison expert*

Jiro Enomoto, a former Director of the Department of Corrections, testified for the defense that, based on defendant's pretrial jail records, he would not pose a safety risk to prison staff or inmates if sentenced to life without parole. On cross-examination, the prosecutor elicited the witness's admissions that he frequently testified for criminal defendants on prison-adjustment issues, and had done so perhaps three or four times in the past year.

The prosecutor then asked, "In fact, a few weeks ago you testified across the hall in the case of the gentleman that was convicted of four separate murders and six attempted murders that he would adjust well to prison life also; is that correct?" The witness responded, "That's correct; yes." Defendant did not object.

 Defendant now insists the prosecutor's question unfairly impugned the witness's credibility, and thus compromised a reliable penalty determination in violation of the Eighth Amendment. The absence of a trial objection,

---

[35] In a related claim, defendant urges the trial court erred when it denied him a penalty trial continuance to investigate and confront the new information disclosed at the *Phillips* hearing. We review such decisions for abuse of discretion. (*Jenkins, supra,* 22 Cal.4th 900, 1029, 1037.) Here the court noted, and defense counsel agreed, that the defense had known for two years that Alexandra M. was a potential aggravating witness. Eight months before the *Phillips* hearing, the defense had received a timely, sufficient statutory notice of aggravating evidence and, according to defense counsel, had also received the Offer of Proof. The prosecutor represented, essentially without dispute from the defense, that he had given discovery to the best of his ability. (See discussion, *ante.*) Under these circumstances, the court reasoned, the defense had had ample time to conduct its own investigation in the interim. We see no abuse of discretion in this ruling.

where an admonition would have cured any harm, forfeits the claim. The contention lacks merit in any event. "[A]n expert's testimony in prior cases involving similar issues is a legitimate subject of cross-examination." (*Price, supra,* 1 Cal.4th 324, 457.) Despite arguable differences in the facts of the two cases, they involved "similar issues" of the expert's views on prison adjustment. The prosecutor was entitled to expose bias in the witness by showing his propensity to advocate for criminal defendants even in extreme cases. No misconduct occurred.

### 3. *Alleged "vouching"*

As noted above, Alexandra M. testified at trial, as at the *Phillips* hearing, that defendant's sexual assault included sodomy and oral copulation as well as rape, that he gagged her with a bandanna, and that he threatened to kill members of her family, and then her, if she told anyone about the incident. She acknowledged the unsent letter to Margaret Yen, in which she wrote that she enjoyed the sex and mentioned no force or threats. Smudges on the letter, she said, were from "my crying." She admitted she did not disclose the incident to "anybody other than [her] mother and some people close to [her], friends," and did not report it to any law enforcement officer until 1988, when she mentioned it to an FBI agent.

As in the *Phillips* hearing, defense counsel cross-examined Alexandra at some length about details of her trial testimony that were not included in the Offer of Proof. Counsel particularly sought to determine what details she had told the prosecutor, and when. She indicated she spoke to the prosecutor by phone in July 1992 and several times thereafter, that he "just asked . . . what had basically happened," and that she told him the "basic facts" corresponding to her testimony. She agreed the Offer of Proof "capture[d] the essence" of what she told the prosecutor, though she insisted she did tell him, in July 1992, of defendant's threats against her and her family. She also agreed she had told the prosecutor "like two weeks ago" about the bandanna used as a gag.

As a defense witness, Yen testified to her conversation with Alexandra M. shortly after the assault. In this conversation, Yen recounted, Alexandra did not seem upset, characterized the encounter as consensual, and described it as "the seduction of a young girl by an older man."

In a stipulation later read to the jury, the parties agreed as follows: The prosecutor first spoke to Alexandra M. in July 1992. Then, and in subsequent conversations, she mentioned only a rape, not sodomy or oral copulation. Only on April 29, 1993 (the day of the *Phillips* hearing), did she mention threats by defendant against herself and her family. The prosecutor did not

believe he asked her any questions beyond whether she was raped, as was his practice in sexual assault cases.

In his closing penalty argument, the prosecutor anticipated defense comments about the discrepancies between the Offer of Proof and Alexandra M.'s trial testimony. He asked the jury not to "be concerned about the legal document I'm sure [defense] counsel will talk about in which the [Alexandra M.] sexual assault was described [only] as a rape. When I spoke with her on the phone, I didn't go into detail with her and ask her questions about each individual detail of the incident. I didn't think it was necessary; and I didn't think it was proper to do that to a woman who was traumatized the way she had, to make her discuss those details on the phone to a stranger. [¶] It is common for women to refer to a rape to cover all the incidents of a sexual assault. If you want to blame someone for the lack of details in that document, blame me. Don't blame Alexandra."

The prosecutor also hypothesized why Alexandra M. wrote that she enjoyed the sex, told Yen it was consensual, and did not report the incident to the authorities sooner. Citing both Alexandra's "tearstained" airplane letter and her later statement, in a second conversation with Yen, that defendant took advantage of her because she was worthless, the prosecutor said, "It's very common for a woman or a girl in this case to have feelings of guilt and shame even though she's done nothing wrong. . . . [¶] And it may very well be that Alexandra was so traumatized by what happened to her that she couldn't admit at first what happened, so it took her time to be able to say, to admit and realize what her uncle had done to her." Defendant raised no objection.

On appeal, defendant contends this argument constituted improper vouching for Alexandra M.'s credibility. The prosecutor, defendant claims, wrongly bolstered her testimony with his personal knowledge and assurances when he alluded to his telephone contact with Alexandra, stated "why he did or did not discuss certain things with her," and asked the jury to blame him, not her, for any discrepancies. Furthermore, defendant insists, the prosecutor gave "unqualified expert opinion," not supported by trial evidence, about the common effects of rape trauma on the victim's ability to understand, accept, and report what happened to her. As a result, defendant urges, he suffered violations of his federal constitutional rights to due process, confrontation, fair trial, impartial jury, adequate legal representation, and freedom from cruel and unusual punishment. (U.S. Const., 5th, 6th, 8th & 14th Amends.)

At the outset, defendant's failure to raise a vouching objection at trial forfeits the claim on appeal. (*People v. Frye* (1998) 18 Cal.4th 894, 970 [77 Cal.Rptr.2d 25, 959 P.2d 183] (*Frye*); *People v. Medina* (1995) 11 Cal.4th 694, 756–757 [47 Cal.Rptr.2d 165, 906 P.2d 2] (*Medina*).)

The claim also fails on the merits. Impermissible vouching occurs "where the prosecutor places the prestige of the government behind a witness through personal assurances of the witness's veracity or suggests that information not presented to the jury supports the witness's testimony." (*People v. Fierro* (1991) 1 Cal.4th 173, 211 [3 Cal.Rptr.2d 426, 821 P.2d 1302] (*Fierro*).) But "so long as a prosecutor's assurances . . . are based on the 'facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief,' [his] comments cannot be characterized as improper vouching." (*Frye, supra*, 18 Cal.4th 894, 971; see also *Medina, supra*, 11 Cal.4th 694, 757.)

Such is the case here. The prosecutor's references to his telephone contact with Alexandra M., and his stated reasons for not questioning her about the details of the assault, are amply supported either directly, or by reasonable inference, from the trial evidence. The stipulation read to the jury indicated that the prosecutor first spoke to Alexandra in July 1992, one month before filing the Offer of Proof, that in this and subsequent conversations she mentioned only a rape, and that it was "his practice" not to subject sexual assault victims to detailed questioning. Alexandra confirmed that she first spoke with the prosecutor "on the phone" in July 1992, and told him the "basic" facts of the incident at that time. Jurors could readily infer that the prosecutor's restrained questioning "practice" in sex assault cases stemmed from his sensitivity to the victim's traumatized state.

Nor was the prosecutor obliged to present a rape trauma expert before suggesting that feelings of confusion and unwarranted shame might have caused Alexandra M. to be uncertain about whether the sexual encounter with defendant was consensual, and to delay reporting the incident. There was substantial evidence that she was confused and ashamed as a result of the assault. She testified she was "hysterically crying" immediately after the incident, even though defendant told her she had enjoyed the experience, and she knew no better.

Alexandra further testified that she remained hysterical as she boarded the plane home, and that she cried during the flight as she drafted a letter about the episode to Margaret Yen. In this letter, which was admitted in evidence, Alexandra said she "enjoyed" the sex, but also that she "hate[d] [her]self," that Yen would probably want nothing more to do with her "now that I have shamed myself and my family," and that "I can never look at my aunt or my cousins again."

According to Alexandra, she was a "basket case" during the three months between the assault and the discovery of her pregnancy. Only then did she tell her mother, without "go[ing] into detail," and she still kept the matter secret from other family members.

Yen, testifying as a defense witness, recounted Alexandra's statement, months after the incident, that it must have been caused by her own worthlessness. Yen could tell from the conversation that Alexandra was feeling "some shame." Six years after the assault, when the FBI contacted her family in connection with defendant's fugitive status, Alexandra still had told only close family and friends. Alexandra stated that, even recently, she was reluctant to testify about the assault because of the effect it would have on her grandfather, who was ill.

This evidence readily permitted an inference that Alexandra M. was traumatized, confused, and unjustifiably ashamed about defendant's assault, and that this might have influenced her reluctance to report the matter. No improper vouching occurred.[36]

### 4. *Biblical references*

In the midst of his lengthy penalty phase argument, the prosecutor admonished the jury that the statutory aggravating factors were the only ones the jury could consider, but said he "want[ed] to speak briefly about the subject of religion in case there is anybody who may have a problem or may feel an impediment principled by that." While quotes from the Bible could not be used in aggravation, he cautioned, he offered them "only . . . to show that the death penalty has from the beginning of time been repeatedly considered a just and proper punishment for murderers."

Quoting Genesis chapter 9, verse 6 ("whoever sheds the blood of man, by man shall his blood be shed, for in [H]is image did God make man"), the prosecutor said this stood for two concepts: "The first is that capital punishment for murderers is necessary to preserve the sanctity of human life, and second being it is man's obligation to do it." The sanctity of life, the prosecutor continued, does not forbid, but demands, the death penalty for murder, because a lesser penalty "means that the taking of life is not that serious an offense."

The prosecutor followed with other biblically attributed quotes on a similar theme: "He who fatally strikes a man shall be put to death"; "You shall not make reparations for the soul of a murderer who deserves to die, and he shall

---

[36] We also reject on its merits defendant's argument that the prosecutor vouched for Alexandra M.'s credibility by asserting that women "common[ly]" use the word "rape" to refer to sexual assaults generally. This was not an insinuation that evidence known to the prosecutor, but not presented to the jury, made Alexandra's trial testimony more credible, but an argument based on a matter of everyday experience. The jurors could evaluate this claim for themselves, and were free to accept or reject it based on their own understanding of common language usage.

be put to death"; "Vengeance is mine, I will repay, saith the Lord"; "The ruler bears not the sword in vain for he is a minister of God, a revenger to execute wrath upon him that doeth evil."

"That's all I want to say on that subject, [l]adies and [g]entlemen," he concluded. Defendant did not object.

Defendant responded with his own religious references. Counsel noted that when Cain slew Abel, God did not kill Cain, but banished him with a mark. Counsel urged that although he was "not a particularly religious person," he believed jurors who imposed death might one day face "memory's accusing voice" asking, "did I do the wrong thing?" He also suggested that "[e]very philosophical tenet of faith that I'm familiar with, Christianity, Judaism, Buddhism, almost says the same thing. To err is human, to forgive divine. Man without mercy is not man at all."

Defendant now insists the prosecutor's invocation of the Bible as religious authority for the death penalty undermined the jurors' sense of penalty responsibility, and discouraged them from giving individualized consideration to mitigating factors. As a result, he urges, he was denied his Eighth Amendment right to a reliable penalty determination.

At the outset, defendant's failure to object at trial forfeits the claim on appeal. (E.g., *Vieira, supra,* 35 Cal.4th 264, 298; *People v. Slaughter* (2002) 27 Cal.4th 1187, 1209 [120 Cal.Rptr.2d 477, 47 P.3d 262] *(Slaughter)*; *People v. Ervin* (2000) 22 Cal.4th 48, 100 [91 Cal.Rptr.2d 623, 990 P.2d 506] *(Ervin)*.) In any event, even if the prosecutor's argument overstepped proper bounds, defendant fails to show the remarks at issue warrant reversal of the penalty judgment.

■ A prosecutor may not cite the Bible or religion as a basis to impose the death penalty. (E.g., *Ervin, supra,* 22 Cal.4th 48, 100; *People v. Roybal* (1998) 19 Cal.4th 481, 519–521 [79 Cal.Rptr.2d 487, 966 P.2d 521]; *People v. Wash* (1993) 6 Cal.4th 215, 260–261 [24 Cal.Rptr.2d 421, 861 P.2d 1107] *(Wash)*.) On the other hand, we have suggested it is not impermissible to argue, for the benefit of religious jurors who might fear otherwise, that application of the death penalty according to secular law does not *contravene* biblical doctrine (e.g., *People v. Bradford* (1997) 14 Cal.4th 1005, 1063 [60 Cal.Rptr.2d 225, 929 P.2d 544]; *Arias, supra,* 13 Cal.4th 92, 180; *People v. Davenport* (1995) 11 Cal.4th 1171, 1223 [47 Cal.Rptr.2d 800, 906 P.2d 1068] *(Davenport)*), or that the Bible shows society's historical acceptance of capital punishment (*People v. Williams* (1988) 45 Cal.3d 1268, 1325 [248 Cal.Rptr. 834, 756 P.2d 221]). This prosecutor sought to cast his remarks accordingly.

However, he did not strictly confine himself to these themes. Though he insisted he sought only to allay religious misgivings about the propriety of the death penalty, he did not simply argue that jurors could impose capital punishment without offending the Bible's teachings. Instead, he asserted that the Bible, and particularly Genesis chapter 9, verse 6, makes it man's duty to impose that penalty to preserve the sanctity of human life. He urged that the Bible not only permits such action, but demands it. We recently have suggested or assumed that prosecutorial arguments substantially similar to the one at issue here are improper. (*Vieira, supra,* 35 Cal.4th 264, 297–298; *Slaughter, supra,* 27 Cal.4th 1187, 1208–1210.)

But even if we similarly assume this prosecutor's comments went too far, we find, as in *Vieira* and *Slaughter,* that defendant suffered no prejudice. In this regard, we note that the prosecutor's biblical comments "were part of a longer argument that properly focused upon the factors in aggravation and mitigation." (*Slaughter, supra,* 27 Cal.4th 1187, 1210.) Hence, there is no likelihood his biblical references diminished the jury's sense of responsibility or displaced the court's standard penalty instructions. (*Vieira, supra,* 35 Cal.4th 264, 297; *Wash, supra,* 6 Cal.4th 216, 251.) That defendant himself invoked religious principles is further evidence he suffered no unfair damage at the prosecutor's hands. (*Ervin, supra,* 22 Cal.4th 48, 100.) Hence, reversal of the penalty judgment is not warranted.

### 5. *Comments regarding lack of mental illness evidence*

In the midst of his argument that no mitigating factors applied, the prosecutor discussed factor (h) (§ 190.3, factor (h)), i.e., whether the defendant's capacity to "appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect, or the [e]ffects of intoxication." In that regard, he told the jury "you have heard not one shred of evidence from a psychologist or psychiatrist or family member or anybody of any mental impairment on the part of the defendant. You heard no evidence of any mental disease or effect of intoxication, not from the defendant, not from anybody." Defendant did not object.

Later, when discussing factor (k) (§ 190.3, factor (k)), i.e., whether there was "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime," the prosecutor remarked, "No evidence of unhappy childhood. No evidence of drug or alcohol problems. *No evidence of any mental problems.*" (Italics added.) Again, defendant raised no objection.

Defendant claims the prosecutor thus willfully misled the jury, because he knew there *was* evidence of defendant's mental illness—the "born insane"

letter he had received from defendant's sister Terri Zambrano. (See discussion, *ante*.) The prosecutor's misconduct, defendant asserts, violated his federal constitutional rights to a fair penalty determination, effective assistance of counsel, freedom from cruel and unusual punishment, due process, and equal protection of the law. (U.S. Const., 5th, 6th, 8th & 14th Amends.) The claim must be rejected.

Once again, defendant's failure to object at trial to the remarks now challenged forfeits the claim on appeal. (E.g., *People v. Hinton* (2006) 37 Cal.4th 839, 903 [38 Cal.Rptr.3d 149, 126 P.3d 981] (*Hinton*).) In any event, the prosecutor committed no misconduct. He merely observed, accurately, that the jury had heard no evidence on this subject. While the prosecutor may not misstate the record, "[i]n general, . . . [he] may comment on the record as it actually stands." (*People v. Keenan* (1988) 46 Cal.3d 478, 509 [250 Cal.Rptr. 550, 758 P.2d 1081] (*Keenan*).)

Defendant had obtained a copy of the letter before the end of the guilt trial, but did not attempt to introduce it, or any related mental evidence, at the penalty trial. The record contains no explanation for the omission. (See *Keenan, supra*, 46 Cal.3d 478, 509.) Defendant now suggests the prosecutor's delay in turning it over prevented him from conducting a timely investigation of the allegations it contained, and the letter's author had, in any event, since died. But defendant had the letter no later than April 12, 1993, when he moved for a mistrial on *Brady* grounds, citing the prosecutor's failure to disclose it. The defense did not begin to present its penalty case until May 4, 1993, almost three weeks later.

When it denied a guilt mistrial, the court specifically said defendant was free to submit the letter to a psychiatrist for whatever help it might be at the penalty phase. And, despite Terri Zambrano's death, there were indications that other members of defendant's family were still available to provide information about his mental health. Yet counsel sought no continuance to pursue the matter.

The record thus provides no ground to conclude the prosecutor's comment was unfair. Moreover, the trial court gave a standard instruction that statements by attorneys are not evidence. "Under the circumstances, we find no misconduct of the sort defendant suggests." (*Keenan, supra*, 46 Cal.3d 478, 510, fn. omitted.)

### 6. *Derogatory references to defendant*

At a point in his closing penalty argument, the prosecutor addressed the issue whether defendant acted under "extreme duress" or "the substantial

domination of another" (§ 190.3, factor (g)). The prosecutor argued, without objection, that there was no evidence of either because defendant "acted on his own and did what he did for his own evil reasons."

Later, the prosecutor urged that defendant deserved no leniency as one who never before did anything wrong, or killed from an internal breakdown or human weakness. Defendant, said the prosecutor, was "just the opposite"; he killed to suit his purposes, as a way of solving his problems, even to the point of carrying out, in cold blood, the murder and dismemberment of his friend. Thus, the prosecutor argued, "this man is especially evil, and this man is especially deserving of the death penalty. [¶] This is not human weakness, ladies and gentlemen. This is evil. This defendant is much more like the other end of the spectrum, the hit man, the hired killer, except he does it himself."

Still later, the prosecutor stressed that "[t]his defendant was not forced into evil because of some environmental factor. This defendant had everything going for him. He chose evil, [l]adies and [g]entlemen." Finally, the prosecutor said, "All you heard from the defendant are lies, [l]adies and [g]entlemen. He has not changed one bit over the years. He is still the same dangerous sociopath he has always been."

Defendant now urges that the prosecutor committed misconduct, and injected his personal opinions into the case, by branding defendant as "evil," a liar, and a "sociopath." As a result, he insists, he was denied his constitutional right to a fair and reliable penalty determination.

Defendant failed to object to any of these comments, though a prompt admonition would have cured any harm. He has therefore forfeited the claim on appeal. (E.g., *People v. San Nicolas* (2004) 34 Cal.4th 614, 665–666 [21 Cal.Rptr.3d 612, 101 P.3d 509].)

 His claim lacks merit in any event. There is a wide range of permissible argument at the penalty phase. (E.g., *People v. Ochoa* (1998) 19 Cal.4th 353, 463 [79 Cal.Rptr.2d 408, 966 P.2d 442] (*Ochoa*).) Argument may include opprobrious epithets warranted by the evidence. (*Sandoval, supra*, 4 Cal.4th 155, 180.) Where they are so supported, we have condoned a wide range of epithets to describe the egregious nature of the defendant's conduct. (E.g., *Farnam, supra*, 28 Cal.4th 107, 168 [defendant is "monstrous," "cold-blooded," vicious, and a "predator"; evidence is "horrifying" and " 'more horrifying than your worst nightmare' "]; *People v. Thomas* (1992) 2 Cal.4th 489, 537 [7 Cal.Rptr.2d 199, 828 P.2d 101] (*Thomas*) [defendant is " 'mass murderer, rapist,' " " 'perverted murderous cancer,' " and " 'walking depraved cancer' "]; *Sully, supra*, 53 Cal.3d 1195, 1249 [based on facts of crime, defendant is " 'human monster' " and "mutation"].)

Defendant brutally assaulted the Mishells because he believed they had exposed his extramarital affair. After admitting this to his friend Reyna, he murdered Reyna to prevent Reyna from testifying to the admission. Defendant then dismembered and scattered Reyna's body to hamper its identification. The prosecutor could properly characterize these acts as "evil," and could brand defendant as "evil" for committing them. And, considering that defendant was a successful contractor and public official whose life began its downward spiral when he decided to commit adultery, the prosecutor was not amiss for suggesting that he "chose" his evil course.

Nor did the prosecutor mischaracterize the evidence by saying that defendant told nothing but lies, and was a sociopath. When a defendant's testimony contradicts the strong evidence of his guilt, it is not improper to call him a liar. (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1030 [254 Cal.Rptr. 586, 766 P.2d 1] [" 'snake in the jungle,' " "slick," "tricky," a " 'pathological liar,' " and " 'one of the greatest liars in the history of Fresno County' "]; *People v. Reyes* (1974) 12 Cal.3d 486, 505 [116 Cal.Rptr. 217, 526 P.2d 225].) And the label of sociopath—someone who acts without conscience or remorse—certainly fit defendant, based on the facts of his crimes. No misconduct occurred.

### 7. *Comments on absence of family witnesses and remorse evidence*

As mitigating character witnesses, defendant called persons who knew him in his adult life as a contractor, computer enthusiast, community activist, and parent. No family members were presented. There was evidence that his parents were deceased, and that he wished to spare his children any involvement in the trial, but that he had a living brother and sister.

In his closing argument, the prosecutor noted defendant's omission to call family and childhood witnesses, remarking, "I ask you, who really knows someone, acquaintances or family, friends, brothers and sisters, the people you grew up with in your youth? [¶] They really know you; and they were not called, [l]adies and [g]entlemen. You did not hear from them. You have to ask yourself what that means and why that was." The defense raised no objection.

On appeal, defendant urges the prosecutor's argument unfairly placed pressure on him to produce a certain kind of mitigating evidence. The failure to object, where an admonition would have cured any harm, forfeits the point. The argument is meritless in any event. The prosecutor never suggested defendant had a legal burden to present family members in mitigation. He

merely commented, as is permitted, on defendant's failure to call logical witnesses. (E.g., *Dennis*, *supra*, 17 Cal.4th 468, 549; *Wash*, *supra*, 6 Cal.4th 215, 262–263.)

The prosecutor also argued there was no evidence defendant felt remorse for his crimes. The prosecutor said, "There is something else you can consider to see if the defendant deserves sympathy, and that's remorse. [¶] Is there any evidence that the defendant has repented or has expressed remorse? [¶] I submit, [l]adies and [g]entlemen, there has been none, no evidence at all that he has ever repented, ever expressed remorse for what he did to Luis Reyna in the desecration of his body, no evidence that he ever admitted the truth of what he did to Luis Reyna or has ever accepted responsibility for it." Defendant did not object.

On appeal, defendant first claims these remarks constituted comment on his failure to testify at the penalty phase, in violation of his Fifth Amendment right against self-incrimination. (*Griffin v. California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229] (*Griffin*); see *Estelle v. Smith* (1981) 451 U.S. 454, 462 [68 L.Ed.2d 359, 101 S.Ct. 1866] [5th Amend. privilege applies at sentencing phase of capital trial].) The claim was not forfeited by his failure to object, he urges, because an admonition could not have cured the harm.

 Even if so (but see *Bemore*, *supra*, 22 Cal.4th 809, 854), his *Griffin* claim fails on the merits. The prosecutor did not comment that defendant had failed to *take the stand* to express remorse; he simply said there was no *evidence* that defendant had *ever* expressed remorse. We have consistently found such penalty phase argument permissible under *Griffin*, even where it faults the defendant for failing to confess guilt and express remorse *during his guilt phase testimony*. (E.g., *People v. Boyette* (2002) 29 Cal.4th 381, 455 [127 Cal.Rptr.2d 544, 58 P.3d 391] (*Boyette*); *Bemore*, *supra*, 22 Cal.4th 809, 854–855; *People v. Holt* (1997) 15 Cal.4th 619, 691 [63 Cal.Rptr.2d 782, 937 P.2d 213] (*Holt*); *People v. Osband* (1996) 13 Cal.4th 622, 724 [55 Cal.Rptr.2d 26, 919 P.2d 640]; *People v. Taylor* (1990) 52 Cal.3d 719, 744 [276 Cal.Rptr. 391, 801 P.2d 1142].) We do so again.

Defendant also argues that the prosecutor's argument improperly implied he deserved pity or sympathy only if he had expressed remorse. The claim is forfeited for failure to object on that ground at trial. In any event, it lacks merit. The prosecutor only said that "something *else*" (italics added) the jury could consider sympathetically—an expression of remorse—was absent. He never stated or implied the jury could not or should not decide defendant deserved sympathy unless it found he had expressed remorse.

Finally, defendant contends the prosecutor argued that the absence of sympathetic evidence was an aggravating factor. Again the claim is forfeited

for failure to object, and is also meritless. The prosecutor did not state or imply that defendant's failure to express or show remorse in the wake of his crimes was a factor in aggravation. He urged only that remorse was absent as a possible mitigating factor. Such argument is permissible. (*Cook, supra,* 39 Cal.4th 566, 611; *Jurado, supra,* 38 Cal.4th 72, 141; *Mendoza, supra,* 24 Cal.4th 130, 187.) No misconduct occurred.

### 8. *Argument that defendant did not deserve sympathy*

The prosecutor devoted substantial portions of his argument to the premise that the jury should not show defendant sympathy or mercy. Aside from the "no remorse" remarks detailed above, the prosecutor argued that "[t]here was no basis for mitigation or to show sympathy or mercy based upon the evidence presented to you in this trial." At another point, he noted that defendant had asked for sympathy under "section (k)" of the death penalty statute (§ 190.3, factor (k); see CALJIC No. 8.85) because there was nothing else in mitigation. Then he asked, "What kinds of things could you consider under [factor] (k) as we've seen because there is nothing else there." In this regard, he urged that sympathy might be appropriate for someone who had been born in a ghetto, or had suffered a broken home or childhood abuse, but the "opposite" was true of defendant, who grew up in an intact family in a beautiful home in Long Beach. Thus, the prosecutor insisted, defendant had "absolutely no excuse for what he's done. And he has no right to ask you for sympathy for what he's done."

The prosecutor asked rhetorically what evidence defendant offered to show he deserved sympathy or mercy, answered sarcastically by alluding to defendant's "interest[] in old buildings," and asked "[h]ow many buildings equal a human life." "He asks for sympathy," said the prosecutor, "but look at the viciousness of his attack on Robert and Barbara Mishell."

In summation, the prosecutor asserted: "The defendant asks you for sympathy and mercy. I ask you to tell him no. He has no right. The crimes he has committed go far beyond the pale, are too horrible. He's not entitled to sympathy or mercy. [¶] I will tell you as the prosecutor representing the People of the State of California, if you show him the same sympathy and mercy that he showed to Alexandra [M.], the same sympathy and mercy that he showed to Robert and to Barbara Mishell, the same sympathy that he showed to Luis Reyna, then I will be satisfied and justice will be done. If this defendant deserves sympathy, then they all do; and we become defenseless against predators among us, and they devour us."

Defendant urges this argument violated his Eighth Amendment right to the jury's sympathetic consideration to all character and background evidence

proffered in support of a penalty less than death. (E.g., *Eddings v. Oklahoma* (1982) 455 U.S. 104, 114–117 [71 L.Ed.2d 1, 102 S.Ct. 869].) The gravamen of the claim appears to be that the prosecutor improperly told the jury that sympathy evidence was irrelevant, and that defendant was not *legally* entitled to sympathy or mercy.[37]

The prosecutor made no such assertion. On the contrary, he acknowledged that sympathy and mercy were factors the jury *could* consider in deciding the appropriate punishment, and he indicated that sympathetic evidence, if any, must be weighed against the evidence of aggravating factors. However, he urged, when weighed against all the aggravating evidence, the evidence in mitigation was "nothing," and "[t]here was no basis for mitigation or to show mercy or sympathy to this defendant *based upon the evidence presented to you in this trial.*" (Italics added.)

All the excerpts cited by defendant pursued the same theme, i.e., that *this* defendant did not *deserve* sympathy or mercy on the basis of the evidence actually presented. The prosecutor's rhetorical assertions that defendant had no "right" to "ask" the jury for sympathy or mercy in light of his terrible crimes and the lack of sympathetic evidence would not reasonably be understood to mean that consideration of sympathy and mercy was legally foreclosed, or that sympathetic evidence was irrelevant. Instead, they suggested only that defendant had not presented a case deserving of consideration on the issue. We have often upheld such arguments. (E.g., *Vieira, supra,* 35 Cal.4th 264, 296; *Ochoa, supra,* 19 Cal.4th 353, 464–465; *People v. Jones, supra,* 15 Cal.4th 119, 184–185; *Arias, supra,* 13 Cal.4th 92, 176–177.) We do so again.

As noted above, the prosecutor said in his final summation that, as the People's representative, he would be satisfied if the jury showed defendant the same sympathy and mercy defendant showed his victims. Defendant contends this was misconduct, in that the prosecutor used his official position to vouch personally for the appropriateness of the verdict he was urging. (See *People v. Ayala* (2000) 24 Cal.4th 243, 288 [99 Cal.Rptr.2d 532, 6 P.3d 193] *(Ayala); People v. Benson* (1990) 52 Cal.3d 754, 795 [276 Cal.Rptr. 827, 802 P.2d 330] *(Benson).*)

---

[37] Defendant raised no objection during this argument. However, prior to the commencement of closing arguments, he filed a written motion to prohibit the prosecutor from arguing that sympathy should not be considered by the jury. In the midst of a confusing argument on the motion, counsel said his request was "to issue an order prohibiting [the prosecutor] from arguing the jury *cannot* consider sympathy." The court, after asking, "How can you do that?," denied the motion. In context, the court's ruling appears only to have meant the prosecutor was free to argue the evidence did not *warrant* sympathy or mercy. In any event, given the firm denial of the preargument motion, we conclude defendant did not forfeit the issue by failing to renew his objection during the argument itself.

The claim is forfeited for failure to object at trial. It also lacks merit. Here, as in *Ayala* and *Benson*, no improper vouching occurred. The prosecutor simply stated " 'what was obvious and altogether unobjectionable—i.e., that it was the People's position that defendant's crimes called for the ultimate sanction.' [Citation.]" (*Ayala, supra,* 24 Cal.4th 243, 288, quoting *Benson, supra,* 52 Cal.3d 754, 795.) No misconduct occurred.

> 9. *Appeals to "community vengeance," "collective conscience," and "social contract"*

Most of the prosecutor's closing penalty argument, covering some 33 pages in the reporter's transcript, was an attempt to persuade the jury that the balance of aggravating and mitigating evidence warranted the death penalty. At the conclusion of his argument, however, the prosecutor said he wanted to talk for a few minutes about the "philosophy" of capital punishment.

In this regard, the prosecutor indicated that the purpose of the death penalty is collective vengeance, defined simply as punishment or retribution for a wrong. He urged that such vengeance is a vital expression of the community's outrage, and that the vigor of society's values is nourished by use of the criminal justice system to impose punishments that reflect the community's "controlled indignation." He asserted that a society incapable of imposing such punishment where warranted is decadent and emasculated, and that the jury serves as the community's conscience in implementing this sanction.

The prosecutor also invoked John Locke's concept of the social contract, whereby each individual surrenders the personal right of vengeance in favor of state-controlled retribution. The jury's failure to implement the death penalty, he argued, would violate this contract, for if society were unable or unwilling to impose even the most drastic punishment in appropriate cases, individuals, having lost faith in state justice and protection, might return to vigilantism and personal vengeance.

Defendant did not object at trial. However, he now claims the prosecutor's plea that the jurors act as the community's conscience and avengers, and that they apply collective and societal values rather than focusing on a case-specific determination of the appropriate punishment, diminished their personal sense of sentencing responsibility, and deprived him of an independent, individualized, and constitutionally reliable penalty determination, in violation of the Eighth Amendment.

Because an admonition would have cured any harm, defendant's failure to object below forfeits the argument on appeal. In any event, it lacks merit. The

prosecutor never invited the jurors to abrogate their personal responsibility to determine the appropriate punishment. Nor did he commit misconduct merely by describing the jurors, accurately (*Witherspoon v. Illinois, supra,* 391 U.S. 510, 519–520), as the conscience of the community (*People v. Lucero* (2000) 23 Cal.4th 692, 734 [97 Cal.Rptr.2d 871, 3 P.3d 248] (*Lucero*); *People v. Jones, supra,* 15 Cal.4th 119, 185–186; see also *Lang, supra,* 49 Cal.3d 991, 1041) or by noting the jury's important role in the criminal justice system (*Lang, supra,* at p. 1041; *Fierro, supra,* 1 Cal.4th 173, 248, 249).

Furthermore, the prosecutor did not err by devoting some remarks to a reasoned argument that the death penalty, where imposed in deserving cases, is a valid form of community retribution or vengeance—i.e., punishment— exacted by the state, under controlled circumstances, and on behalf of all its members, in lieu of the right of personal retaliation. Retribution on behalf of the community *is* an important purpose of all society's punishments, including the death penalty. (E.g., *Spaziano v. Florida* (1984) 468 U.S. 447, 462 [82 L.Ed.2d 340, 104 S.Ct. 3154]; see also § 1170, subd. (a)(1) ["the purpose of imprisonment for crime is punishment"].) And the prosecutor was entitled to direct some argument, as he clearly intended, against the possibility that one or more jurors harbored lingering reservations about capital punishment as "equivalent to the State murdering."

Our modern cases have suggested that prosecutorial references to community vengeance, while potentially inflammatory, are not misconduct if they are brief and isolated, and do not form the principal basis for advocating the death penalty. (E.g., *Hinton, supra,* 37 Cal.4th 839, 907; *Davenport, supra,* 11 Cal.4th 1171, 1222; *Wash, supra,* 6 Cal.4th 215, 262; *People v. Ghent* (1987) 43 Cal.3d 739, 771 [239 Cal.Rptr. 82, 739 P.2d 1250].) Concern about extended comment on this issue appears traceable to *People v. Floyd* (1970) 1 Cal.3d 694 [83 Cal.Rptr. 608, 464 P.2d 64] (*Floyd*). There we noted that "[a]lthough this court has never held that it is improper for a prosecutor in closing argument in a penalty trial to ask the jury to impose the death penalty for reasons of retribution or vengeance, we have stated in other contexts that 'There is no place in the [sentencing] scheme for punishment for its own sake, the product simply of vengeance or retribution.' [Citation.]" (*Id.* at pp. 721–722.)

*Floyd* also pointed to another earlier statement of this court, i.e., that " '[w]hatever may have been the fact historically, retribution is no longer considered the *primary* objective of the criminal law [citation] and is thought by many not even to be a proper consideration [citations].' " (*Floyd, supra,* 1 Cal.3d 694, 722.) Intervening changes in penal philosophy (see discussion, *ante*) make these statements suspect, and thus ameliorate concerns about the inflammatory irrelevance of such prosecutorial argument.

Here, the prosecutor's comments were not brief or isolated, but neither did they form the principal basis of his argument. Moreover, his remarks were not inflammatory. They did not seek to invoke untethered passions, or to dissuade jurors from making individual decisions, but only to assert that the community, acting on behalf of those injured, has the right to express its values by imposing the severest punishment for the most aggravated crimes. This case, the prosecutor was at pains to suggest, was one of those that deserved such severe punishment. No misconduct occurred.

### 10. *"Future dangerousness" argument*

The prosecutor argued that, based on defendant's crimes, "there was every reason to believe he will be as dangerous in prison as he was on the street." Alluding to the numerous incident reports in defendant's jail record, including two fights, the prosecutor noted that defendant "couldn't even keep his nose clean" in jail. Thus, the prosecutor asked, "How will he be in state prison," where he would have no incentive to behave. The prosecutor continued in the rhetorical-question vein, asking, "Would any guard or inmate be safe from this defendant? [¶] And if he does kill again in prison, what do we say then, [l]adies and [g]entlemen? What do we say to the family, that we didn't know how he was? [¶] . . . [¶] How many victims must there be before we finally say to this defendant enough?" Defendant did not object.

Defendant now insists the prosecutor improperly played to the jury's fears by speculating on his future dangerousness, thus denying him the reliable penalty verdict guaranteed by the Eighth Amendment. Defendant's failure to object at trial forfeits the claim, and it lacks merit in any event.

As defendant concedes, the prosecutor may not present expert evidence of future dangerousness as an aggravating factor, but he may argue from the defendant's past conduct, as indicated in the record, that the defendant will be a danger in prison. (E.g., *Boyette, supra*, 29 Cal.4th 381, 446; *People v. Michaels* (2002) 28 Cal.4th 486, 540–541 [122 Cal.Rptr.2d 285, 49 P.3d 1032]; *Ervin, supra*, 22 Cal.4th 48, 99; *Thomas, supra*, 2 Cal.4th 489, 537.) Defendant insists, however, that the prosecutor's "what if" approach went beyond the evidence into the realm of emotion. We find no impropriety. The prosecutor was entitled to present his argument in colorful terms. (See, e.g., *Boyette, supra*, at p. 446 [given strong likelihood that defendant will kill again, " '[y]ou have to ask yourselves, do you want to put more families through that?' "]; *Michaels, supra*, at p. 540 [" 'Just think of all the generations of prisoners that will . . . be exposed to [defendant's] extreme danger . . . [and] of all the prison guards who will be lucky enough to meet [him]' "].) No misconduct occurred.

### 11. *Argument that defendant had received a fair trial*

In the course of his argument, the prosecutor commented that defendant, represented by two "experienced, topnotch criminal defense attorneys" with the aid of a long-term investigator, had had the "fairest trial imaginable" before "a judge that is known throughout the state for fairness and his knowledge of the law on death penalty cases." The prosecutor further noted that the jurors, after going through a two-month selection process, had been chosen "specifically because of [their] fairness and impartiality." Moreover, the prosecutor observed, defendant had been able to confront all the witnesses presented against him and had "had the opportunity to present any and all evidence he wished to on his behalf." The result of "all this," said the prosecutor, was that defendant was guilty beyond doubt of the charges and deserved the death penalty. Defendant did not object.

Defendant now contends this argument wrongly invoked the prosecutor's official prestige, and his purported expertise and personal knowledge, to vouch for the quality of defendant's trial representation, the reputation of the presiding judge, and the fairness of the trial process, thereby reassuring jurors that defendant had received every protection against arbitrary and unwarranted imposition of the death penalty. The prosecutor's assertions, defendant urges, were not supported by evidence in the record, and were in many respects inaccurate, but were likely to be accepted by the jurors, who had no basis to evaluate their truth or falsity, because of the prosecutor's status. As a result, defendant insists, he suffered violations of his federal constitutional rights to a fair trial, an impartial jury, due process, equal protection, and freedom from cruel and unusual punishment. (U.S. Const., 5th, 6th, 8th & 14th Amends.)

Defendant's failure to object at trial forfeits the claim. In any event, he demonstrates no basis for reversal. As the People point out, the prosecutor's comments were supported by the record, or by the jurors' personal observations. The prosecutor's global assertion, that defendant had had the "fairest trial imaginable," would only be understood as established by the specific factors then cited by the prosecutor. The jurors could see that defendant was represented by two attorneys, whom the court had described, in the jurors' presence, as experienced, skilled, and competent. The defense investigator testified he had worked on the case for several years. The trial judge informed the jurors he had been on the bench a long time and had tried many capital cases—thus suggesting his reputation and competence in that area were high—and the jurors could observe his daily handling of the case, including his interactions with the opposing lawyers.

The jurors also knew they had gone through an extended selection process, involving questions designed to determine if they were fair and impartial.

They could see the defense had presented numerous witnesses, and had been allowed to cross-examine prosecution witnesses. In sum, reasonable jurors would understand the prosecutor's "fairest trial imaginable" remark simply as an argumentative gloss on matters directly before them.

Defendant urges the prosecutor was willfully false in his statement that defendant had the "opportunity" to present "any and all evidence" he wished. Defendant cites the effect of the prosecutor's late disclosure of Terri Zambrano's "born insane" letter on the defense's ability to present mental evidence. But as we have seen, the record gives no indication that the belated acquisition of the letter—whatever caused the delay—prevented the defense from introducing available, material evidence.

In any event, the prosecutor's argument was, at bottom, mere puffery, and would readily be recognized as such. This is especially so in light of the standard instruction, given by the court, that statements by attorneys are not evidence. There was no misconduct, and no conceivable prejudice. Defendant's claim must be rejected.

### 12. *Cumulative prejudice from misconduct*

Defendant asserts he suffered cumulative prejudice from the multiple instances of alleged misconduct by the prosecutor in his closing penalty argument. But we have identified only one possible such instance of misconduct, the prosecutor's discussion of biblical themes (see discussion, *ante*), and have concluded that, if error, these remarks were clearly harmless. We therefore reject defendant's claim of cumulative prejudice.

### G. *Penalty trial error issues*

### 1. *Admission of unadjudicated rape of Alexandra M.*

Defendant urges that admission, as aggravating evidence, of the unadjudicated sexual assault against Alexandra M. violated his federal constitutional rights to due process, equal protection, a fair and impartial jury, and a reliable penalty verdict. (U.S. Const., 5th, 6th, 8th & 14th Amends.)[38] He asserts that jurors who had found him guilty of capital offenses could not impartially judge his guilt of the aggravating crime, and that he was denied the protection of a unanimous jury verdict beyond a reasonable doubt. We reject the contention, as we have many times before. (E.g., *Stanley, supra,* 39 Cal.4th

---

[38] Defendant moved in limine to exclude the Alexandra M. incident from the penalty phase, claiming, among other things, that the use of unadjudicated criminal activity as aggravating evidence violates the federal Constitution. The motion was denied, but the court accepted the parties' stipulation that this motion would be deemed "continuing and timely."

913, 962; *Anderson, supra*, 25 Cal.4th 543, 584–585; *Jenkins, supra*, 22 Cal.4th 900, 1054; *People v. Samayoa* (1997) 15 Cal.4th 795, 863 [64 Cal.Rptr.2d 400, 938 P.2d 2]; *Balderas, supra*, 41 Cal.3d 144, 204–205.)

■ Defendant also claims his federal and state due process rights were violated by virtue of the "preaccusation" delay in "prosecuting" the 1982 sexual assault on Alexandra M. But we have consistently held that the prosecution may offer in aggravation the defendant's violent criminal activity that occurred at any time. Absent demonstrable prejudice, the remote time at which that activity occurred does not violate the defendant's due process, speedy trial, or fair trial rights. (E.g., *People v. Yeoman* (2003) 31 Cal.4th 93, 136–138 [2 Cal.Rptr.3d 186, 72 P.3d 1166]; *People v. Koontz* (2002) 27 Cal.4th 1041, 1088 [119 Cal.Rptr.2d 859, 46 P.3d 335]; *Anderson, supra*, 25 Cal.4th 543, 585–586; *Medina, supra*, 11 Cal.4th 694, 772.) Though defendant claims prejudice, he demonstrates none except the damaging nature of the evidence. The evidence was admissible.[39]

### 2. *Denial of allocution*

At the outset of the penalty trial, defendant moved for permission to allocute before the penalty jury, i.e., to make a personal statement immune from cross-examination. Counsel's attached declaration stated that, if permitted to do so, defendant would speak about the "constructive worth and value of his life even as it may exist in prison," the artistic and vocational activities he might wish to undertake behind bars, his opportunity to teach other inmates based on his experience and knowledge, his love for his children, and "[h]is promise of good behavior while serving out the remainder of his life in prison." The motion was denied.[40]

Defendant now urges the denial of allocution was error. The consequence, he insists, was a violation of his federal constitutional rights to due process, equal protection, and a reliable penalty verdict. (U.S. Const., 5th, 6th, 8th & 14th Amends.) In particular, he asserts, he was treated unequally compared to noncapital defendants, who do have a right of allocution at sentencing.

As defendant concedes, we have repeatedly rejected similar arguments. (E.g., *People v. Carter* (2005) 36 Cal.4th 1215, 1276 [32 Cal.Rptr.3d 838,

---

[39] There is no merit in defendant's related claim that the court violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights by instructing, over defense objection, on the elements of sodomy and forcible oral copulation as related to the assault on Alexandra M. The argument rests entirely on the premise that it was error to admit evidence about these unadjudicated and insufficiently noticed crimes. We have rejected that contention. The instructional argument thus also fails.

[40] Defendant was later allowed to allocute to the trial court before it ruled on the automatic motion for modification of the death verdict under section 190.4, subdivision (e) (section 190.4(e)). (See discussion, *post.*)

117 P.3d 544]; *Lucero, supra,* 23 Cal.4th 692, 717; *People v. Clark* (1993) 5 Cal.4th 950, 1036–1037 [22 Cal.Rptr.2d 689, 857 P.2d 1099] [summarily dismissing equal protection argument]; *Keenan, supra,* 46 Cal.3d 478, 511; *People v. Robbins* (1988) 45 Cal.3d 867, 888–890 [248 Cal.Rptr. 172, 755 P.2d 355] (*Robbins*).)

We have held generally that capital and noncapital sentences are not similarly situated for purposes of equal protection. (E.g., *People v. Elliot* (2005) 37 Cal.4th 453, 488 [35 Cal.Rptr.3d 759, 122 P.3d 968]; *People v. Williams, supra,* 45 Cal.3d 1268, 1330.) With regard to allocution specifically, we have explained that noncapital sentencees have no other right to express themselves about the appropriate sentence, while capital defendants may take the stand and testify on that issue. (*Robbins, supra,* 45 Cal.3d 867, 889.) In the latter context, a right of allocution immune from cross-examination contravenes the capital sentencing law's purpose to provide the sentencer with all relevant information bearing on the appropriate penalty. (*Keenan, supra,* 46 Cal.3d 478, 511.)

Defendant urges that because he did not intend to discuss *facts* in his statement, cross-examination would be irrelevant. But his promises to behave well and be a constructive presence in prison would be a legitimate subject for cross-examination to test their sincerity based on past conduct. Defendant's claim lacks merit.

## H. *Denial of automatic motion for modification of death verdict*

On September 8, 1993, the trial court denied defendant's automatic motion for modification of the death verdict (§ 190.4(e)). Defendant claims the ruling was improper, in that the court disregarded all mitigating evidence.

Defendant did not object below to any aspect of the court's recitation of its reasons for denying the automatic modification motion. He has therefore forfeited his claim. (*Lewis and Oliver, supra,* 39 Cal.4th 970, 1064, citing *People v. Riel* (2000) 22 Cal.4th 1153, 1220 [96 Cal.Rptr.2d 1, 998 P.2d 969] [applying the forfeiture rule to hearings on such motions following the finality of *People v. Hill* (1992) 3 Cal.4th 959 [13 Cal.Rptr.2d 475, 839 P.2d 984]].) As we hereafter explain, the contention lacks merit in any event.

Section 190.4(e) requires that, in ruling on the motion, "the judge shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in [s]ection 190.3, and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented. The judge shall state on the record the reasons for his findings."

" 'On appeal, we subject a ruling on such an application to independent review: the decision resolves a mixed question of law and fact; a determination of this kind is generally examined de novo [citation]. Of course, when we conduct such scrutiny, we simply review the trial court's determination after independently considering the record; we do not make a de novo determination of penalty.' " (*People v. Carter* (2005) 36 Cal.4th 1114, 1211 [32 Cal.Rptr.3d 759, 117 P.3d 476], quoting *Mickey, supra,* 54 Cal.3d 612, 703–704.)

The trial court began its ruling by correctly stating its statutory obligation. Indicating it had carefully reviewed the guilt and penalty phase evidence, the court said it was satisfied beyond reasonable doubt of the truth of the guilt and special circumstance findings, and that defendant had raped Alexandra M. Assessing the circumstances of the capital crime—the killing of a witness, and the decapitation and dismemberment of the corpse to hamper identification—the court found them "totally repulsive," "heinous," and "a grave threat to our society," committed by a man with a "base, antisocial personality" who had "little regret for his conduct or the injury caused to innocent people."

The court indicated it had considered potential factors in mitigation, including "any circumstances which extenuate the gravity of the crime even though not a legal excuse for the crime." In this regard, the court stated, it had examined all the testimony of "defendant's neighbors, associates, his children's teachers and co-workers," and of his prison adjustment expert, as well as the evidence of his participation in civic organizations and his assistance to jail inmates, but found nothing mitigating in his character or background. On the contrary, said the court, defendant's privileged background and adult success weighed against mitigation. Indeed, said the court, defendant's life "has been a life of egocentricity with total disregard for any human being." Though it had "considered sympathy and compassion," the court asserted, in light of the evidence, "these considerations are not sufficient or do not in any way serve as the basis of a sentence less than death."

In sum, the court ruled, "considering all the evidence and by independent review, the Court's personal assessment is that the factors in aggravation beyond all reasonable doubt outweigh those in mitigation, and further the court independently finds that the evidence of aggravation is so substantial when compared to the evidence of mitigation that it warrants death and not life without possibility of parole."

Thus, the court fully considered all the proffered mitigating evidence and simply deemed it insufficient to warrant a sentence less than death. On review, we cannot say that ruling is contrary to law or the evidence. No error occurred.

I. *Challenges to capital sentencing scheme*

Defendant raises numerous challenges, under the Fifth, Sixth, Eighth, and Fourteenth Amendments, to the California capital sentencing scheme "as applied" in his case. Some of the issues are presented as claims of instructional error. In other instances defendant simply suggests that the statutory sentencing scheme itself, as explicated by the standard instructions given in his case, is unconstitutional. Still other claims attack the death penalty statute, or the death penalty process in general, for reasons beyond the instructions. As will appear, no matter how these arguments are framed, we have rejected all of them.

Defendant urges the trial court erred by failing to instruct that the jury must find, beyond reasonable doubt (1) the existence of each aggravating factor used to justify the death penalty, (2) that aggravation outweighed mitigation, and (3) that death was the appropriate penalty. He is mistaken. (*People v. Boyer* (2006) 38 Cal.4th 412, 485 [42 Cal.Rptr.3d 677, 133 P.3d 581] (*Boyer*); *Jurado, supra,* 38 Cal.4th 72, 143; *Stitely, supra,* 35 Cal.4th 514, 573; *Panah, supra,* 35 Cal.4th 395, 499.)

 Defendant contends the trial court erred, on similar constitutional grounds, by refusing his requests to delete from the instructions those sentencing factors listed in section 190.3 that he deems inapplicable to his case, including factors (d) (offense committed under "extreme" mental or emotional disturbance), (f) (defendant's belief in moral justification or extenuation for his conduct), (h) (inability to appreciate criminality or conform conduct to law because of mental disease or defect, or intoxication), (i) (defendant's age at time of crime) and (j) (defendant as minor accomplice). (§ 190.3, factors (d), (f), (h), (j).) There is no such requirement where, as here, the jury was instructed to consider only "applicable" sentencing factors. (*Boyer, supra,* 38 Cal.4th 412, 486; see *People v. Gray* (2005) 37 Cal.4th 168, 236 [33 Cal.Rptr.3d 451, 118 P.3d 496] (*Gray*); *Maury, supra,* 30 Cal.4th 342, 439–440.) In particular, we have made clear that the defendant's age "is neither aggravating nor mitigating, 'but is used in the statute "as a metonym for *any* age-related matter suggested by the evidence or by common experience." ' " (*Mendoza, supra,* 24 Cal.4th 130, 190.)

Defendant finds constitutional error in the court's failure to designate which factors are aggravating and which are mitigating. There was no such obligation. (*Boyer, supra,* 38 Cal.4th 412, 486; *Gray, supra,* 37 Cal.4th 168, 236; *Kraft, supra,* 23 Cal.4th 978, 1078–1079.)

The sentencing statute and instructions in general, and the mitigating factors in particular, are not unconstitutionally vague. (*Young, supra,* 34

Cal.4th 1149, 1226; *Lucero, supra,* 23 Cal.4th 692, 741; *People v. Freeman* (1994) 8 Cal.4th 450, 525 [34 Cal.Rptr.2d 558, 882 P.2d 249]; *Webb, supra,* 6 Cal.4th 494, 535.)

The jury need not make written findings of aggravating factors. (*People v. Marlow* (2004) 34 Cal.4th 131, 154 [17 Cal.Rptr.3d 825, 96 P.3d 126]; *Kraft, supra,* 23 Cal.4th 978, 1078; *Bemore, supra,* 22 Cal.4th 809, 859.)

The jury need not be instructed that it does not have to find mitigating factors unanimously or beyond a reasonable doubt. (*Roldan, supra,* 35 Cal.4th 646, 741; *Boyette, supra,* 29 Cal.4th 381, 466.)

Use of descriptors such as "reasonably believed" and "moral" in sentencing factor (f) (§ 190.3, factor (f) [whether defendant "reasonably believed" in "moral justification" for his conduct]) and "substantial" in sentencing factor (g) (*id.,* factor (g) [whether defendant acted under "substantial domination" of another]) are not so vague as to erect impermissible barriers to the consideration of mitigating evidence. (*Panah, supra,* 35 Cal.4th 395, 500; *Boyette, supra,* 29 Cal.4th 381, 467.)

The standard sentencing instructions are not constitutionally deficient insofar as they fail to define mitigation. The presumption that jurors comprehend the instructions is not rebutted by empirical assertions to the contrary based on research that is not part of the present record and has not been subject to cross-examination. (*Welch, supra,* 20 Cal.4th 701, 772–773; see also *Holt, supra,* 15 Cal.4th 619, 702.)

The death penalty statute adequately narrows the class of death-eligible murderers. (*People v. Williams* (2006) 40 Cal.4th 287, 339 [52 Cal.Rptr.3d 268, 148 P.3d 47]; *Marks, supra,* 31 Cal.4th 197, 237.) Nor is the statute facially invalid insofar as it allows prosecutors discretion, within its parameters, to decide the cases in which they will and will not seek the death penalty. (*Vieira, supra,* 35 Cal.4th 264, 304; *People v. Lucas* (1995) 12 Cal.4th 415, 477 [48 Cal.Rptr.2d 525, 907 P.2d 373]; *Keenan, supra,* 46 Cal.3d 478, 505–507.)

The statute is not unconstitutional insofar as it does not require comparative, or intercase, proportionality review. (*Lewis and Oliver, supra,* 39 Cal.4th 970, 1067; *Stanley, supra,* 39 Cal.4th 913, 966; *People v. Jablonski* (2006) 37 Cal.4th 774, 837 [38 Cal.Rptr.3d 98, 126 P.3d 938]; *Panah, supra,* 35 Cal.4th 395, 500.) Defendant claims we also deny *intracase* proportionality review in capital cases, but he is mistaken. Upon request, we do undertake to determine whether a particular defendant's death sentence " 'is so "grossly disproportionate" to the offenses [he committed] as to constitute cruel or unusual

punishment under article I, section 17 of the California Constitution.' " (*Stanley, supra,* 39 Cal.4th 913, 966, quoting *Arias, supra,* 13 Cal.4th 92, 193.)

Defendant contends his death sentence was grossly disproportionate to his individual culpability, but we reject the claim. He was a successful contractor and public official who brutally assaulted Robert and Barbara Mishell, leaving both with permanent disabilities, because he believed they had exposed his extramarital affair. After admitting this assault to his friend and fellow official, Luis Reyna, he murdered Reyna to prevent Reyna's testimony against him in the Mishell matter, then decapitated and dismembered Reyna's body and dumped it in a remote location in order to hamper the body's identification. Under these circumstances, defendant's death sentence is not "so disproportionate to his offenses and to his personal culpability for those offenses as to 'shock[] the conscience' or 'offend[] fundamental notions of human dignity.' " (*Stanley, supra,* 39 Cal.4th 913, 967, quoting *People v. Livaditis* (1992) 2 Cal.4th 759, 786 [9 Cal.Rptr.2d 72, 831 P.2d 297].)

Defendant urges that the delay in carrying out his death sentence is cruel and/or unusual punishment in violation of the federal and state Constitutions. But we have uniformly held that reasonable delays required by the process of statutorily mandated appellate review do not violate these constitutional provisions. (E.g., *Panah, supra,* 35 Cal.4th 395, 500; *Ochoa, supra,* 19 Cal.4th 353, 477–478.)

Finally, defendant urges that the death penalty is, per se, cruel and unusual punishment violative of the Eighth Amendment. We continue to reject such claims. (E.g., *Moon, supra,* 37 Cal.4th 1, 47–48; *People v. Staten* (2000) 24 Cal.4th 434, 462 [101 Cal.Rptr.2d 213, 11 P.3d 968] (*Staten*).)

### J. *Cumulative penalty phase prejudice*

Defendant claims cumulative prejudice from all alleged errors and misconduct at the penalty phase. We have identified no such error, and only one possible instance of misconduct, the prosecutor's biblical references. We have further found that if misconduct occurred in this respect, it was clearly harmless. Hence, defendant's assertion of cumulative prejudice must fail.

### K. *Other issues*

#### 1. *New trial motion*

Defendant moved for a new trial (§ 1181) on grounds, among others, that he had been prejudiced by numerous trial court errors and prosecutorial

missteps throughout the course of the guilt and penalty trials (*id.*, subd. 5). The motion included a "laundry list" of asserted erroneous rulings on defense motions and objections, and instances of prosecutorial misconduct, with no accompanying argument as to each individual claim. The trial court denied the motion.

On appeal, defendant urges the trial court thereby erred, violating his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. As below, he lists, in conclusory fashion, some 30 instances of alleged error and misconduct. Some have been raised as separate, substantive issues on appeal. Others have not, and as to those, defendant presents no argument as to why each cited instance was erroneous or improper.

" ' " 'The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears.' " ' " (*Staten, supra,* 24 Cal.4th 434, 466, quoting *People v. Cox* (1991) 53 Cal.3d 618, 694 [280 Cal.Rptr. 692, 809 P.2d 351].) Defendant fails to meet this test.

We have rejected all defendant's appellate claims of trial court error and misconduct, finding no basis therein, singly or cumulatively, for reversal of the guilt or penalty judgments. Accordingly, those claims, insofar as included in his new trial motion and arguments, form no grounds for disturbing the trial court's ruling. As to the others, claims raised perfunctorily may be rejected on that basis. (*Waidla, supra,* 22 Cal.4th 690, 736, fn. 15; *People v. Turner* (1994) 8 Cal.4th 137, 214, fn. 19 [32 Cal.Rptr.2d 762, 878 P.2d 521].) Defendant has shown no manifest and unmistakable abuse of discretion in the trial court's ruling. No basis for reversal appears.

### 2. *Alleged attorney conflict of interest*

Defendant argues his trial counsel had a conflict of interest that adversely affected their performance. The information bearing on this conflict, he asserts, was contained in the probation and sentencing report read by the judge at the combined posttrial hearing addressing sentencing and new trial issues. Accordingly, he insists, the trial court erred by failing, sua sponte, to appoint new counsel to argue his motion for new trial, and to grant a new trial because of the conflict.

We find defendant's claim unpersuasive. The pertinent facts are these:

In his guilt trial testimony, defendant stated under oath that, on July 19, 1988, the day after Luis Reyna died in his presence, he went with Celebration

Oberman to "[meet] with [his] attorney," with whom he "had some discussions," then went home and packed to leave. Under direct examination, he agreed that, as he had truthfully written to Oberman in his letter from jail of July 6, 1992, he decided to leave because (1) he thought that would stop the expected civil suits arising from the Mishell and Reyna cases, (2) he did not believe the police would allow him to remain free on bail, and (3) there had been death threats from Reyna's brothers. He also indicated he was then thinking about returning as soon as September or "when I was next scheduled to appear in court."

On May 20, 1993, following the guilt and penalty verdicts, a probation officer interviewed defendant for purposes of a sentencing report regarding the noncapital convictions. As cited by defendant, the report states the following: During his interview, defendant accused Oberman and Alexandra M. of lying, and claimed his attorneys had not fully discredited either witness though "there was clear ammunition to do so." Defendant then asked whether the officer "really wanted to hear what I feel were the mistakes made by my attorneys? What I feel should have been told the jury?" Defendant said he was willing to impart this information, because he believed it was important and should have been presented to the jury, but "your report to the court is probably not the place to have [it] brought out. It will come out at some later time appropriately." The officer responded that he was obliged to provide the court with all information he deemed relevant.

The report further indicates that, while recounting his version of the Mishell and Reyna episodes (apparently including information defendant thought was not sufficiently presented to the jury), defendant stated, as at trial, that he dismembered Reyna's body to delay its identification because "I needed time to confer with my [attorney] about what had happened." According to defendant, he did consult his attorney "as soon as he was able to see me."

At that meeting, which included Oberman and the attorney's investigator, defendant claimed, "I told all of them exactly what happened. *The advice that I was given by Tim [Rien]* [one of defendant's trial attorneys] *was that I should get out of the country as quickly as possible!* You see that's some of the information which the jury never was given. My attorney never tried to impeach Celebration Oberman when she testified that the first time she ever heard about Reyna's death was when I told her while we were lying on a beach in Mexico. All Rien had to do was to put his investigator on the stand but he refused because, I assume, he has ambitions to be a judge and he has to maintain a clean record as an attorney in order to achieve that!" (Italics added.)

After completing his account, defendant again broached the subject of omitting "these things" from the report. He said, "You see, this really isn't the time or the place to bring up these things. It would just complicate my relationship with my attorneys. I assume that they will need to assist me with my appeals." The report states that "[o]ur response to this admonishment was that [defendant] should never have uttered anything that he wanted kept confidential from the Court."

On September 8, 1993, the court held a combined hearing to address (1) defendant's pending motion for a new trial, (2) the pending motion for automatic modification of the death verdict, and (3) noncapital sentencing. At the outset, defendant was allowed to make a lengthy statement to the court. He reiterated his claim that there were lying witnesses at trial, conceding that "I was one. I misstated some truth during the trial." While blaming various components of the system for the unjust result in his case, defendant directed mixed praise and criticism at his own attorneys. However, even though he had been told the probation officer's report would include his claim that Attorney Rien had advised him to leave the country immediately, he said nothing on that subject.

After denying the new trial motion and the motion to modify the death verdict, the court announced it would pause to read, for the first time, the probation officer's report in order to undertake noncapital sentencing.[41] Having done so, the court did not comment on defendant's allegations against his attorney, as contained in the report. Neither did counsel for either side, though all had received advance copies. (§ 1203, subd. (b)(ii)(E); see *id.*, former subd. (b).) The court imposed noncapital sentences, pronounced judgment, and concluded the proceedings.

On appeal, defendant asserts the following: By advising defendant to commit the additional crime of interstate or foreign flight to escape murder charges (see 18 U.S.C. § 1073), Attorney Rien placed himself in a dilemma. Rien's trial duty to defendant required him to show that the true reason for defendant's flight was counsel's advice, not consciousness of guilt. Yet to do so would expose Rien's own violation of the Rules of Professional Conduct (see rule 3-210 [attorney shall not advise violation of any law except upon good faith belief that law is invalid]). The adverse affect of the conflict on counsel's performance requires reversal of the guilt and penalty judgments.

 "The right to effective assistance of counsel secured by the Sixth Amendment to the federal Constitution and article I, section 15 of the

---

[41] As the court indicated, it thereby adhered to the rule that the proper procedure is to defer reading the probation report until after ruling on the automatic motion to modify the death verdict. (*People v. Lewis* (1990) 50 Cal.3d 262, 287 [266 Cal.Rptr. 834, 786 P.2d 892]; *People v. Williams, supra,* 45 Cal.3d 1268, 1329–1330.)

California Constitution includes the right to representation free from conflicts of interest. [Citation.] . . . To establish a federal constitutional violation, a defendant who fails to object at trial must show that an actual conflict of interest 'adversely affected his lawyer's performance.' [Citations.] To show a violation of the corresponding right under our state Constitution, a defendant need only demonstrate a *potential* conflict, so long as the record supports an 'informed speculation' that the asserted conflict adversely affected counsel's performance. [Citations.]" (*Frye, supra,* 18 Cal.4th 894, 998.)

"When a trial court is aware, or should be aware, of a possible conflict of interest between a criminal defendant and defense counsel, the court is required to inquire into the circumstances of the possible conflict and take whatever action may be appropriate. [Citation.] A trial court's failure to carry out its duty to conduct such an inquiry, or to take action based on the results of its inquiry, denies the defendant the right to due process. [Citation.]" (*Frye, supra,* 18 Cal.4th 894, 999.)

We do not interpret these principles to mean that the court must inquire into every claim of conflict, however suspect and unfounded. In this instance, defendant's unsworn eleventh-hour assertion that his counsel advised him to engage in criminal flight was, in blunt terms, inherently incredible. During his extensive sworn testimony, which specifically included the subjects of his consultation with counsel and his reasons for fleeing, he did not mention it. Defendant's unsworn accusation against counsel was made only after the guilt and penalty verdicts had gone against him. And his statement to the probation officer was marked by inconsistency. On the one hand, he insisted that counsel's advice to flee was something the jury should have heard about. On the other hand, he proposed that this same information be omitted from the officer's report, because the time was not yet right to disclose it.

Though advised that his accusations would indeed be included in the report, defendant did not allude to them in his subsequent, lengthy allocution to the trial court—in which he addressed perceived flaws in his legal representation. In the course of his allocution, defendant admitted he was among the witnesses who had lied at trial. The trial court obviously agreed with this assessment. In denying the automatic motion to modify the death verdict, the court declared itself satisfied beyond reasonable doubt that, contrary to defendant's trial testimony, he had murdered Luis Reyna to prevent Reyna's testimony.

Under these circumstances, the trial court was not obliged to credit, investigate, or act upon, defendant's last-minute effort to blame his flight on his counsel, rather than on his own consciousness of guilt. No error occurred.

Even were we to credit defendant's claim, and to assume an actual or potential conflict of interest, defendant fails to raise an inference, or even a basis for informed speculation, that counsel's performance was adversely affected. In arguing otherwise, defendant suggests that evidence of counsel's advice, if presented, would have shown he did not flee for venal reasons of his own. But defendant has never said, on the stand or elsewhere, that counsel's advice was the reason he fled. And, as the People observe, such evidence might well have prejudiced the jurors by suggesting "that [defendant's] own counsel found [his] explanation [of the events surrounding Reyna's death] so incredible that he advised [defendant] to flee rather than present it to a jury." In sum, we find no basis for reversal.

### 3. Missing records

The reporters' notes of certain proceedings in this case were lost or destroyed. Defendant also points to various unreported conferences and discussions among court and counsel, extending from the time of defendant's arrest in the Mishell case through the guilt trial, and including the preliminary hearing. Defendant seeks a new trial on grounds these omissions denied him a record adequate for appellate review, in violation of his due process rights.

■ "An incomplete record is a violation of section 190.9, which requires that all proceedings in a capital case be conducted on the record with a reporter present and transcriptions prepared. (See also Cal. Rules of Court, [former] rule 39.51(a)(2) [see now rule 8.610].) Although section 190.9 is mandatory, a violation of its provisions does not require reversal of a conviction unless the defendant can show that 'the appellate record is not adequate to permit meaningful appellate review.' [Citation.]" (Frye, supra, 18 Cal.4th 894, 941; see also Seaton, supra, 26 Cal.4th 598, 699.) Moreover, irregularities in the preliminary hearing are no basis for reversal on appeal unless defendant can demonstrate a resulting unfairness in the subsequent trial. (See Crandell, supra, 46 Cal.3d 833, 855; Pompa-Ortiz, supra, 27 Cal.3d 519, 529–530.)

As we explain, defendant fails to meet these tests. At a record settlement conference on December 3, 1999, the prosecutor and lead defense trial counsel, Timothy Rien, agreed as to the inconsequential nature of most of these discussions, and the available record supports their recollections.[42] Even as to the remainder, the available record strongly suggests nothing

---

[42] Judge Golde, who had presided at trial, died in October 1998, and the 1999 record settlement proceeding was held before Judge Goodman. Defendant urges that Judge Golde's unavailability, and the fact that counsel's recollections were sometimes qualified by such words as "probably" and "believe," undermines the reliability of the settlement proceedings. For reasons we explain below, we are not persuaded.

affecting the validity of the judgment occurred. Thus, there is no basis to conclude the record is inadequate.

The reporter's notes of a number of 1988 municipal court proceedings relating solely to the Mishell assault case were destroyed. At the record settlement proceeding, both the prosecutor and Rien indicated they knew nothing of the content of these proceedings. Rien's predecessor, Attorney Schnayerson, who represented defendant at this early stage, had also professed no recall.

However, the clerk's transcript confirms, as the prosecutor suggested during record settlement, that the proceedings were routine, involving arraignment, bail, time waiver, defendant's motion for discovery, and substitution of counsel. Defendant demonstrates no realistic possibility of prejudice from events occurring during these proceedings.

The reporter's notes relating to a municipal court proceeding on December 7, 1989, were also lost. At the record settlement proceeding, counsel could not recall what occurred on that occasion. The pertinent docket entry indicates that a defense motion for discovery was granted in part, submitted in part, and continued for further proceedings on January 17, 1990. Defendant shows no realistic chance that anything warranting reversal took place during this proceeding.

Defendant cites nine unreported conferences or discussions during the preliminary hearing. At the record settlement conference, trial counsel essentially agreed that all these unreported matters involved scheduling or evidentiary issues peculiar to the preliminary hearing itself. The available record supports this determination. Defendant fails to show, and our careful review does not disclose, any realistic chance that any of these off-the-record discussions affected the fairness of his subsequent trial. (*Pompa-Ortiz, supra,* 27 Cal.3d 519, 529.)

Defendant next cites a number of allegedly unreported pretrial matters in the superior court. Both the record settlement conference and the available record indicate that these proceedings involved only the setting and continuation of the trial date. There is no hint of any controversy on this scheduling issue that might have affected defendant's rights. Hence, defendant does not show, and our careful review does not reveal, any realistic possibility defendant was prejudiced by the failure to place these oral proceedings on the record.[43]

---

[43] In one instance—an August 17, 1990, proceeding at which defendant's motion for dismissal under section 995 was heard and denied—the minute order erroneously describes the proceeding as unreported. At the record settlement proceeding, this was brought to the court's

Defendant claims prejudice from the failure to report a number of discussions and conferences during trial. In particular, he points to unreported discussions during jury voir dire, insinuating that they might pertain to the prosecutor's improper dismissal of African-American prospective jurors (see discussion, *ante*). The record does not bear out this speculation. Again, defendant demonstrates no realistic chance that any of these unreported matters had a bearing on the validity of the judgment. The cited instances are as follows:

On January 19, 1993, there was an unreported bench discussion during defense cocounsel Traback's voir dire of Prospective Juror Tracy H. At the record settlement proceeding, neither counsel recalled the exact content of this discussion. The record, however, makes clear that it had no ultimate importance. Immediately following the unreported conference, Traback said in open court that it concerned the scope of permissible voir dire of Tracy H. The parties later stipulated to Tracy H.'s excusal for reasons unconnected to her qualifications as a juror.

An unreported bench discussion occurred on January 25, 1993, during Traback's voir dire examination of Prospective Juror Cecilia M. At the record settlement proceeding, counsel agreed the discussion concerned the degree to which Traback could question Cecilia M. about the details of the case—a tactic the court had generally not been allowing. The record confirms this recollection. Cecilia M. had disclosed on her questionnaire that she might know something about the case. At the outset of Traback's examination on this subject, the court made clear it would carefully monitor counsel's questions. Cecilia M. indicated she remembered some aspects of the Mishell assaults, but nothing about Reyna's murder. Traback then asked to approach the bench. After an off-the-record discussion, he resumed his examination, but on a different subject. Without exhausting its peremptory challenges, the defense accepted Cecilia M. as a member of the regular jury. There is no indication anything in the unreported discussion would affect the validity of the judgment.

Later on January 25, 1993, an unreported discussion took place between defense counsel and the court just after the voir dire examination of Prospective Juror Robert M. had begun. At the record settlement proceeding, counsel did not recall the precise subject of the discussion, but suggested it must have involved an insignificant matter, such as scheduling, because the prosecutor was not asked to participate. There is no indication that the discussion,

---

attention. The court ordered a reporter's transcript to be prepared and included in the record, and this was done. Defendant also cites an unreported proceeding of February 2, 1993, but that proceeding did not pertain to him at all. At the record settlement proceeding, all trial counsel agreed it involved another person and case. The record confirms counsel's recollections.

whatever its subject, had any ultimate importance. Insofar as it concerned Robert M., it cannot have been material. As the result of subsequent voir dire examination in open court, he was excused for cause.

On January 27, 1993, there was an unreported discussion between the court and defense counsel early in the voir dire examination of Prospective Juror Tom N. At the record settlement proceeding, counsel agreed the discussion "probably" concerned scheduling or excuse of the juror, and was no doubt insignificant because the prosecutor was not invited to participate. The record does not disclose the purpose of the discussion, but there is no indication it was material. Insofar as it concerned Tom N., it cannot have been relevant. Though he survived a defense challenge for cause, he was not among the prospective jurors whose names were drawn to face peremptory challenges. Of course, he did not sit on the final jury.

On February 3, 1993, there was a bench conference among court and counsel during the voir dire examination of Prospective Juror Donald C. At the record settlement proceeding, counsel recalled that the prospective juror had just said he would always vote for death in a child homicide, and defense counsel approached the bench to determine whether he could explore that further. The record does not confirm counsel's precise recollection, but it does not matter. The off-the-record discussion occurred during examination of Donald C. about a newspaper article concerning a judge who had allowed child molesters to plea bargain. Donald C. said the article had upset him and showed the courts were too lenient. When, in open court, the trial judge disclosed he was the jurist described in the article, Donald C. conceded he might have difficulty following the court's instructions, and would prefer to be excused. By stipulation, he was.

On February 11, 1993, there was a bench conference among court and counsel during the voir dire of Prospective Juror David H. At the record settlement proceeding, the prosecutor indicated he "believe[d]" defense counsel wanted clarification whether he or the court should examine David H. in a "somewhat sensitive area." The record tends to confirm this recollection. After the bench discussion, which occurred at defense cocounsel Traback's request, Traback examined David H. about family organizational affiliations that David H. had deemed "private" on his questionnaire. Both parties accepted David H., and he sat on the final jury. Defendant did not exhaust his peremptory challenges. Hence, the discussion cannot have affected the validity of the judgment.

On March 4, 1993, Traback requested a bench conference at the conclusion of the voir dire examination of Prospective Juror Diane M. At the record settlement proceeding, the prosecutor indicated this discussion concerned a

stipulated dismissal of the juror, as indicated by the immediately following events on the record. The record confirms the recollection.

Defendant cites the following additional unreported proceedings during trial. Again, he fails to demonstrate any realistic possibility they were material to the validity of the judgment.

On March 10, 1993, court and counsel met "to discuss peremptory challenges." At the record settlement proceeding, the prosecutor indicated this concerned discussions about how the "big spin" (i.e., the county's random-draw procedure for calling qualified jurors into the box to face peremptory challenges) would work. Lead defense trial counsel Rien did not demur. The record does not contradict the prosecutor's recollection. Defense counsel, who were present at the discussion, posed no objection to the procedure actually employed to select a final jury. There is no basis to infer defendant was prejudiced by the failure to report this proceeding.

On Monday morning, March 15, 1993, the jurors, who had been selected the previous week but not yet sworn, were called into court and excused until the following Wednesday, apparently to allow argument and resolution, on the intervening Tuesday, of defendant's just-filed *Wheeler/Batson* motion. Then, in the course of discussions about how to use the remainder of Monday, defense counsel asked if they "could just have a moment." After a chambers conference among court and counsel, discussions resumed in open court about matters to be addressed at the afternoon session. The noon recess was then called. At the record settlement proceeding, the prosecutor indicated he "believe[d]" the unreported chambers conference concerned only scheduling. Lead defense trial counsel Rien agreed. Nothing in the record casts doubt on this mutual recollection.

On March 22, 1993, just before a videotape of the Mishell assault crime scene was to be played for the jury, defense counsel Traback asked to approach the bench briefly. After an unreported conference among court and counsel, the tape was played. At the record settlement proceeding, the prosecutor indicated he "believe[d]" the off-the-record discussion concerned how to arrange the courtroom so defendant could see the tape. Lead defense trial counsel Rien agreed. The record tends to confirm this mutual recollection. At the conclusion of the bench conference, defendant indicated he could see the videotape screen so long as it was not turned any further. No basis appears to infer the conference was material to the judgment.

On March 22, 1993, defense cocounsel Traback sought to cross-examine Inspector Muller of the Berkeley Police Department about a police report Muller had prepared in the Mishell assault case. Confusion arose about

whether there were two separate reports, both dated February 25, 1988. Traback requested a bench conference. After an off-the-record discussion among court and counsel, the cross-examination of Muller continued. At the record settlement proceeding, the prosecutor said he "believe[d]" the conference simply sought to ensure that the witness and counsel were all referring to the same report. Lead defense trial counsel Rien did not object. The record tends to confirm the prosecutor's recollection. There is no basis to believe the discussion was significant to the judgment.

On March 29, 1993, Detective Gustafson was on the stand. The prosecutor asked to have marked for identification two tape cassettes containing the recorded police statement given to Gustafson by Luis Reyna. This was done. Lead defense counsel Rien asked to approach the bench. After an unreported discussion among court and counsel, Detective Gustafson played the tapes for the jury. At the record settlement proceeding, the prosecutor recalled that the discussion concerned whether the tapes would be played before or after Gustafson's authenticating testimony. Rien agreed. Nothing in the record undermines this mutual recollection.

On April 1, 1993, Detective Stockle, a prosecution witness, testified he had inspected the engine compartment of defendant's pickup truck several days after the murder, and had noticed something unusual. When the prosecutor asked what Stockle noticed, Rien objected and asked to approach the bench. An unreported chambers discussion among court and counsel followed. Back in open court, Stockle testified he noticed that there was a new radiator hose, which was disconnected. He said he found the old radiator hose clamp in the driver's side fender area of the compartment, and that he also found cut hose ends in the back of the truck. At the record settlement proceeding, Rien recalled the chambers conference concerned whether Stockle could opine that tampering had occurred in the engine compartment. The prosecutor agreed with this recollection. Stockle did not give such an opinion. There is no indication the unreported conference affected the validity of the judgment.

On April 6, 1993, after all guilt phase prosecution witnesses had testified, and various prosecution exhibits had been moved into evidence, the court asked lead defense counsel Rien whether he had a motion to present. Rien indicated he had previously asked "in chambers" that prosecution witness Celebration Oberman be cautioned not to mention "the arrest in Mexico," "the jailing in Mexico, the name of this Court." The court responded that "[s]he adhered to" that admonition. As indicated by the prosecutor at the record settlement proceeding, the subject matter, and the result, of this chambers discussion thus were placed on the record.

On April 7, 1993, at the conclusion of Detective Muller's testimony for the defense, Rien asked to approach the bench. The court called a 10-minute

recess, and court and counsel retired to chambers. When proceedings in open court resumed, the next defense witness was called. At the record settlement proceeding, the prosecutor indicated, with respect to the chambers discussion, that "[t]hat is a scheduling matter." Rien did not disagree. The record gives no reason to doubt the prosecutor's recollection.

On April 15, 1993, court and counsel met "to discuss proposed jury instructions." At the record settlement proceeding, the prosecutor indicated he believed the court had placed the subject matter on the record at a later time. For the most part, the record supports this recollection. On April 19, 1993, the court stated that it had just submitted to counsel the instructions it proposed to give and asked if counsel had any objections. Objections, arguments, and rulings on the proposed instructions followed, including discussion of instructions proposed by the defense that the court did not intend to give. There is no basis to infer the unreported proceedings included additional matters of significance to the judgment.

We thus conclude defendant has failed to demonstrate that the record is inadequate for appellate review. No basis for reversal of the judgment is shown.

## DISPOSITION

The guilt and penalty judgments are affirmed.

George, C. J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

**KENNARD, J.,** Concurring and Dissenting.—At the guilt phase of defendant's capital trial, the jury found him guilty of the first degree murder of Luis Reyna, with a special circumstance finding that Reyna was killed to prevent him from testifying as a witness; the jury also found him guilty of the attempted murders of Robert and Barbara Mishell. I agree with the majority's affirmance of these convictions.

I disagree, however, with the majority's affirmance of defendant's sentence of death rendered at the penalty phase. In my view, the trial court erred in refusing defense counsel's request to ask prospective jurors if they would invariably impose the death penalty in a case involving dismemberment of the murder victim's body. A second error occurred when, in closing argument at the penalty phase, the prosecutor quoted passages from the Bible as authority for the death penalty. These errors prejudiced defendant, undermining confidence in the fairness of the penalty phase of defendant's capital trial. Therefore, I would reverse the judgment of death.

## I

Before trial, defense counsel asked the trial court to include in the jury questionnaire a statement to prospective jurors that the murder victim had been dismembered and a question asking them how it would affect their "philosophical view of the death penalty." Counsel expressed concern that the fact of the victim's dismemberment "might impel" a juror "to vote for death without regard to any other mitigating circumstances" that might be presented. The trial court denied the request. The court told defense counsel that it would "not permit" counsel "to go into any of the factual issues, including but not limit[ed] to the dismemberment." The court explained: "The only facts of the case that the jury will be permitted to know in voir dire" are those "in the information." The trial court's ruling thus made it clear that the court would not add to the juror questionnaire any questions about dismemberment and that it would not allow defense counsel to pursue such questions during voir dire. Defense counsel's voir dire of prospective jurors made no mention of dismemberment.

At the guilt phase, a parade of witnesses testified to the circumstances in which murder victim Luis Reyna's body parts were found, recovered, medically examined, and identified. Kelly Morrison described how, while taking a walk in a wooded area of Contra Costa County on July 18, 1988, he saw a human hand along the trail. Contra Costa Sheriff's Deputy Ricky Johnson recovered the hand and delivered it to the county coroner's office, where it was fingerprinted. Wayne Schultz, a reserve officer with the Berkeley Police Department, reported smelling "something dead" while on an early morning jog on July 24, 1988. Returning to the brush-covered area two days later during daylight hours, Schultz spotted something on the slope below the road, and through binoculars saw that it was a naked body. When Deputy Johnson recovered the body, it was missing its head and both hands. On July 29, 1988, Sergeant Dennis Burke of the Berkeley Police Department concluded that a print from the thumb on the severed left hand matched a latent thumbprint recovered from documents found among Reyna's possessions. Some eight months later, on March 17, 1989, James McDonald was hiking down a deer trail in the same area when he came upon a human skull lacking its lower jaw. The skull bore no traces of skin, flesh, or hair.

On July 27, 1988, before the skull was found, forensic pathologist Louis E. Daugherty conducted an autopsy of the body and of the recovered left hand. The wrists and head had been "completely cut" from the body, but Daugherty was able to match the recovered left hand to the left forearm of the body. Paul Hermann, a pathologist with the Alameda County Coroner's Office, testified that markings on the severed portion of the neck suggested that the head had been removed with a small saw. Rodger Heglar, a forensic

anthropologist who in August 1988 had examined portions of the murder victim's vertebra, testified that portions of the third vertebra exhibited incision marks "consistent with saw marks," and that similar markings appeared on the left forearm.

Defendant's own testimony at the guilt phase substantiated the findings of the expert witnesses. He admitted driving to the area with Reyna's dead body on the seat next to him and dismembering it to make identification more difficult. After an unsuccessful attempt with a hatchet, he took a hacksaw from his toolbox, and severed both of Reyna's hands at the wrists; he then held Reyna's head with his left hand and used his right hand to saw off the head.

## II

"A criminal defendant is entitled to a trial by jurors who are impartial and unbiased. (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 16.)" (*People v. Roldan* (2005) 35 Cal.4th 646, 689 [27 Cal.Rptr.3d 360, 110 P.3d 289].) To assure that impartiality, jury selection includes questioning of prospective jurors in a process called voir dire. "*Voir dire* plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored. Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." (*Rosales-Lopez v. United States* (1981) 451 U.S. 182, 188 [68 L.Ed.2d 22, 101 S.Ct. 1629].)

"The due process clause of the Fourteenth Amendment requires the sentencing jury in a capital case to be impartial to the same extent required at the guilt phase." (*People v. Blair* (2005) 36 Cal.4th 686, 741 [31 Cal.Rptr.3d 485, 115 P.3d 1145].) In a capital case, a prospective juror who "would invariably vote either for or against the death penalty because of one or more circumstances likely to be present in the case being tried, without regard to the strength of aggravating and mitigating circumstances," is not impartial and must be excused for cause. (*People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1005 [30 Cal.Rptr.2d 818, 874 P.2d 248]; accord, *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 46–47 [17 Cal.Rptr.3d 710, 96 P.3d 30]; *People v. Cash* (2002) 28 Cal.4th 703, 719–720 [122 Cal.Rptr.2d 545, 50 P.3d 332]; *People v. Ervin* (2000) 22 Cal.4th 48, 70 [91 Cal.Rptr.2d 623, 990 P.2d 506]; *People v. Earp* (1999) 20 Cal.4th 826, 853 [85 Cal.Rptr.2d 857, 978 P.2d 15].) To determine during voir dire whether prospective jurors are impartial in this sense, "either party is entitled to ask prospective jurors questions that are specific enough to determine if those jurors harbor bias, as to some fact or circumstance shown by the trial evidence, that would cause

them not to follow an instruction directing them to determine a penalty after considering aggravating and mitigating evidence." (*People v. Cash, supra,* at pp. 720–721.)

Here, the murder victim's dismemberment by defendant was "a general fact or circumstance" likely to elicit a strong emotional response from the jurors. (*People v. Cash, supra,* 28 Cal.4th at p. 721.) Before trial, defense counsel asked the trial court to include in the jury questionnaire a statement telling prospective jurors that the murder victim had been dismembered and a question asking them how it would affect their "philosophical view of the death penalty." Voir dire at the outset of trial would have revealed whether this "general fact or circumstance" would cause any juror to invariably vote for the death penalty, without considering mitigating evidence presented by defendant.

The majority insists that the dismemberment of the victim's body was not a circumstance "that could cause a *reasonable* juror . . . *invariably* to vote for death, regardless of the strength of the mitigating evidence." (Maj. opn., *ante,* at p. 1122.) I disagree. The fact of dismemberment may be of great significance to a prospective juror. Undoubtedly, there are prospective jurors who consider the integrity of the body of a deceased person to be extremely important. The history of torts is rife with lawsuits brought by relatives alleging mishandling of the bodies of their loved ones. (See, e.g., *Christensen v. Superior Court* (1991) 54 Cal.3d 868 [2 Cal.Rptr.2d 79, 820 P.2d 181]; *Conroy v. Regents of University of California* (2007) 151 Cal.App.4th 132 [59 Cal.Rptr.3d 661]; *Aguirre-Alvarez v. Regents of University of California* (1998) 67 Cal.App.4th 1058 [79 Cal.Rptr.2d 580]; *Saari v. Jongordon Corp.* (1992) 5 Cal.App.4th 797 [7 Cal.Rptr.2d 82]; *Cohen v. Groman Mortuary, Inc.* (1964) 231 Cal.App.2d 1 [41 Cal.Rptr. 481].) Thus, the trial court here erred in not permitting defense counsel to ask the prospective jurors whether the murder victim's dismemberment would affect their views on the choice of penalty.

Relying on *People v. Roldan, supra,* 35 Cal.4th 646, the majority asserts the trial court's ruling was within its discretion. *Roldan* is not on point. As *Roldan* observed, the defense in that case failed to identify what topics it wanted explored in the trial court's supplemental questioning of prospective jurors. (*Id.* at p. 693.) Moreover, the murder in that case occurred during an armed robbery (*id.* at p. 664), and neither the circumstances nor the manner of killing were markedly different from those committed during other armed robberies.

The majority here, noting that the parties disagreed about the circumstances surrounding the dismemberment of Reyna's body, reasons that if the

trial court had permitted the defense to question prospective jurors about the fact of dismemberment, "the prosecutor could strongly argue he should be permitted to explore in more detail how prospective jurors might react to *all* the anticipated evidence on that issue," which "could have led to a lengthy examination of prospective jurors about specific details of the case." (Maj. opn., *ante*, at p. 1123.) Not at all. Defense counsel here sought only to explore juror attitudes toward the subject of dismemberment in general. There was no need to mention the factual details about when, where, and how this dismemberment occurred.

Because the trial court refused defense counsel's request to question the prospective jurors about their views on dismemberment, the record does not reveal whether any of the individuals who wound up serving on the jury in this case "held the disqualifying view that the death penalty should be imposed invariably and automatically" on a defendant who had dismembered his victim's body. (*People v. Cash, supra,* 28 Cal.4th at p. 723.) Therefore the error cannot be discounted as harmless, and reversal of the judgment of death is compelled. (*Morgan v. Illinois* (1992) 504 U.S. 719, 739 [119 L.Ed.2d 492, 112 S.Ct. 2222]; *People v. Cash, supra,* at p. 723.)

### III

In closing argument at the penalty phase, the prosecutor cited the Bible as authorizing capital punishment. He told the jury: "The commandment to put murderers to death is universal." And he quoted Genesis chapter 9, verse 6: "[W]hoever sheds the blood of man, by man shall his blood be shed, for in his image did God make man." The prosecutor then summarized two concepts he perceived in that verse: "[F]irst is that capital punishment for murderers is necessary to preserve the sanctity of human life, and second being it is *man's obligation* to do it." (Italics added.) Thus, he argued, "[o]nly the severest of punishments can underscore the severity of taking a life," and imposing "any lesser penalty means that the taking of life is not that serious an offense." In the prosecutor's view, the biblical text quoted meant that "[p]reserving the life of a murderer compromises the value of life," a point he said was reiterated in these two other biblical passages: "He who fatally strikes a man shall be put to death" (Exodus 21:12), and "[y]ou shall not make reparations for the soul of a murderer who deserves to die, and he shall be put to death" (Numbers 35:31). (See *People v. Samuels* (2005) 36 Cal.4th 96, 133, fn. 6 [30 Cal.Rptr.3d 105, 113 P.3d 1125] [same biblical passages cited in argument].) In essence, the prosecutor here argued to the penalty phase jurors that the Bible not only authorized but required them to return a verdict against defendant at the penalty phase of death. A lesser sentence, he asserted, was to shirk their obligation and cheapen the value of human life.

A prosecutor's argument to the jury that the Bible authorizes or demands the death penalty for murder creates the risk that " 'such argument may "diminish the jury's sense of responsibility for its verdict and . . . imply that another, higher law should be applied in capital cases, displacing the law in the court's instructions." ' " (*People v. Hughes* (2002) 27 Cal.4th 287, 389 [116 Cal.Rptr.2d 401, 39 P.3d 432]; see also *People v. Wash* (1993) 6 Cal.4th 215, 261 [24 Cal.Rptr.2d 421, 861 P.2d 1107]; *People v. Samuels, supra,* 36 Cal.4th at p. 134; *People v. Slaughter* (2002) 27 Cal.4th 1187, 1226 [120 Cal.Rptr.2d 477, 47 P.3d 262] (dis. opn. of Kennard, J.).)

Because defense counsel here did not object to the prosecutor's argument, defendant has forfeited the right to claim that the prosecutor's comments were misconduct. But counsel's failure to object violated defendant's constitutional right to the effective assistance of counsel. Defense counsel may have decided not to object because he intended to reply to the prosecutor's argument with a biblical argument of his own; however, that is not a legitimate tactical purpose for failing to object. As I explained in a previous dissenting opinion: "[I]t is improper to answer one impermissible argument not based on the facts or the law applicable to the case with another impermissible argument not based on the facts or the law applicable to the case. A religious argument against the death penalty is no more acceptable at the penalty phase of a capital case than a religious argument in favor of the death penalty. . . . It follows that defense counsel's decision to respond to the prosecutor's religious argument by relying on opposing religious authority cannot be considered a legitimate tactical choice that would excuse his failure to object to the prosecutor's impermissible religious argument." (*People v. Wash, supra,* 6 Cal.4th at p. 283 (conc. & dis. opn of Kennard, J.), citations omitted; see also *People v. Slaughter, supra,* 27 Cal.4th at p. 1227 (conc. & dis. opn. of Kennard, J.).)

Here, the prosecutor's appeal to biblical authority invited the penalty phase jurors to disregard their duty to follow the trial court's instructions to weigh the mitigating and aggravating evidence in deciding penalty, whether death or life without parole. Accordingly, the prosecutor's improper biblical argument may well have permitted one or more jurors to overlook the defense evidence in mitigation, causing the juror or jurors to vote for death without weighing that mitigating evidence against the prosecution's evidence in aggravation. Thus, the prosecutor's improper reliance on biblical authority prejudiced defendant.

I would reverse the judgment of death in light of the two prejudicial errors: the one just discussed, and the other pertaining to defense counsel's request to question prospective jurors about their attitudes toward dismemberment of the murder victim's body.